KLEVANSKY PIPER, LLP
A Limited Liability Law Partnership

SIMON KLEVANSKY            3217-0
ALIKA L. PIPER             6949-0
CARISA LIMA KA'ALA DUFFY   7372-0
841 Bishop Street, Suite 1707
Honolulu, Hawaii 96813
Telephone:  (808) 536-0200
Facsimile:   (808) 237-5759
E-Mail: sklevansky@kplawhawaii.com
        apiper@kplawhawaii.com
        kduffy@kplawhawaii.com

Attorneys for Trustee Dane S. Field

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>ROLLOFFS HAWAII, LLC,<br><br>Debtor. | Case No. 16-01294<br>(Chapter 7) |
| DANE S. FIELD, Chapter 7 Trustee for the Estate of Rolloffs Hawaii, LLC<br><br>Plaintiff,<br><br>v.<br><br>TRASHMASTERS, LLC; CORRIDOR CAPITAL LLC; CORRIDOR CAPITAL ADVISORS, LLC; CORRIDOR TRASHMASTERS, L.P.; SPB MANAGEMENT, LLC; SPB WASTE, LLC; SPB CAPITAL GP, | Adversary Proceeding No. 18-90035<br><br>**FIRST AMENDED COMPLAINT; EXHIBITS "1" through "46"** |

116767_9.docx

LLC; SPB CAPITAL PARTNERS, L.P.; SPB PARTNERS, LLC; CRAIG ENENSTEIN; L. GEOFFREY GREULICH; EDWARD A. MONNIER; JESSAMYN DAVIS; ARI D. BASS; SCOTT R. BULLOCH; KENNETH M. PRESSBERG; KRISTIAN GOURLAY; DOUGLAS L. ASAY; DOUGLAS D. ASAY; CHARLES E. LEONARD; BRIAN COLBECK [ESTATE OF BRIAN COLBECK]; ROLLOFFS HAWAII, INC.; THE KNG GROUP, LLC; COLBECK CONSULTING LLC; JOHN DOES 1-50; JANE DOES 1-50; DOE CORPORATIONS 1-50; DOE PARTNERSHIPS 1-50; DOE ENTITIES 1-50,

Defendants.

# FIRST AMENDED COMPLAINT

[This space is intentionally left blank.]

# TABLE OF CONTENTS

Page

I.    PARTIES ................................................................. 1

      A.    Corridor Private Equity Enterprise ........................... 1

      B.    SPB Private Equity Enterprise ................................ 3

      C.    The Debtor's and TrashMasters' Management Team ............. 6

      D.    Other Defendants ............................................ 16

II.   JURISDICTION AND VENUE ....................................... 17

III.  BACKGROUND ...................................................... 18

      A.    Fraudulent Scheme ........................................... 19

      B.    TrashMasters, the Debtor's Manager and Parent
            Company .................................................... 25

      C.    TrashMasters' Members ....................................... 27

      D.    TrashMasters' ROHI Asset Acquisition ....................... 28

      E.    TrashMasters' Maricopa Asset Acquisition ................... 30

      F.    Union Bank Financing of TrashMasters' ROHI and
            Maricopa Asset Acquisitions ($500k LOC and $4.5M
            Term Loan) ................................................. 31

      G.    Advisory Agreement with Corridor Capital and SPB
            Management ................................................. 35

      H.    Advisory Fees Paid to Corridor Capital and SPB
            Management ................................................. 36

I.     Contribution Agreement (ROHI and Maricopa Assets) ......... 39

J.     TrashMasters' KNG Asset Acquisition ................................ 40

K.    Contribution Agreement (KNG Assets) ................................ 41

L.     The Debtor's Default on the Union Bank Credit Facility ....... 42

M.   ASB 2012 Credit Agreement ($1M LOC and $4.3M Term Loan) ................................................................... 44

N.    2012 Convergent Mezzanine Loan ($2.5M Hard Money Loan) ................................................................................ 46

O.    Lincoln International ................................................. 49

P.     Brian Colbeck ........................................................... 50

Q.    ASB 2015 Refinance ($5.5.M Term Loan) ........................... 51

IV.   DEBTOR'S INSOLVENCY ................................................. 53

V.    DEBTOR'S BANKRUPTCY ................................................ 55

VI.   UNSECURED CREDITORS ................................................ 55

VII.  CLAIMS ........................................................................ 57

COUNT 1    Fraudulent Conveyance (2009 UB Credit Facility) ............................................................. 57

COUNT 2    Fraudulent Transfer (2009 UB Credit Facility) ............................................................. 64

COUNT 3    Fraudulent Transfer (2009 UB Credit Facility) ............................................................. 66

COUNT 4    Fraudulent Transfer (2009 UB Credit Facility) ............................................................. 68

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 71   Filed  07/31/19   Page 4 of 173

COUNT 5    Fraudulent Conveyance (2009 Payments to ROHI) ................................................. 71

COUNT 6    Fraudulent Transfer (2009 Payments to ROHI) ................................................. 76

COUNT 7    Fraudulent Transfer (2009 Payments to ROHI) ................................................. 77

COUNT 8    Fraudulent Transfer (2009 Payments to ROHI) ................................................. 79

COUNT 9    Fraudulent Conveyance (Advisory Agreement) ................................................. 80

COUNT 10   Fraudulent Transfer (Advisory Agreement) ................................................. 88

COUNT 11   Fraudulent Transfer (Advisory Agreement) ................................................. 89

COUNT 12   Fraudulent Transfer (Advisory Agreement) ................................................. 91

COUNT 13   Fraudulent Conveyance (Corridor Capital Advisory Fees) ................................................. 92

COUNT 14   Fraudulent Transfer (Corridor Capital Advisory Fees) ................................................. 97

COUNT 15   Fraudulent Transfer (Corridor Capital Advisory Fees) ................................................. 98

COUNT 16   Fraudulent Transfer (Corridor Capital Advisory Fees) ................................................. 99

COUNT 17   Fraudulent Conveyance (SPB Advisory Fees) ................................................. 101

COUNT 18   Fraudulent Transfer (SPB Advisory Fees) ...... 104

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 71   Filed  07/31/19   Page 5 of 173

COUNT 19     Fraudulent Transfer (SPB Advisory Fees) ....... 105

COUNT 20     Fraudulent Transfer (SPB Advisory Fees) ...... 106

COUNT 21     Fraudulent Conveyance (ROHI Payoff -
             $752,448-96) .................................... 108

COUNT 22     Fraudulent Transfer (ROHI Payoff -
             $752,448-96) .................................... 110

COUNT 23     Fraudulent Transfer (ROHI Payoff -
             $752,448-96) .................................... 111

COUNT 24     Fraudulent Transfer (ROHI Payoff -
             $752,448-96) .................................... 113

COUNT 25     Fraudulent Conveyance (KNG Guaranty) ....... 114

COUNT 26     Fraudulent Transfer (KNG Guaranty) ............. 116

COUNT 27     Fraudulent Transfer (KNG Guaranty) ............. 118

COUNT 28     Fraudulent Transfer (KNG Guaranty) ............. 119

COUNT 29     Fraudulent Conveyance (KNG Payoff -
             $1,525,127.49) .................................... 120

COUNT 30     Fraudulent Transfer (KNG Payoff -
             $1,525,127.49) .................................... 123

COUNT 31     Fraudulent Transfer (KNG Payoff -
             $1,525,127.49) .................................... 124

COUNT 32     Fraudulent Transfer (KNG Payoff -
             $1,525,127.49) .................................... 126

COUNT 33     Fraudulent Transfer (Colbeck Payments) ........ 127

COUNT 34     Civil Conspiracy to Commit Fraudulent
             Conveyances .................................... 129

COUNT 35    Civil Conspiracy to Commit Fraudulent
            Transfers ............................................    134

COUNT 36    Breach of Fiduciary  Duty - Fraudulent
            Conveyances and Transfers  ...........................    140

COUNT 37    Breach of Duty of Loyalty  ..............................    145

COUNT 38    Breach of Duty of Care  ...................................    148

COUNT 39    Civil  Conspiracy  to  Breach  Fiduciary
            Duties  ...............................................    150

COUNT 40    Aiding  and  Abetting  Breach  of  Fiduciary
            Duties  ...............................................    151

COUNT 41    Alter Ego  ...........................................    153

COUNT 42    Single Enterprise  ...................................    155

COUNT 43    Unjust Enrichment  ...................................    156

VIII.   PRAYER FOR RELIEF  ...................................    157

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 71   Filed  07/31/19   Page 7 of 173

<u>**FIRST AMENDED COMPLAINT**</u>

Plaintiff DANE S. FIELD ("<u>Plaintiff</u>"), by and through his attorneys of record, herein complains against the defendants named herein as follows:

**I.      PARTIES**

1.      Plaintiff was the duly appointed Chapter 11 Trustee and is also now the duly appointed Chapter 7 trustee in the case <u>In re Rolloffs Hawaii, LLC</u>, Case No. 16-01294, commenced by Debtor Rolloffs Hawaii, LLC (the "<u>Debtor</u>") on December 9, 2016 (the "<u>Petition Date</u>").

2.      The Debtor is a Hawaii limited liability company.

3.      Upon information and belief, Defendant TrashMasters, LLC (<u>TrashMasters</u>) is a Delaware limited liability company that is the sole member of the Debtor and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

**A.      Corridor Private Equity Enterprise**

4.      Upon information and belief, Defendant Corridor Capital, LLC ("<u>Corridor Capital</u>") is a Delaware limited liability company that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

5.      Upon information and belief, Defendant Corridor Capital Advisors, LLC ("<u>Corridor Advisors</u>") is a Delaware limited liability company that

has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

6. Upon information and belief, Defendant Corridor TrashMasters, L.P. ("Corridor TM") is a Delaware limited partnership that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

7. Upon information and belief, Corridor Advisors is the general partner of Corridor TM.

8. Upon information and belief, Corridor Capital is the management company of Corridor TM.

9. Collectively, Corridor Capital, Corridor Advisors and Corridor TM are referred to herein as the "Corridor Entities".

10. Corridor Capital and Corridor Advisors are parent, sister, and/or related companies of each other and Corridor TM.

11. The Corridor Entities operated as single enterprise ("Corridor Enterprise") formed for private equity firm investment purposes, including investment in TrashMasters and the Debtor through Corridor TM.

12. Upon information and belief, the various Corridor Entities had the same, or an overlap of substantially the same managers, officers, and directors who managed, controlled and operated the Corridor Enterprise.

13.    The Corridor Enterprise, through the Corridor Officers and Directors ("Corridor O/Ds"), managed and controlled TrashMasters and the Debtor.

14.    The Corridor Enterprise owned and controlled TrashMasters and the Debtor via Corridor TM, the TrashMasters' Operating Agreement[1], the "Advisory Agreement" (as defined hereinafter), and certain of the Corridor O/Ds holding manager, officer, and/or director positions in both TrashMasters and the Debtor.

15.    To the extent claims are made against the Corridor O/Ds, said claims are intended to be made against the managers, officers, and directors serving in said capacity during the periods relevant to each Count made herein, and any other managers, officers and directors that may be later identified.

**B.    SPB Private Equity Enterprise**

16.    Upon information and belief, Defendant SPB Management, LLC ("SPB Management") is a Nevada limited liability company that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

---

[1]    The TrashMasters' Operating Agreement means and refers to that certain TrashMasters, LLC Amended & Restated Limited Liability Company Agreement, dated May 1, 2009, together with all subsequent amendments thereto.

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 71   Filed  07/31/19   Page 10 of 173

17.     Upon information and belief, Defendant SPB Waste, LLC ("SPB Waste") is a single purpose Nevada limited liability company that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

18.     Upon information and belief, Defendant SPB Capital GP, LLC ("SPB Capital GP") is a Delaware limited liability company that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

19.     Upon information and belief, Defendant SPB Capital Partners, L.P. ("SPB Capital Partners") is a Delaware limited partnership that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

20.     Upon information and belief, SPB Capital Partners is the sole member of SPB Waste and is a private equity fund.

21.     Upon information and belief, Defendant SPB Partners, LLC ("SPB Partners") is a Nevada limited liability company that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

22.     Collectively, SPB Management, SPB Waste, SPB Capital GP, LLC, SPB Capital Partners, and SPB Partners are referred to herein as the "SPB Entities".

23.     SPB Management, SPB Capital GP, SPB Capital Partners and SPB Partners are parent, sister, and/or related companies of each other and/or SPB Waste.

24.     SPB Capital GP is the sole general partner of SPB Capital Partners.

25.     The SPB Entities operated a single enterprise ("SPB Enterprise") formed for private equity firm investment purposes, including investment in TrashMasters and the Debtor through SPB Waste.

26.     The various SPB Entities had the same, or an overlap of substantially the same managers, officers, and directors that managed, controlled and operated the SPB Enterprise, all of which acted in those capacities during the relevant periods set forth herein.

27.     The SPB Enterprise, through the SPB Officers and Directors ("SPB O/Ds") managed and controlled TrashMasters and the Debtor.

28.     The SPB Enterprise owned, managed and controlled TrashMasters and the Debtor via SPB Waste, the TrashMasters' Operating

Agreement, the "Advisory Agreement", and certain of the SPB O/Ds holding manager, officer, and/or director positions in both TrashMasters and the Debtor.

## C. The Debtor's and TrashMasters' Management Team

29. To the extent certain officers and directors of the Debtor and TrashMasters were replaced from time to time, the claims made herein are intended to be made as against those various Defendants that served as managers, officers, and/or directors of the Debtor and/or TrashMasters during the relevant time periods as set forth below, and as may be determined in further discovery.

30. Upon information and belief, at all relevant times, Defendant Craig Enenstein ("Mr. Enenstein") individually, and on behalf of one or more Corridor Entities, was a manager, officer and/or director of the Debtor and/or TrashMasters, attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

31. In particular, upon information and belief, at all relevant times, Mr. Enenstein was/is the manager of Corridor Capital Advisors, LLC, the general partner to Corridor TM, and the chief executive officer and manager of Corridor Capital.

32. Upon information and belief, at all relevant times, Mr. Enenstein led the Corridor team which manages and controls the Corridor Entities.

33.     Upon information and belief, during the approximate period 2013-2017, Defendant L. Geoffrey Greulich ("Mr. Greulich") individually, and on behalf of one or more Corridor Entities, was a manager, officer and/or director of the Debtor and/or TrashMasters, and attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

34.     In particular, upon information and belief, Mr. Greulich is the manager and director of operations of Corridor Capital.

35.     Upon information and belief, during the approximate period 2009-2013, Defendant Edward A. Monnier ("Mr. Monnier") individually, and on behalf of one or more Corridor Entities, was a manager, officer, and/or director of the Debtor and/or TrashMasters, the Chairman of TrashMasters, and attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

36.     In particular, upon information and belief, Mr. Monnier was the managing director of Corridor Capital during the approximate period 2005-2013.

37.     Upon information and belief, during the approximate period 2012-2015, Defendant Jessamyn Davis ("Ms. Davis") individually, and on behalf of one or more Corridor Entities, served as a manager, officer, and/or director of the Debtor and/or TrashMasters, and attended board meetings and other company

meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

38.     In particular, upon information and belief, Ms. Davis was the vice-president and chief financial officer of Corridor Capital during the approximate period 2012-2015.

39.     Mr. Enenstein, Mr. Greulich, Mr. Monnier, and Ms. Davis are or were at one time managers, officers, directors and/or principals of the Corridor Entities and are collectively referred to herein as the "Corridor O/Ds".

40.     Upon information and belief, at all relevant times, Defendant Ari D. Bass ("Mr. Bass") individually, and on behalf of one or more SPB Entities, was a manager, officer, and/or director and Chairman of the Audit Committee of the Debtor and/or TrashMasters, attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

41.     Upon information and belief, at all relevant times, Mr. Bass was/is also a principal of SPB Capital GP, the sole general partner of SPB Capital Partners, and a manager of SPB Partners, SPB Management and SPB Waste.

42.     Upon information and belief, at all relevant times Defendant Scott R. Bulloch ("Mr. Bulloch") individually, and on behalf of one or more SPB Entities, was a manager, officer, and/or director and the Tax Matter Partner of the

Debtor and/or TrashMasters, attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

43.     In particular, upon information and belief, at all relevant times, Mr. Bulloch was/is a principal and chief financial officer and/or chief operating officers of SPB Partners.

44.     Upon information and belief, at all relevant times, Defendant Kenneth M. Pressberg ("Mr. Pressberg") individually, and on behalf of one or more SPB Entities, was a manager, officer, and/or director of the Debtor and/or TrashMasters, attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

45.     In particular, upon information and belief, at all relevant times, Mr. Pressberg was/is a cofounder and managing principal of SPB Partners and a manager of SPB Partners, SPB Management and SPB Waste, SPB Capital GP, and SPB Capital Partners.

46.     Mr. Bass, Mr. Bulloch, and Mr. Pressberg are or were at one time or another officers, directors, and/or principals of the SPB Entities, and are collectively referred to herein as the "SPB O/Ds".

47.     The SPB O/Ds own, manage, and control the SPB Entities, and upon information and belief, have invested their own funds into the SPB Enterprise, and in particular SPB Capital Partners.

48.     Upon information and belief, during the approximate period August 2010-March 2013, Kristian Gourlay ("Mr. Gourlay") was a principal of The KNG Group, LLC, and a director of the Debtor and/or TrashMasters, attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

49.     In particular, during the approximate period August 2010-March 2013, pursuant to that certain Employment Agreement with the Debtor, Mr. Gourlay served as the Vice-President and General Manager, Hawaiian Operations, of the Debtor.

50.     A true and correct copy of the Employment Agreement between the Debtor and Mr. Gourlay is attached as Exhibit "1".

51.     Beginning August 2009, Mr. Gourlay also served as a director of TrashMasters.

52.     Upon information and belief, Douglas D. Asay ("Mr. Asay, Sr.") was as an officer and/or director of the Debtor and/or TrashMasters, attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

53.    In particular, during the approximate period May 1, 2009 through August 20, 2010, Mr. Asay, Sr. served as President and Chief Operations Officer of TrashMasters, and assisted with the management of the operations of TrashMasters and its subsidiaries, including the Debtor.

54.    A true and correct copy of that certain Employment Agreement, dated May 1, 2009, between Mr. Asay, Sr. and TrashMasters is attached as Exhibit "2".

55.    Mr. Asay, Sr.'s employment ended on August 20, 2010.

56.    A true and correct copy of that certain Severance Agreement and General Release, dated November 1, 2010, between Mr. Asay, Sr. and TrashMasters is attached as Exhibit "3".

57.    Beginning May 1, 2009, and at all relevant times herein, Mr. Asay, Sr. was an equity holder of TrashMasters.

58.    Upon information and belief, Douglas L. Asay ("Mr. Asay, Jr."), was an officer and/or director of the Debtor and/or TrashMasters, attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

59.    In particular, beginning May 1, 2009, pursuant to that certain Employment Agreement, dated May 1, 2009, Mr. Asay, Jr. served as Vice President of Operations and Maintenance for TrashMasters, and assisted with the

management of the operations of TrashMasters and its subsidiaries, including the Debtor.

60.     A true and correct copy of the Employment Agreement, dated May 1, 2009, between TrashMasters and Mr. Asay, Jr. is attached as <u>Exhibit "4"</u>.

61.     Thereafter, pursuant to that certain Amended & Restated Employment Agreement, dated October 1, 2012, between TrashMasters and Mr. Asay, Jr., Mr. Asay, Jr. served as President and Chief Operations Officers of TrashMasters, and assisted with the management of the operations of TrashMasters and its subsidiaries, including the Debtor.

62.     A true and correct copy of that certain Amended & Restated Employment Agreement, dated October 1, 2012 is attached as <u>Exhibit "5"</u>.

63.     During the period May 1, 2014 thru July 6, 2016, when Mr. Asay, Jr.'s employment was terminated, pursuant to that certain Retention Agreement, Mr. Asay, Jr. continued to serve as President and Chief Operations Officer of TrashMasters and assisted with the management of the operations of TrashMasters and its subsidiaries, including the Debtor.

64.     A true and correct copy of the Retention Agreement, dated May 1, 2014, between TrashMasters and Mr. Asay, Jr. is attached as <u>Exhibit "6"</u>.

65. A true and correct copy of the Severance Agreement and Full Release, between TrashMasters and Mr. Asay, Jr., executed on July 1, 2016, is attached as Exhibit "7".

66. Beginning May 1, 2009, and at all relevant times herein, Mr. Asay, Jr. was an equity holder of TrashMasters.

67. Charles E. Leonard (Mr. Leonard") was an officer of TrashMasters, and upon information and belief an officer and/or director of the Debtor, attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

68. In particular, during the period January 1, 2010 to January 31, 2011, pursuant to that certain Employment Agreement, dated January 1, 2010, between TrashMasters and Mr. Leonard, Mr. Leonard was employed by TrashMasters to serve as President and Chief Operating Officer of TrashMasters, and to assist with the management of the operations of TrashMasters and its subsidiaries, including the Debtor.

69. A true and correct copy of the Employment Agreement, dated January 1, 2010, between TrashMasters and Mr. Leonard is attached as Exhibit "8".

70.     During the period February 1, 2011 through October 1, 2012, (the date Mr. Leonard's employment was terminated), Mr. Leonard was employed by TrashMasters to serve as Chief Executive Officer and to assist with the management and operations of TrashMasters and its subsidiaries, including the Debtor.

71.     A true and correct copy of that certain Amended & Restated Employment Agreement, dated February 1, 2011, between TrashMasters and Mr. Leonard is attached as Exhibit "9".

72.     A true and correct copy of that certain Severance Agreement and General Release, dated September 30, 2012, is attached as Exhibit "10".

73.     Mr. Leonard later returned in or about June 20, 2016 as Interim Chief Executive Officer with the responsibility of managing the day-to-day operations of the Debtor, and closing the anticipated sale of the Debtor.

74.     A true and correct copy of that certain letter agreement, dated June 6, 2016, which sets forth the terms and conditions of Mr. Leonard's employment is attached as Exhibit "11".

75.     Upon information and belief, Brian Colbeck ("Mr. Colbeck") was an officer of TrashMasters, attended board meetings and other company meetings, and conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

76.     Upon information and belief, Mr. Colbeck passed away in May of 2019.   Any allegations set forth herein against Mr. Colbeck and Colbeck Consulting LLC are intended to also be made against Mr. Colbeck's estate.

77.     In particular, beginning July 30, 2014, pursuant to that certain Consulting Agreement between TrashMasters and Mr. Colbeck, Mr. Colbeck was employed by TrashMasters to serve as interim Chief Operating Officer of TrashMasters primarily responsible for TrashMasters' financial performance and driving the process of preparing TrashMasters for sale.

78.     A true and correct copy of the Consulting Agreement, dated July 30, 2014, between TrashMasters and Mr. Colbeck is attached as Exhibit "12".

79.     Mr. Enenstein, Mr. Greulich, Mr. Monnier, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Gourlay, Mr. Asay, Sr., Mr. Leonard, Mr. Asay, Jr., Mr. Colbeck, and any manager, officer and/or director that may be identified in discovery, were at one time or another managers, officers and/or directors (or *de facto* managers, officers, and/or directors) of TrashMasters and are collectively referred to herein as the "TrashMasters O/Ds".

80.     Mr. Gourlay, Mr. Asay, Sr., Mr. Asay, Jr., Mr. Leonard, Mr. Monnier, Mr. Enenstein, Ms. Davis, and any manager, officer, and/or director that may be identified in discovery, were at one time or another managers, officers

and/or directors (or *de facto* managers, officers or directors) of the Debtor and are collectively referred to herein as the "Debtor O/Ds".

**D.    Other Defendants**

81.    Upon information and belief, Defendant Rolloffs Hawaii, Inc. ("ROHI") is a Hawaii corporation that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

82.    Upon information and belief, Defendant The KNG Group, LLC ("KNG") is a Hawaii limited liability company that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

83.    Upon information and belief, Defendant Colbeck Consulting LLC ("Colbeck Consulting") is a California limited liability company that has conducted transactions in the State of Hawaii that are pertinent to the allegations alleged herein.

84.    Collectively, TrashMasters, the Corridor Entities, SPB Entities, each of the Corridor O/Ds, SPB O/Ds, TrashMasters O/Ds, and Debtor O/Ds, ROHI, KNG and Colbeck Consulting are referred to herein as the "Defendants".

85.    Defendants John Does 1-50, Jane Does 1-50, Doe Corporations 1-50, Doe Partnerships 1-50, and Doe Entities 1-50 are persons and entities who are or may be liable together with the above-named Defendants for any liability alleged herein, or who or which may have received certain transfers which are the

subject of this action, or who or which may have an interest in property which is the subject of this action, and whose true names, identities, and capacities are presently unknown to Plaintiff or Plaintiff's attorneys. At this time, Plaintiff is unable to ascertain whether or not all parties who are or may be liable for the liability alleged herein are named herein. Plaintiff will identify such defendants when their names and capacities are ascertained.

## II.    JURISDICTION AND VENUE

86.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

87.    This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2) (E), (H), and (O).

88.    Plaintiff provisionally consents to the entry of final orders or judgment by this Court, subject to Plaintiff's rights of appeal from any adverse final order or judgment of this Court, and reserves Plaintiff's right, upon review of the answers and other pleadings filed by Defendants in this case, to demand a jury trial, and upon doing so to withdraw consent and require trial before a Court authorized to conduct jury trials.

89.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

## III. BACKGROUND

90.     The SPB Enterprise consists of the related SPB Entities that make up a private equity firm, and at all times relevant to the claims made herein, operated one or more investment funds, owned, controlled and managed by, among others, Mr. Bass, Mr. Bulloch, and Mr. Pressberg, and also provided certain advisory services.

91.     The Corridor Enterprise consists of the related Corridor Entities that make up a private equity firm, and at all times relevant to the claims made herein, operated one or more investment funds managed and controlled (at one time or another) by, among others, Mr. Enenstein, Mr. Greulich, Mr. Monnier, and Ms. Davis, and also provided certain advisory services.

92.     The Corridor Entities and SPB Entities are for profit entities that routinely invest in and engage in the acquisition, sale, and management of companies.

93.     The Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds, variously initiated, participated in, and were directly responsible for and/or approved, among other things, the following:

       i.     the formation of each of their respective companies (i.e., the Corridor O/Ds formed the Corridor Entities and the SPB O/Ds formed the SPB Entities);

ii.	the formation of the Debtor, TrashMasters, and TrashMasters Arizona, LLC ("TMAZ");

iii.	all acquisitions made, including the acquisition of the assets of ROHI, Maricopa (as defined below), and KNG;

iv.	all loans made to the Debtor, TrashMasters, and TMAZ, including without limitation loans from Union Bank, American Savings Bank, Convergent Capital, ROHI and KNG;

v.	all financial statements, audits, forecasts, appraisals of assets, and tax analysis of the Debtor and TrashMasters;

vi.	the hiring, firing, and compensation of the Debtor O/Ds and TrashMasters O/Ds, and the general management of the Debtor and TrashMasters; and

vii.	the consummation of the "Advisory Agreement" (as defined hereinafter), and the payment of "Advisory Fees" (as defined hereinafter) to Corridor Capital and SPB Management.

A.	**Fraudulent Scheme**

94.	Together, the Defendants, among other things, failed to adequately capitalize the Debtor, stripped the Debtor of its funds and assets for certain of the Defendants' own benefit, and left the Debtor unable to pay its

creditors ultimately leaving the Debtor's creditors to bear the loss of the Defendants' conduct.

95.     To facilitate their fraudulent scheme, the Corridor O/Ds and SPB O/Ds formed a conglomerate of companies to advance their own interests.

96.     The Corridor O/Ds and SPB O/Ds formed Corridor TM and SPB Waste as special purpose investment companies in which they invested their investors' money.

97.     The Corridor O/Ds and SPB O/Ds formed Corridor Capital and SPB Management as special purpose entities for their own benefit to furnish "advisory" services to TrashMasters, the Debtor and TMAZ and essentially manage and control their investors' investments in both Corridor TM and SPB Waste, as well as in TrashMasters and the Debtor.

98.     The Corridor O/Ds also formed the other Corridor Entities to carry out their private equity firm enterprise interests.

99.     Similarly, the SPB O/Ds formed the other SPB Entities to carry out their private equity firm enterprise interests.

100.    In a series of leveraged buyouts, the Corridor O/Ds, SPB O/Ds, TrashMasters O/Ds, and Debtor O/Ds had <u>TrashMasters</u> (not the Debtor) acquire the assets of other companies at purchase prices that far exceeded the appraised value of the assets, and with loans serviced by the <u>Debtor</u> and secured with the

assets TrashMasters acquired and contributed as a capital contribution to the Debtor.

101.    The contributions, however, were *equity* contributions credited to TrashMasters.

102.    Excepting Mr. Colbeck, the Debtor O/Ds, and in particular Mr. Asay, Sr., and Mr. Asay, Jr. (for the Rolloffs and TMAZ acquisitions), and Mr. Leonard, Mr. Asay, Sr., Mr. Asay, Jr., and Mr. Gourlay (for the KNG acquisition) approved one or more of these acquisitions, the financing for these acquisitions, and the contribution of the assets to the Debtor.

103.    Although TrashMasters was liable to ROHI and the Maricopa sellers for the assets it acquired, TrashMasters only paid a small portion of the amounts it owed for those assets.

104.    These acquisitions advanced the private equity interests of the Corridor Enterprise and SPB Enterprise, as well as the Corridor O/Ds and SPB O/Ds.

105.    The Corridor O/Ds and SPB O/Ds then simultaneously used inflated asset valuations and understated debt of the Debtor to secure additional loans from lenders, which increased the Debtor's debt and fully leveraged its assets, and used the proceeds of said loans to pay TrashMasters' debt, and to pay Corridor Capital and SPB Management the Advisory Fees.

106. The Debtor O/Ds approved the use of inflated asset valuations and understated debt of the Debtor to secure additional loans from lenders, which increased the Debtor's debt and fully leveraged its assets, and also approved of the use of the proceeds of said loans to pay TrashMasters' debt, and to pay Corridor Capital and SPB Management the Advisory Fees.

107. TrashMasters, however, was insolvent from inception.

108. TrashMasters had no operations and was a shell company.

109. TrashMasters had no independent ability to pay any of its creditors.

110. TrashMasters incurred debt to, among others, ROHI, KNG, Corridor Capital, SPB Management, Mr. Asay, Sr., Mr. Asay, Jr., Mr. Colbeck/Colbeck Consulting, and Lincoln International, and had no operations or income to pay for that debt.

111. At all times, the Defendants intended for the Debtor to pay the debts of TrashMasters, defrauding the Debtor's creditors.

112. The Defendants engaged in an established pattern whereby they caused the Debtor, from inception until the Debtor's bankruptcy, to routinely pay the debts of TrashMasters.

113. The Defendants intended that the Debtor pay the debts of TrashMasters even when the Debtor did not have sufficient funds to pay its own creditors and/or the debts of TrashMasters.

114. The Defendants (and in particular the Corridor Enterprise and SPB Enterprise) intentionally caused the Debtor to make loans, and incur fees and expenses in connection with said loans to pay TrashMasters' debt.

115. The Defendants intentionally caused the Debtor to service the loans made.

116. At no time did the Corridor O/Ds or SPB O/Ds themselves "lose" money (unless they were also investors in their own fund, a fact upon which the Defendants have refused to permit the Trustee to conduct discovery).

117. Instead, the Corridor O/Ds and SPB O/Ds lost their private equity investors' investments.

118. Upon information and belief, the Corridor O/Ds and SPB O/Ds variously paid themselves all or a portion of the $1,849,131.00 in Advisory Fees which were initially paid to Corridor Capital and SPB Management.

119. The Defendants spent the Debtor's money on professionals they hired on behalf of TrashMasters, including Mr. Colbeck of Colbeck Consulting, and Lincoln International, to "ready" TrashMasters and/or the Debtor for sale.

120. "Readying" TrashMasters and/or the Debtor for sale was intended to benefit and in fact benefitted, among others, TrashMasters (and its equity holders), the Corridor Enterprise, Corridor O/Ds, SPB Enterprise and SPB O/Ds, and KNG (including Mr. Gourlay), ROHI, Mr. Asay, Sr., and Mr. Asay, Jr. as members of TrashMasters, and those employees offered a bonus or other compensation in connection with a sale.

121. The Corridor Enterprise, Corridor O/Ds, SPB Enterprise, and SPB O/Ds undercapitalized the Debtor and TrashMasters.

122. Mr. Asay, Sr. and Mr. Asay, Jr., as the Debtor O/Ds and TrashMasters O/Ds, had knowledge of (or should have had knowledge of), approved, and/or agreed to the undercapitalization of the Debtor and TrashMasters.

123. The Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds did not invest a sufficient amount to support the Debtor's operation and their Advisory Fees and private equity interests.

124. The Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds focused their efforts on preparing TrashMasters and/or the Debtor for sale and directed the use of the Debtor's cash and assets for their own benefit.

125. The Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds, TrashMasters O/Ds and Debtor O/Ds attempted to get ASB and the City &

County of Honolulu ("C&C") to make concessions to prolong the Debtor's business on "life support".

126. The Debtor indeed continued its operations longer than it should have, in part, because it did not pay the C&C the $3.1M tipping fees it had accrued, and the Corridor Entities, SPB Entities, Corridor O/Ds, and SPB O/Ds, created and used audited financial statements, which the TrashMasters O/Ds and Debtor O/Ds approved, that significantly overvalued the Debtor's assets and understated its debt.

127. These actions hindered, delayed, and defrauded the Debtor's creditors.

**B.  TrashMasters - The Debtor's Manager and Parent Company**

128. In or about 2009, the Corridor Entities and SPB Entities, together with certain Corridor O/Ds and SPB O/Ds formed TrashMasters.

129. The Corridor Entities and SPB Entities, together with certain Corridor O/Ds and SPB O/Ds formed TrashMasters to insulate themselves and their companies from liability.

130. TrashMasters had no business operations and generated no revenue.

131. TrashMasters routinely incurred expenses which the Corridor Entities, SPB Entities, Corridor O/Ds, SPB O/Ds, TrashMasters O/Ds, and Debtor O/Ds knew TrashMasters could not independently repay.

132. The Corridor Entities, SPB Entities, Corridor O/Ds, SPB O/Ds, Mr. Asay, Sr. and Mr. Asay, Jr. utilized TrashMasters to acquire the assets of ROHI and three (3) Arizona companies, namely Arizona Disposal Services, LLC, Eagle Hauling, Inc., and Haul-A-Way, LLC (collectively, the three Arizona companies are referred to herein as "Maricopa").

133. Later in August 2010, the Corridor Entities, SPB Entities, Corridor O/Ds, SPB O/Ds, Mr. Asay, Jr. and Mr. Leonard utilized TrashMasters to acquire the assets of KNG

134. The Debtor was TrashMasters' only income producing asset.

135. At all relevant times, and pursuant to the terms of that certain Amended and Restated Limited Liability Company Agreement of Rolloffs Hawaii, LLC, dated May 1, 2009, TrashMasters managed, directed, and controlled the Debtor.

136. A true and correct copy of the Amended & Restated Limited Liability Company Agreement of Rolloffs Hawaii, LLC, dated May 1, 2009 is attached as Exhibit "13".

137. A true and correct copy of the TrashMasters, LLC Amended & Restated Limited Liability Company Agreement, dated May 1, 2009 is attached as Exhibit "14".

138. A true and correct copy of the TrashMasters, LLC Third Amended & Restated Limited Liability Company Agreement, dated August 13, 2010 is attached as Exhibit "15".

139. A true and correct copy of the TrashMasters, LLC Fourth Amended & Restated Limited Liability Company Agreement, dated February 1, 2011 is attached as Exhibit "16".

140. A true and correct copy of TrashMasters, LLC Amendment Number One to the Fourth Amended & Restated Limited Liability Company Agreement, dated January 10, 2012, is attached as Exhibit "17".

## C. TrashMasters' Members

141. During the period May 1, 2009 to the Petition Date, Corridor TM was a member of TrashMasters.

142. Corridor TM owned a majority interest in TrashMasters.

143. During the period May 1, 2009 to the Petition Date, SPB Waste was a member of TrashMasters.

144. After Corridor Capital, SPB Waste owned the next largest interest in TrashMasters.

145. During the period May 1, 2009 to the Petition Date, ROHI was a member of TrashMasters.

146. During the period May 1, 2009 to the Petition Date, Mr. Asay, Sr. was a member of TrashMasters.

147. During the period May 1, 2009 to the Petition Date, Mr. Asay, Jr. was a member of TrashMasters.

148. During the period August 13, 2010 to the Petition Date, KNG was a member of TrashMasters.

149. Mr. Gourlay is a member and officer of KNG.

150. As the members that held the majority membership interests in TrashMasters, the Corridor Enterprise (through Corridor TM), and the SPB Enterprise (through SPB Waste) primarily controlled and directed the Debtor's affairs.

151. Further, certain members of the Corridor Enterprise and SPB Enterprise also held officer, director, and/or management positions in TrashMasters and the Debtor.

## D. TrashMasters' ROHI Asset Acquisition

152. On or about February 26, 2009, TrashMasters, as buyer, and ROHI, Robert Henriques, and Linda Henriques, as sellers, entered into that certain Asset Purchase Agreement, dated February 26, 2009 (the "ROHI APA").

153. A true and correct copy of the ROHI APA is attached as Exhibit "18".

154. Pursuant to the terms of the ROHI APA, TrashMasters purchased substantially all of the assets of ROHI for a stated purchase price of $10,000,000.00, which purchase price was subject to certain adjustments after closing.

155. The Corridor Enterprise, led by Mr. Enenstein, and the SPB Enterprise, led by Mr. Bass, as well as the TrashMasters O/Ds and Debtor O/Ds, variously negotiated, directed, controlled, and approved all aspects of the ROHI asset acquisition.

156. Pursuant to the terms of the ROHI APA, TrashMasters incurred a direct liability to ROHI for, among other things, a $1,000,000.00 Promissory Note, dated May 1, 2009 (the "ROHI Note").

157. A true and correct copy of the ROHI Note is attached as Exhibit "19".

158. The ROHI Note accrued interest at the rate of 8% per annum.

159. The ROHI Note matured on May 1, 2014.

160. The Debtor made substantially all payments in connection with the ROHI Note.

### E. TrashMasters' Maricopa Asset Acquisition

161. On or about May 1, 2009, TrashMasters, as buyer, and Arizona Disposal Services, LLC, Eagle Hauling, Inc. and Haul-A-Way, LLC (also referred to herein as Maricopa), as sellers, entered into that certain Asset Purchase Agreement, dated as of May 1, 2009 (the "Maricopa APA").

162. A true and correct copy of the Maricopa APA is attached as Exhibit "20".

163. The Corridor Enterprise, led by Mr. Enenstein, and the SPB Enterprise, led by Mr. Bass, as well as the TrashMasters O/Ds and Debtor O/Ds variously negotiated, directed, controlled and/or approved all aspects of the Maricopa asset acquisition.

164. Pursuant to the terms of the Maricopa APA, TrashMasters purchased substantially all of the Maricopa assets for a stated purchase price of $1,714,031.00, which purchase price was subject to certain adjustments after closing.

165. As a part of the purchase price, Mr. Asay, Sr. obtained 720,167 common units in TrashMasters.

166. As a part of the purchase price, Mr. Asay, Jr. obtained 120,834 common units in TrashMasters.

### F. Union Bank Financing of TrashMasters' ROHI and Maricopa Asset Acquisitions ($500k LOC and $4.5M Term Loan)

167. TrashMasters' acquisition of the assets of ROHI and Maricopa were financed, in part, with a Union Bank credit facility.

168. The Corridor Enterprise, led by Mr. Enenstein, and the SPB Enterprise, led by Mr. Bass, as well as the TrashMasters O/Ds and Debtor O/Ds variously negotiated, directed, controlled, and/or approved all aspects of the Union Bank credit facility.

169. By that certain Credit Agreement, dated May 1, 2009 (the "UB Credit Agreement"), entered into by and among the Debtor and TMAZ as borrowers, and Union Bank, N.A. as Lender, Union Bank furnished the Debtor and TMAZ a credit facility consisting of (i) a single revolving credit facility (the "UB $500k LOC") in a maximum aggregate principal amount at any time outstanding not to exceed $500,000, and (ii) a term loan (the "UB $4.5M Term Loan") facility in the aggregate principal amount of $4,500,000.00.

170. A true and correct copy of the UB Credit Agreement, dated May 1, 2009 is attached hereto as Exhibit "21".

171. The UB Credit Agreement was amended pursuant to that certain First Amendment to Credit Agreement, dated July 1, 2009, a true and correct copy of which is attached hereto as Exhibit "22".

172. The UB Credit Agreement was further amended pursuant to that certain Second Amendment to Credit Agreement, dated August 12, 2010, a true and correct copy of which is attached hereto as Exhibit "23".

173. The UB Credit Agreement was further amended pursuant to that certain Third Amendment to Credit Agreement, dated November 29, 2011, a true and correct copy of which is attached hereto as Exhibit "24".

174. The UB Credit Agreement was further amended pursuant to that certain Fourth Amendment to Credit Agreement, dated May 18, 2012, a true and correct copy of which is attached hereto as Exhibit "25".

175. The UB Credit Agreement together with all amendments thereto is collectively referred to herein as the "UB Credit Agreement".

176. The UB $500k LOC was evidenced in that certain Revolving Note, dated May 1, 2009, in the principal sum of $500,000.00, a true and correct copy of which is attached hereto as Exhibit "26".

177. The UB $500k LOC initially matured on May 1, 2011.

178. The UB $4.5M Term Loan was evidenced in that certain Term Note, dated May 1, 2009, in the principal sum of $4,500,000.00, a true and correct copy of which is attached hereto as Exhibit "27".

179. The UB $4.5M Term Loan matured on May 1, 2014.

180. Pursuant to that certain Security Agreement, dated May 1, 2009 by and between the Debtor and Union Bank (the "UB Security Agreement"), the Debtor granted Union Bank a security interest in essentially all of the Debtor's assets.

181. A true and correct copy of the UB Security Agreement is attached hereto as Exhibit "28".

182. Union Bank was also furnished a security interest in the assets of TMAZ and TrashMasters, as well as a pledge of TrashMasters' membership interests in the Debtor and TMAZ.

183. In connection with TrashMasters' acquisition of the assets of ROHI and Maricopa, Corridor TM furnished Union Bank only $2,653,513.00 by wire transfer (the "Corridor TM Funds").

184. In connection with TrashMasters' acquisition of the assets of ROHI and Maricopa, SPB Waste furnished Union Bank only $1,326,756.00 by wire transfer (the "SPB Funds").

185. Substantially all of the Corridor TM Funds, SPB Waste Funds, and the proceeds of the UB $4.5M Term Loan were used to fund TrashMasters' expenses. These expenses included the following.

186. On or about May 1, 2009, the Debtor made a $6,093,440.55 payment to ROHI, which payment was made in connection with the ROHI APA,

and came from proceeds of the UB $4.5M Term Loan, as well as proceeds of the Corridor TM Funds and the SPB Waste Funds.

187. On or about May 1, 2009, the Debtor also paid ROHI's line of credit, certain lienholders of ROHI, and ROHI an aggregate amount of $1,067,551.30.

188. On or about May 1, 2009, the Debtor paid Corridor Capital $23,587.84 for TrashMasters "deal expenses".

189. On or about May 1, 2009, the Debtor paid SPB Waste $23,684.43 for TrashMasters "deal expenses".

190. The Debtor made all, or substantially all, payments due on account of the UB Credit Agreement, the UB $4.5M Term Loan, and the UB $500k LOC.

191. During the period May 2009 to June 2012, the Debtor made approximately $1,714,285.44 in payments to Union Bank on account of the UB $4.5M Term Loan.

192. A non-exhaustive list of payments the Debtor made to Union Bank on account of the UB $4.5M Term Loan is attached as <u>Exhibit "29"</u>. Plaintiff reserves the right to revise the list.

193. Neither the Debtor's creditors, nor the Plaintiff could have reasonably discovered the circumstances and terms and conditions of the "UB

Credit Facility" prior to the Trustee's appointment as the Chapter 11 Trustee of the Debtor's estate.

## G. Advisory Agreement with Corridor Capital and SPB Management

194. As part of their investment structure, the Corridor Enterprise and the SPB Enterprise as the "private equity firms" caused TrashMasters, the Debtor, and TMAZ to enter into an Advisory Agreement with Corridor Capital and SPB Management, which entities they respectively owned and controlled.

195. On or about May 1, 2009, TrashMasters, the Debtor, and TMAZ, on the one hand, and Corridor Capital and SPB Management, on the other hand, entered into that certain Advisory Agreement.

196. A true and correct copy of the Advisory Agreement is attached as Exhibit "30".

197. The Corridor Enterprise and SPB Enterprise, directed the structure and formation, as well as the drafting of the terms and conditions of the Advisory Agreement.

198. Pursuant to the terms of the Advisory Agreement, TrashMasters, the Debtor, and TMAZ engaged Corridor Capital and SPB Management to provide, among other things, services as agreed to by Corridor Capital, SPB Management, and TrashMasters' board of directors.

199. Corridor Capital is an affiliate of Corridor TM and the other Corridor Entities.

200. SPB Management is an affiliate of SPB Waste and the other SPB Entities.

201. Corridor Capital is an insider of the Debtor.

202. Corridor TM is an insider of the Debtor.

203. SPB Management is an insider of the Debtor

204. SPB Waste is an insider of the Debtor.

205. The Debtor paid all payments made in respect of the Advisory Agreement.

## H.    Advisory Fees Paid to Corridor Capital and SPB Management

206. Pursuant to the terms of the Advisory Agreement, Corridor Capital and SPB Management intended to extract money from the Debtor through the payment of certain advisory fees.

207. The amount of the subject annual advisory fees was based on a percentage of the Debtor's EBITDA.

208. The advisory fee calculation did not take into account the amount of debt and debt service for which the Debtor was obligated, and thus according to the terms of the Advisory Agreement accrued even if the Debtor was

insolvent and/or did not have funds to pay the advisory fees or its own debts as they became due.

209. The Debtor paid Corridor Capital and SPB Management advisory fees when the Debtor was insolvent.

210. Together Corridor Capital and SPB Management were paid $1,849,131.62 in advisory fees.

211. On or about October 2, 2009, the Debtor paid Corridor Capital $200,000.00 in advisory fees.

212. On or about May 6, 2010, the Debtor paid Corridor Capital $210,000.00 in advisory fees.

213. On or about May 20, 2011, the Debtor paid Corridor Capital $50,000.00 in advisory fees.

214. On or about June 27, 2012, the Debtor paid Corridor Capital $289,018.75 in advisory fees.

215. On or about May 20, 2013, the Debtor paid Corridor Capital $182,325.94 in advisory fees.

216. On or about May 5, 2014, the Debtor paid Corridor Capital $95,721.12 in advisory fees.

217. On or about October 2, 2009, the Debtor paid SPB Management $100,000.00 in advisory fees.

218. On or about May 6, 2010, the Debtor paid SPB Management $105,000.00 in advisory fees.

219. On or about May 20, 2011, the Debtor paid SPB Management $50,000.00 in advisory fees.

220. On or about June 28, 2012, the Debtor paid SPB Management $289,018.75 in advisory fees.

221. On or about May 20, 2013, the Debtor paid SPB Management $182,325.94 in advisory fees.

222. On or about May 2, 2014, the Debtor paid SPB Management $95,721.12 in advisory fees.

223. Neither the creditors of the Debtor, nor the Plaintiff, could have reasonably discovered the circumstances and terms and conditions of the Advisory Agreement or the advisory fees paid to Corridor Capital and SPB Management, prior to the Trustee's appointment as the Chapter 11 Trustee of the Debtor's estate.

224. The Debtor's payment of advisory fees to Corridor Capital and SPB Management was made at the direction and/or with the knowledge and approval of one or more of the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, and TrashMasters O/Ds and Debtor O/Ds (including without limitation Mr. Asay, Sr., during the approximate period of May 1, 2009 thru August 20, 2010, Mr. Asay, Jr., during the approximate period of May 1, 2009 thru July 6, 2016, Mr.

Leonard, during the approximate periods January 1, 2010 thru October 1, 2012 and June 20, 2016 thru the Petition Date, and Mr. Gourlay during the approximate period August 2010 thru the Petition Date ).

**I.    Contribution Agreement (ROHI and Maricopa Assets)**

225.    In or about 2009, the SPB Entities, SPB O/Ds, Corridor Entities, Corridor O/Ds, together with Mr. Asay, Sr. and Mr. Asay, Jr., formed TMAZ.

226.    TrashMasters was the manager of TMAZ.

227.    By that certain Contribution Agreement, dated May 1, 2009, by and between TrashMasters, TMAZ, and the Debtor (the "2009 Contribution Agreement"), TrashMasters, among other things, purported to contribute, as a capital contribution, all of the ROHI assets TrashMasters acquired pursuant to the ROHI APA to the Debtor, and all of the Maricopa assets TrashMasters acquired pursuant to the Maricopa APA to TMAZ.

228.    A true and correct copy of the 2009 Contribution Agreement is attached as Exhibit "31".

229.    The Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, TrashMasters O/Ds, Mr. Asay, Sr. and Mr. Asay, Jr. directed, authorized, and/or had knowledge of the Debtor entering into the 2009 Contribution Agreement.

230. On or about June 1, 2010, the Maricopa assets were sold to Waste Management of Arizona, Inc.

**J.    TrashMasters' KNG Asset Acquisition**

231. On or about August 13, 2010, TrashMasters, as buyer, and KNG and Hawaii Pacific Hydraulics, Inc. (collectively the "KNG Sellers"), as sellers, entered into that certain Asset Purchase Agreement, dated as of August 13, 2010 (the "KNG APA").

232. A true and correct copy of the KNG APA is attached as Exhibit "32".

233. The Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, and one or more TrashMasters O/Ds and Debtor O/Ds (including without limitation, Mr. Leonard, Mr. Asay, Jr., Mr. Monnier, Mr. Enenstein, Mr. Bass, Mr. Bulloch, and Mr. Pressberg) negotiated, directed, controlled, and/or had knowledge of all aspects of the KNG asset acquisition.

234. Pursuant to the terms of the KNG APA, TrashMasters purchased substantially all of the assets of the KNG Sellers for a stated purchase price of $6,300,000.00, which purchase price was subject to certain adjustments.

235. Pursuant to the terms of the KNG APA, TrashMasters incurred a direct liability to KNG, for among other things, a $1,500,000.00 Promissory Note, dated August 13, 2010 (the "KNG Note").

236. A true and correct copy of the KNG Note is attached as Exhibit "33".

237. The KNG Note accrued interest at the rate of 12% per annum.

238. The KNG Note matured on December 31, 2012.

239. The KNG Note was secured by that certain Secured Guaranty, dated August 13, 2010 (the "KNG Guaranty") by which the Debtor guaranteed the KNG Note and also granted KNG a security interest in the Debtor's equipment.

240. A true and correct copy of the KNG Guaranty is attached as Exhibit "34".

241. The Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, TrashMasters O/Ds, and Debtor O/Ds, including without limitation, Mr. Leonard, Mr. Asay, Sr., Mr. Asay, Jr., Mr. Monnier, Mr. Enenstein, Mr. Bass, Mr. Bulloch, and/or Mr. Pressberg, variously approved, directed and authorized the Debtor to furnish KNG the KNG Guaranty.

242. Pursuant to the terms of the KNG APA, KNG also acquired 1,447,196 common units in TrashMasters.

K.      **Contribution Agreement (KNG Assets)**

243. Pursuant to that certain Contribution Agreement, dated August 13, 2010 (the "2010 Contribution Agreement"), by and among TrashMasters and the Debtor, TrashMasters, among other things, purported to contribute, as a capital

contribution, all of the assets TrashMasters acquired pursuant to the KNG APA to the Debtor.

244. A true and correct copy of the 2010 Contribution Agreement is attached as Exhibit "35".

245. The Corridor Entities, SPB Entities, Corridor O/Ds, SPB O/Ds, TrashMasters O/Ds, and Debtor O/Ds approved, directed and authorized the 2010 Contribution Agreement.

**L.    The Debtor's Default on the Union Bank Credit Facility**

246. In or about August 2009, the Debtor's O/Ds, TrashMasters O/Ds, Corridor Enterprise and SPB Enterprise, including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Sr., and Mr. Asay, Jr. were aware that the Debtor would not meet certain of the Debtor's financial loan covenants to Union Bank.

247. By early September 2009, the Debtor (under the direction and control of the Debtor's O/Ds, TrashMasters O/Ds, the Corridor Enterprise and SPB Enterprise, including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Sr., and Mr. Asay, Jr.) requested a covenant change from Union Bank.

248. In or about December 2011, the Debtor defaulted upon its obligations and/or covenants to Union Bank.

249. The Debtor had suffered losses and had been experiencing cash flow issues.

250. Union Bank was reluctant to extend the Debtor additional credit and asked that it be taken out by another lender.

251. The Corridor Enterprise, SPB Enterprise, TrashMasters O/Ds and Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Jr., and Mr. Leonard) sought financing from various other lenders.

252. The Corridor Enterprise, SPB Enterprise, TrashMasters O/Ds and Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Jr., and Mr. Leonard) initially decided to obtain "take-out" financing from Fifth Third Bank.

253. Just prior to closing, Fifth Third Bank backed out and would not approve the proposed financing.

254. The Debtor's financial condition was determined to have been weak, and the proposed Fifth Third Bank Loan had a lower than standard, "problem loan" rating.

255. The Corridor Enterprise, SPB Enterprise, TrashMasters O/Ds, and Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Jr., and Mr. Leonard) then engaged in

discussions with American Savings Bank, F.S.B. ("ASB") and Convergent Capital Partners II, L.P. ("Convergent").

**M.  ASB 2012 Credit Agreement ($1M LOC and $4.3M Term Loan)**

256.  On or about June 26, 2012, ASB, as lender, and TrashMasters and the Debtor, as borrowers, entered into that certain Credit Agreement (the "2012 ASB Credit Agreement").

257.  A true and correct copy of the 2012 ASB Credit Agreement is attached as Exhibit "36".

258.  The Corridor Enterprise, SPB Enterprise, and one or more of the Corridor O/Ds, SPB O/Ds, TrashMasters O/Ds, and Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Monnier, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Jr., and Mr. Leonard), variously negotiated, directed, authorized, approved and/or had knowledge of the 2012 ASB Credit Agreement.

259.  Pursuant to the terms of the 2012 ASB Credit Agreement, ASB furnished TrashMasters and the Debtor a credit facility consisting of (i) a $1,000,000.00 Revolving Line of Credit and (ii) a $4,300,000.00 Term Loan.

260.  Pursuant to that certain Promissory Note, dated June 25, 2012, ASB loaned TrashMasters and the Debtor $4,300,000.00 at the rate of 3.625% per annum (the "2012 $4.3M ASB Term Loan").

261. A true and correct copy of the 2012 $4.3M ASB Term Loan is attached as Exhibit "37".

262. The 2012 $4.3M ASB Term Loan matured on June 26, 2017.

263. Pursuant to that certain Security Agreement, dated June 26, 2012, ASB had a blanket security interest in all of the Debtor's collateral.

264. A true and correct copy of the Security Agreement, dated June 26, 2012, between the Debtor and ASB is attached as Exhibit "38".

265. The 2012 ASB Credit Agreement was used to, among other things, refinance the Union Bank credit facility obligations and pay TrashMasters' debt.

266. The Debtor paid Union Bank $503,500.68 from the 2012 ASB Credit Agreement proceeds in connection with the UB $500k LOC.

267. The Debtor paid Union Bank $33,000.00 from the 2012 ASB Credit Agreement proceeds in connection with a Union Bank Amendment Fee.

268. The Debtor paid Union Bank $2,805,218.36 from the 2012 ASB Credit Agreement proceeds in connection with the $4.5M UB Term Loan.

269. The Debtor paid KNG and/or Mr. Gourlay $1,525,127.49 from the 2012 ASB Credit Agreement proceeds in connection with the KNG Note and KNG Guaranty.

270. The Debtor paid the payments due with respect to the 2012 ASB Credit Agreement, including the 2012 $4.3M ASB Term Loan, from the Debtor's bank account.

271. Neither the Debtor's creditors, nor the Plaintiff, could have reasonably discovered the circumstances and terms and conditions of the 2012 ASB Credit Agreement and the 2012 $4.3M ASB Term Loan prior to the Trustee's appointment as the Chapter 11 Trustee of the Debtor's estate.

## N. 2012 Convergent Mezzanine Loan ($2.5M Hard Money Loan)

272. In or about June 26, 2012, Convergent, as lender, and TrashMasters and the Debtor, as borrowers, entered into that certain Securities Purchase Agreement (the "2012 Convergent Loan Agreement").

273. A true and correct copy of the 2012 Convergent Loan Agreement is attached as Exhibit "39".

274. The Corridor Enterprise, the SPB Enterprise, TrashMasters O/Ds, and Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Monnier, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Jr., Mr. Gourlay, and Mr. Leonard), variously negotiated, directed, authorized, and/or approved the 2012 Convergent Loan Agreement.

275.   Pursuant to the terms of the 2012 Convergent Loan Agreement, Convergent agreed to lend TrashMasters and the Debtor $2,500,000.00 (the "2012 $2.5M Convergent Loan").

276.   The 2012 $2.5M Convergent Loan was a hard money loan with a high interest rate and unfavorable terms.

277.   The 2012 $2.5M Convergent Loan accrued interest at the rate of 16.5% per year consisting of (i) interest at 12% per year payable in cash on a monthly basis, and (ii) interest at 4.5% per year that may be deferred.

278.   The 2012 $2.5M Convergent Loan matured on June 26, 2017.

279.   Pursuant to the terms of that certain Security Agreement, dated June 26, 2012, TrashMasters and the Debtor granted Convergent a security interest in all of the Debtor's personal property.

280.   A true and correct copy of that certain Security Agreement, dated June 26, 2012, between the Debtor and Convergent is attached as Exhibit "40".

281.   The Debtor paid the payments due with respect to the 2012 $2.5M Convergent Loan from the Debtor's bank account.

282.   The Debtor paid in excess of $776,000.00 in interest only payments to Convergent.

283. Neither the Debtor's creditors, nor the Plaintiff, could have reasonably discovered the circumstances and terms and conditions of the 2012 $2.5M Convergent Loan prior to the Trustee's appointment as the Chapter 11 Trustee of the Debtor's estate.

284. The 2012 $2.5M Convergent Loan was a short term solution to the Debtor's cash flow issues.

285. The Debtor and TrashMasters, on a long term basis, could not service the 2012 $2.5M Convergent Loan and the 2012 ASB Credit Agreement.

286. Immediately after the 2012 ASB Credit Agreement and the 2012 $2.5M Convergent Loan, the Debtor experienced severe cash flow issues.

287. The Debtor used all of the proceeds of the 2012 Credit Agreement and 2012 $2.5M Convergent Loan to pay, among others, Union Bank, ROHI, KNG, SPB Management, and Corridor Capital, and to pay other closing costs.

288. The Corridor Enterprise, SPB Enterprise, TrashMasters O/Ds and Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Monnier, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Jr., Mr. Gourlay, and Mr. Leonard) authorized, directed, approved, and/or had knowledge of the Debtor's use of the proceeds of the 2012 ASB Credit Agreement and the 2012 $2.5M Convergent Loan.

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 71   Filed  07/31/19   Page 55 of 173

289. The Corridor Enterprise, SPB Enterprise, TrashMasters O/Ds and Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Monnier, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Jr., Mr. Gourlay, and Mr. Leonard), were fully aware of the Debtor's financial condition, including its cash flow issues and insolvency.

## O.    Lincoln International

290.   In or about April 2014, the Corridor Enterprise, SPB Enterprise, TrashMasters O/Ds and Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Greulich, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, and Mr. Asay, Jr.) caused the Debtor and TrashMasters to engage Lincoln International LLC ("Lincoln") to market and sell TrashMasters, the Debtor, and/or the Debtor's assets.

291.   A true and correct copy of the Lincoln engagement letter, dated April 25, 2014, is attached hereto as Exhibit "41".

292.   The Corridor Enterprise and SPB Enterprise desired a return of their investors' capital in TrashMasters.

293.   Upon information and belief, the members of TrashMasters, including Corridor TM and SPB Waste, desired a return on their investment in TrashMasters.

294.  The Debtor's financial performance, however, was inconsistent and continued to decline.

295.  Due to the Debtor's financial performance, Lincoln's sale efforts were suspended in or about September 2014.

## P.    Brian Colbeck

296.  On or about July 30, 2014, the Corridor Enterprise and SPB Enterprise (including without limitation, Mr. Enenstein, Mr. Greulich, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg) and Mr. Asay, Jr., caused TrashMasters and Mr. Colbeck to enter into that certain Consulting Agreement.

297.  A true and correct copy of the Consulting Agreement is attached as Exhibit "12".

298.  Pursuant to the terms of the Consulting Agreement, Mr. Colbeck agreed to act as TrashMasters' interim Chief Operating Officer, primarily responsible for TrashMasters' financial performance and driving the process of preparing TrashMasters for sale, which was expected to be within 18 months of July 30, 2014.

299.  Pursuant to the terms of the Consulting Agreement, TrashMasters agreed to pay Mr. Colbeck $6,000.00 per week.

300.  Upon information and belief, the Debtor paid to Colbeck and/or Colbeck Consulting substantially all of the payments made in connection with the Consulting Agreement (the "Colbeck Payments").

301.  A non-exhaustive list of the Colbeck Payments (approximately $393,869.00) is attached as Exhibit "42".  Plaintiff reserves the right to revise the list.

302.  Upon information and belief, Mr. Colbeck was the sole member and manager of Colbeck Consulting.

**Q.    ASB 2015 Refinance ($5.5M Term Loan)**

303.  In or about December 2014, the Corridor Enterprise, SPB Enterprise, TrashMasters O/Ds, Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Greulich, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Jr., and Mr. Colbeck), Corridor Entities, and SPB Entities discussed ASB refinancing the 2012 $4.3M ASB Term Loan and the 2012 $2.5M Convergent Loan.

304.  In or about January 28, 2015, ASB, as lender, and TrashMasters and the Debtor, as borrowers, entered into that certain Term Loan Agreement (the "2015 ASB Refinance").

305.  A true and correct copy of the ASB Term Loan Agreement, dated January 28, 2015 is attached as Exhibit "43".

306. The Corridor Enterprise, SPB Enterprise, TrashMasters O/Ds and Debtor O/Ds (including without limitation, Mr. Enenstein, Mr. Greulich, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Asay, Jr., and Mr. Colbeck), negotiated, directed and authorized the 2015 ASB Refinance.

307. Pursuant to the terms of the 2015 ASB Refinance and that certain Promissory Note, dated January 28, 2015 (the "2015 $5.5M ASB Note"), ASB agreed to loan TrashMasters and the Debtor $5,500,000.00.

308. A true and correct copy of the 2015 $5.5M ASB Note is attached hereto as Exhibit "44".

309. The 2015 $5.5M ASB Note accrued interest at the rate of 4.15% per annum.

310. The 2015 $5.5M ASB Note matured on January 29, 2020, with a balloon payment due at maturity.

311. Pursuant to that certain letter agreement dated December 23, 2014 (the "2014 ASB Commitment Letter"), the purpose of the 2015 ASB Refinance was to refinance the 2012 $4.3M ASB Term Loan and the 2012 $2.5M Convergent Loan.

312. A true and correct copy of the 2014 ASB Commitment Letter is attached hereto as Exhibit "45".

313. On or about January 29, 2015, the Debtor paid $2,508,331.00 to ASB as a full and final payoff of the 2012 $4.3M ASB Term Loan.

314. On or about February 2, 2015, the Debtor wired from its ASB account, $2,848,212.58 to Convergent as a full and final payoff of the 2012 $2.5M Convergent Loan.

315. The Debtor paid, until the Petition Date, the payments due with respect to the 2015 ASB Refinance from the Debtor's bank account.

## IV. DEBTOR'S INSOLVENCY

316. Upon information and belief, the Debtor was undercapitalized and therefore insolvent at the date of inception.

317. At the time of its inception, the Debtor was liable for up to $5,000,000 to Union Bank, plus an additional $1,000,000 to ROHI. This debt exceeded the value of the Debtor's assets, which, as of May 1, 2009, were essentially the fully encumbered property and equipment of the Debtor.

318. A Forecasted Balance Sheet of TrashMasters, dated April 27, 2009, shows an estimated value of the property and equipment of TrashMasters, at the end of the 2nd quarter of "year 1" (i.e., June 30, 2009) of $2,873,565, net of accumulated depreciation.

319. A true and correct copy of the Forecasted Balance Sheet of TrashMasters, dated April 27, 2009 is attached as Exhibit "46".

320.    Upon information and belief, shortly after inception, the Debtor was also generally not paying its debts as they became due, and is presumed insolvent.

321.    The Debtor was a creditor of the City & County of Honolulu from day one for tipping fees.

322.    The Debtor continued to be a creditor of the City & County of Honolulu both until the Debtor filed its petition for bankruptcy and post-petition.

323.    The Corridor Entities, SPB Entities, Corridor O/Ds, SPB O/Ds, TrashMasters O/Ds and Debtor O/Ds deepened the Debtor's insolvency, spending the Debtor's money, encumbering the Debtor's assets, and incurring additional and increased loan obligations, interest and fees and/or debt for which the Debtor and TrashMasters was unable, and would never be able, to repay.

324.    These loan obligations included "hard" money loans with high interest rates.

325.    Because the proceeds of these loans were used to pay others, the Debtor did not have sufficient assets or cash flow to service the 2012 $2.5M Convergent Loan, the 2012 ASB Credit Agreement, and the 2015 ASB Refinance.

326.    Because of the Debtor's insolvency and cash flow issues, the Debtor was unable to timely replace its trucks, equipment, and other capital assets

and the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, TrashMasters O/Ds and Debtor O/Ds elected to put the Debtor in bankruptcy.

327.   Because of the Debtor's insolvency and cash flow issues, the Debtor was unable to pay its creditors.

## V.   DEBTOR'S BANKRUPTCY

328.   On December 9, 2016, the Debtor filed a petition for Chapter 11 bankruptcy.

329.   By that certain Order Approving Appointment of Trustee, filed on January 17, 2017, Plaintiff was appointed as the Chapter 11 Trustee of the Debtor's estate.

330.   By that certain Order Converting Chapter 11 Case to Chapter 7 Case, filed on September 18, 2017, Plaintiff was appointed as the Chapter 7 Trustee of the Debtor's estate.

## IV.   UNSECURED CREDITORS

331.   At all relevant times, the City & County of Honolulu (the "C&C") was an unsecured pre-petition creditor of the Debtor.

332.   From inception, the Debtor was regularly 60-90 days delinquent on its account with the C&C for tipping fees.

333.   In 2014, the Honolulu City Council adopted Ordinance No. 14-13, which took effect on June 20, 2014.

334. Honolulu Ordinance 14-13 amended Section 9-4-3 of the Revised Ordinances of Honolulu 1990, as amended, and changed the payment terms for tipping fees to the C&C, from 60 days to 30 days.

335. The Debtor and the Defendants had knowledge of Ordinance No. 14-13.

336. The Debtor did not pay the delinquent amounts it owed to the C&C.

337. The Debtor fell further behind to the C&C for tipping fees.

338. The C&C has filed a proof of claim in the Debtor's bankruptcy case for tipping fees in the amount of $3,111,730.72.

339. The Department of Treasury, Internal Revenue Service, has filed a proof of claim in the Debtor's bankruptcy case for FICA and partnership taxes and penalties in the amount of $100,208.32, which taxes accrued in 2010.

340. The State of Hawaii, Department of Taxation, has filed a proof of claim in the Debtor's bankruptcy case for general excise taxes and county surcharges in the amount of $108,970.72 during the period November 1, 2016 through December 9, 2016.

341. At all relevant times, the Debtor was a creditor of TrashMasters.

## VIII.  CLAIMS

**COUNT 1**
**FRAUDULENT CONVEYANCE**
**11 U.S.C. § 544(b)(1), Common Law, and 11 U.S.C. §550**
**(*2009 UB Credit Facility*)**

342.   Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 341.

343.   Defendants, and in particular the Corridor O/Ds and the SPB O/Ds, set up and structured a variety of related companies, including shell and holding companies, to invest in and acquire the assets of ROHI, Maricopa, and KNG, and to advise and/or manage said companies.

344.   As it pertains to this particular Count 1 and Counts 2, 3, and 4, the Corridor O/Ds are intended to include, among others, Mr. Enenstein, and Mr. Monnier, as well as any other individual that may be identified to have participated in the conduct set forth in these Counts.

345.   As it pertains to this particular Count 1 and Counts 2, 3, and 4, the SPB O/Ds are intended to specifically include Mr. Bass, Mr. Bulloch and Mr. Pressberg, as well as any other individual that may be identified to have participated in the conduct set forth in these Counts.

346.   Mr. Asay, Sr. and Mr. Asay, Jr. had knowledge of and approved the setup and structure of TrashMasters, TMAZ, and the Debtor to invest in and acquire the assets of ROHI and Maricopa, and later the assets of KNG.

347.   The Corridor O/Ds and SPB O/Ds intended to create a company (TrashMasters) that incurred debt, but had no revenue to pay the debt, and to insulate themselves from liability and creditors.

348.   Mr. Asay, Sr. and Mr. Asay, Jr. had knowledge of and approved TrashMasters' formation as well as its incurring debt for which TrashMasters had no revenue to pay, and to insulate the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds and TrashMasters O/Ds from liability and creditors.

349.   The Corridor O/Ds and SPB O/Ds intended to further their own interests, and to assure themselves a return out of the operating revenue of the Debtor ahead of creditors, and did so irrespective of the Debtor's and/or TrashMasters' financial condition.

350.   In May 2009, the TrashMasters O/Ds and Debtor O/Ds (including without limitation, Mr. Asay, Sr., and Mr. Asay, Jr., and excepting Mr. Leonard, Mr. Gourlay, and Mr. Colbeck) had knowledge of and consented to the Corridor O/Ds and SPB O/Ds furthering their own interests, and assuring themselves a return out of the operating revenue of the companies ahead of creditors, irrespective of the Debtor's and/or TrashMasters' financial condition.

351.   At the same time, the Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds undercapitalized the companies they set up, and in particular the Debtor and TrashMasters.

352. Mr. Asay, Sr. and Mr. Asay, Jr. had (or should have had) knowledge of and consented to the undercapitalization of the Debtor and TrashMasters.

353. The Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds also fully leveraged all, or substantially all, of the assets of the Debtor to secure, guarantee, and pay the debt obligations and creditors of TrashMasters and TMAZ.

354. Mr. Asay, Sr. and Mr. Asay, Jr. consented to the leveraging and pledge of the Debtor's assets to secure, guarantee, and pay the debt obligations and creditors of TrashMasters and TMAZ.

355. The Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds deliberately encumbered the assets of the Debtor to pay the debts of TrashMasters, TMAZ and others and to place the Debtor's assets beyond the reach of the Debtor's creditors.

356. Mr. Asay, Sr. and Mr. Asay, Jr. consented to the Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds deliberately encumbering the assets of the Debtor to pay the debts of TrashMasters, TMAZ and others and to place the Debtor's assets beyond the reach of the Debtor's creditors.

357. In particular, the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, Mr. Asay, Sr. and Mr. Asay, Jr. procured and incurred the UB

Credit Agreement obligations, together with the related $4.5 UB Term Loan, UB $500k LOC obligations, and the UB Security Agreement pledge (collectively the "UB Credit Facility").

358.  The Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, Mr. Asay, Sr. and Mr. Asay, Jr. overstated the value of the Debtor's assets in its financial statements to obtain the UB Credit Facility.

359.  The Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds knew that UB Credit Facility would operate to the detriment of the Debtor's creditors.

360.  The UB Credit Facility facilitated and benefitted the Corridor Entities', Corridor O/Ds', SPB Entities', and SPB O/Ds' "private equity firm interests" or investment scheme of buying and selling companies and/or their assets.

361.  The UB Credit Facility obligations and pledge facilitated and benefitted the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, Mr. Asay, Sr. and Mr. Asay, Jr. in their scheme to have TrashMasters purchase the assets of Maricopa and ROHI and have the Debtor pay for TrashMasters' purchase.

362.  Union Bank was a conduit of the UB Credit Facility.

363.  The Debtor received a small portion (only $203,835.78) of the proceeds of the UB Credit Facility.

364. The proceeds of the UB Credit Agreement were used to pay TrashMasters' obligations pursuant to the ROHI APA and the Maricopa APA, as well as other fees and expenses related to said acquisitions, the UB Credit Facility, and TrashMasters.

365. The UB Credit Facility was made specifically for the benefit of the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, Mr. Asay, Sr., Mr. Asay, Jr., TrashMasters (and its equity holders), ROHI, Maricopa, and TMAZ.

366. TrashMasters, the Corridor O/Ds, SPB O/Ds, Mr. Asay, Sr. and Mr. Asay, Jr. directed how and to whom the proceeds of the UB Credit Facility would be distributed.

367. Proceeds of the UB Credit Facility were used to pay the debts of TrashMasters to ROHI.

368. Proceeds of the UB Credit Facility were used to pay ROHI's line of credit, liens on certain ROHI assets, and ROHI for assets it sold to TrashMasters.

369. The UB Credit Facility also facilitated TrashMasters' acquisition of the ROHI assets, and allowed ROHI to become an equity holder in TrashMasters.

370. Proceeds of the UB Credit Facility were used to pay liens on certain Maricopa assets sold to TrashMasters.

371.  Proceeds of the UB Credit Facility were used to pay the debt of Maricopa.

372.  Proceeds of the UB Credit Facility were used to pay certain "legacy costs" and "deal expenses" attributable to TrashMasters and Mr. Asay, Sr.

373.  At the time of inception, the Debtor had no outstanding debt. There was no need for the Debtor to incur the UB Credit Facility, or to encumber all of the Debtor's assets to secure the UB Credit Facility.

374.  Although TMAZ was a borrower on the UB Credit Facility, it made no payments to Union Bank in connection with the UB Credit Facility.

375.  The UB Credit Facility was intended to benefit and in fact benefitted TrashMasters (and its equity holders), the Corridor Entities, SPB Entities, Corridor O/Ds, and SPB O/Ds and facilitated both their private equity firm and their scheme to hinder, delay, and defraud the Debtor's creditors.

376.  The UB Credit Facility was also intended to benefit, and in fact benefitted, Mr. Asay, Sr. and Mr. Asay, Jr. as officers and equity holders in the entities that owned the Maricopa assets, and as officers and equity holders in TrashMasters.

377.  The UB Credit Facility was also intended to benefit, and in fact benefitted, ROHI, as the seller of the ROHI assets TrashMasters acquired, and as an equity holder in TrashMasters.

378. The UB Credit Facility was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

379. The Debtor was insolvent from inception.

380. The Debtor was also insolvent or became insolvent shortly after the incurring the UB Credit Facility obligations and pledge.

381. The Debtor was generally not paying its debts as they become due and is presumed insolvent.

382. The Debtor made approximately $1,714,285 in payments on account of the UB Credit Facility.

383. The UB Credit Facility was paid off on or about June 26, 2012 from proceeds of the 2012 ASB Credit Facility.

384. The June 26, 2012, total payoff amount for the UB Credit Facility was approximately $3,341,719.

385. The June 26, 2012 payoff amount for the UB Credit Facility included the following: $503,500.68 for the UB $500k LOC, $2,805,218.36 for the $4.5M UB Term Loan, and $33,000.00 for a Union Bank Amendment Fee.

386. Incurring the entire UB Credit Facility obligation and pledge constitutes a fraudulent conveyance, pursuant to 11 U.S.C. § 544(b)(1) and common law, and Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred and/or the value thereof including,

among other things, all amounts the Debtor paid in connection with the UB Credit Facility obligations and pledge, including without limitation the loan payments paid directly to Union Bank and the payoff of the Union Bank loan from the proceeds of the 2012 ASB Credit Agreement, together with the loan fees and costs, and interest, as the Court shall determine.

## COUNT 2
### FRAUDULENT TRANSFER
### 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(A), Haw. Rev. Stat. § 651C-4(a)(1), and 11 U.S.C. § 550
### (*2009 UB Credit Facility*)

387. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 386, and highlights the allegations set forth in Count I as relevant to this Count.

388. In addition, or in the alternative, incurring the UB Credit Facility obligation and pledge was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

389. The UB Credit Facility was also intended to benefit, and in fact benefitted, TrashMasters (and its equity holders), the Corridor Entities, SPB Entities, Corridor O/Ds, and SPB O/Ds and facilitated both their private equity firm interests and their scheme to hinder, delay, and defraud the Debtor's creditors.

390. The UB Credit Facility was also intended to benefit, and in fact benefitted, Mr. Asay, Sr. and Mr. Asay, Jr. as officers and equity holders in the

entities that owned the Maricopa assets, and as officers and equity holders in TrashMasters.

391. The UB Credit Facility was also intended to benefit, and in fact benefitted, ROHI, as the seller of the ROHI assets TrashMasters acquired, and as an equity holder in TrashMasters.

392. Incurring the entire UB Credit Facility obligation and pledge constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(A), and/or Haw. Rev. Stat. § 651C-4(a)(1), and Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred and/or the value thereof including, among other things, all amounts the Debtor paid in connection with the UB Credit Facility obligations and pledge, including without limitation the loan payments paid directly to Union Bank and the payoff on the Union Bank loan from the proceeds of the 2012 ASB Credit Agreement, together with the loan fees and costs, and interest, as the Court shall determine.

## COUNT 3
## FRAUDULENT TRANSFER
## 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. §3304(b)(1)(B), Haw. Rev. Stat. § 651C-4(a)(2), and 11 U.S.C. § 550
## (*2009 UB Credit Facility*)

393.   Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 392, and highlights the allegations set forth in Count 1 as relevant to this Count.

394.   In addition, or in the alternative, the Debtor incurred the UB Credit Facility obligation and executed the pledge for no consideration.

395.   The Debtor incurred the UB Credit Facility obligation and executed the pledge without receiving a reasonably equivalent value in exchange for said obligation.

396.   Prior to incurring the UB Credit Facility obligation and pledge, the Corridor Entities, SPB Entities, Corridor O/Ds, SPB O/Ds, Mr. Asay, Sr. and Mr. Asay, Jr.  authorized and/or directed Union Bank to disburse the proceeds of the UB Credit Facility to pay the debts and creditors of TrashMasters and others.

397.   Union Bank was a conduit of the proceeds of the UB Credit Facility.

398.   To the extent the proceeds of the UB Credit Facility were not disbursed to the Debtor, and instead, TrashMasters, as the manager of the Debtor, and the TrashMasters O/Ds directed the disbursement of the proceeds of the UB

Credit Facility to ROHI, the Debtor received no reasonably equivalent value in exchange for the UB Credit Facility obligation and pledge and instead both TrashMasters and ROHI directly benefitted from the UB Credit Facility obligation and pledge.

399. The Debtor was insolvent or became insolvent shortly after it incurred the UB Credit Facility obligation and pledge.

400. After incurring the UB Credit Facility obligation and pledge, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

401. The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

402. TrashMasters was an insider of the Debtor.

403. The UB Credit Facility was intended to benefit, and in fact benefitted, TrashMasters (and its equity holders), the Corridor Entities, SPB Entities, Corridor O/Ds, and SPB O/Ds and facilitated both their private equity firm interests and their scheme to hinder, delay, and defraud the Debtor's creditors.

404. The UB Credit Facility was also intended to benefit, and in fact benefitted, Mr. Asay, Sr. and Mr. Asay, Jr. as officers and equity holders in the

entities that owned the Maricopa assets, and as officers and equity holders in TrashMasters.

405. The UB Credit Facility also benefitted ROHI, as the seller of the ROHI assets TrashMasters acquired, and as an equity holder in TrashMasters.

406. Incurring the entire UB Credit Facility obligation and pledge constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(B), and/or Haw. Rev. Stat. § 651C-4(a)(2), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred and/or the value thereof including, among other things, all amounts the Debtor paid in connection with the UB Credit Facility obligations and pledge, including without limitation the loan payments paid directly to Union Bank and the payoff of the Union Bank loan from the proceeds of the 2012 ASB Credit Agreement, together with the loan fees and costs, and interest, as the Court shall determine.

**COUNT 4**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1),**
**Haw. Rev. Stat. § 651C-5(a), and 11 U.S.C. § 550**
**(*2009 UB Credit Facility*)**

407. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 406, and highlights the allegations set forth in Count 1 as relevant to this Count.

408. In addition, or in the alternative, the Debtor incurred the UB Credit Facility obligation and pledge for no consideration.

409. The UB Credit Facility obligation and pledge was incurred to pay the debts of TrashMasters and to facilitate the investment scheme of the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, and TrashMasters.

410. The Debtor incurred the UB Credit Facility obligation and pledge without receiving a reasonably equivalent value in exchange for said obligation and pledge.

411. The Debtor was insolvent or became insolvent shortly after incurring the UB Credit Facility obligation and pledge.

412. After incurring the UB Credit Facility obligation and pledge, and making the payments due to Union Bank in connection with the UB Credit Facility, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

413. The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

414. TrashMasters, the Corridor O/Ds and SPB O/Ds were insiders of the Debtor.

415. The UB Credit Facility intended to benefit and in fact benefitted TrashMasters (and its equity holders), the Corridor Entities, SPB Entities, Corridor O/Ds, and SPB O/Ds and facilitated both their private equity firm interests and their scheme to hinder, delay, and defraud the Debtor's creditors.

416. The UB Credit Facility was also intended to benefit and in fact benefitted Mr. Asay, Sr. and Mr. Asay Jr. as officers and equity holders in the entities that owned the Maricopa assets, and as officers and equity holders in TrashMasters.

417. The UB Credit Facility was also intended to benefit and in fact benefitted ROHI, as the seller of the ROHI assets TrashMasters acquired, and as an equity holder in TrashMasters.

418. Incurring the entire UB Credit Facility obligation and pledge constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), and/or Haw. Rev. Stat. § 651C-5(a), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred and/or the value thereof including, among other things, all amounts the Debtor paid in connection with the UB Credit Facility obligations and pledge, including without limitation the loan payments paid directly to Union Bank and the payoff of the Union Bank loan from the proceeds of the 2012 ASB Credit

Agreement, together with the loan fees and costs, and interest, as the Court shall determine.

## COUNT 5
### FRAUDULENT CONVEYANCE
### 11 U.S.C. § 544(b)(1), Common Law, and 11 U.S.C. §550
### (*2009 Payments to ROHI*)

419. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 418.

420. In addition, or in the alternative, to the extent it is determined that the proceeds of the 2009 UB Credit Facility were in the Debtor's dominion, the Debtor made a $6,093,440.55 payment from the Debtor to ROHI ("$6M ROHI Payment") on or about May 1, 2009.

421. The proceeds of the 2009 UB Credit Facility were used to fund, in part, the $6M ROHI Payment.

422. The Debtor also made in or about May 1, 2009, $1,067,551.32 in other payments ("Other ROHI Payments") to pay off ROHI's line of credit with Bank of Hawaii, to pay off ROHI lien holders, and to pay ROHI.

423. The proceeds of the 2009 UB Credit Facility were used to fund, in whole or in part, the Other ROHI Payments.

424. The $6M ROHI Payment and Other ROHI Payments were made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

425.   In or about May 1, 2009, ROHI was not a creditor of the Debtor.

426.   In or about May 1, 2009, TrashMasters was not a creditor of the Debtor.

427.   TrashMasters, the Corridor Entities, Corridor O/Ds (including without limitation, Mr. Enenstein and Mr. Monnier), SPB Entities, SPB O/Ds (including without limitation, Mr. Bass, Mr. Bulloch and Mr. Pressberg), TrashMasters O/Ds, Debtor O/Ds, Mr. Asay, Sr., and Mr. Asay, Jr. caused and directed the Debtor to make the $6M ROHI Payment and the Other ROHI Payments from proceeds of the 2009 UB Credit Facility.

428.   The $6M ROHI Payment and Other ROHI Payments were intended to benefit and were in fact made for the benefit of TrashMasters (and its equity holders), the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, Mr. Asay, Sr., and Mr. Asay, Jr.

429.   The $6M ROHI Payment and Other ROHI Payments facilitated and furthered the scheme of TrashMasters, the Corridor Enterprise, and Corridor O/Ds, SPB Enterprise, SPB O/Ds, Mr. Asay, Sr., and Mr. Asay, Jr. to have TrashMasters acquire, but not fully pay for, the assets of ROHI.

430.   The Debtor paid ROHI the $6M ROHI Payment and Other ROHI Payments in connection with the ROHI APA.

431. Pursuant to the ROHI APA, TrashMasters was liable to ROHI for the purchase price.

432. The Debtor should not have made the $6M ROHI Payment and Other ROHI Payments to ROHI.

433. TrashMasters, the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, Mr. Asay, Sr., and Mr. Asay, Jr. caused the Debtor to incur the UB Credit Facility obligation and pledge, which encumbered all, or substantially all, of the Debtor's assets to fund, among other things, the $6M ROHI Payment and the Other ROHI Payments.

434. Payment of the $6M ROHI Payment and the Other ROHI Payments consumed all of the proceeds of the UB Credit Facility.

435. Pursuant to the UB Security Agreement, all of the Debtor's assets were encumbered and no assets were available to satisfy the Debtor's unsecured creditors' claims, including its trade creditors' claims.

436. The Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds knew (or should have known) that the $6M ROHI Payment and Other ROHI Payments would operate to the detriment of the Debtor's creditors.

437. The Debtor's payment of TrashMasters' debts lessened the liabilities of TrashMasters.

438. The Debtor's payment of TrashMasters' debts lessened the exposure to liability of TrashMasters (and its equity holders), the TrashMasters O/Ds, TrashMasters members, Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, and the investors of SPB Waste and Corridor TM.

439. The TrashMasters O/Ds, TrashMasters members, Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds, intended to lessen their respective exposure to liability.

440. The Debtor was insolvent from inception.

441. The Debtor was also insolvent or became insolvent shortly after making the $6M ROHI Payment and the Other ROHI Payments.

442. The Debtor was generally not paying its debts as they become due and is presumed insolvent.

443. ROHI knew, or should have known, that the $6M ROHI Payment and the Other ROHI Payments were funded by the proceeds of the UB Credit Facility.

444. ROHI knew, or should have known, that the $6M ROHI Payment and the Other ROHI Payments were avoidable transfers.

445. ROHI knew, or should have known, that the UB Credit Facility obligation and pledge was an avoidable transfer.

446.   The Debtor received no consideration or value in exchange for paying the obligations of TrashMasters to ROHI.

447.   The Debtor received no consideration or value in exchange for paying the lienholders of ROHI.

448.   The Debtor received no consideration or value in exchange for paying the ROHI line of credit.

449.   TrashMasters' contribution of the assets it acquired under the ROHI APA, as equity, pursuant to the 2009 Contribution Agreement, did not add value to the Debtor because, among other things, those assets were fully encumbered pursuant to the UB Security Agreement and not available to the Debtor or its creditors.

450.   To the extent the Debtor had full dominion of the proceeds of the UB Credit Facility and proceeds of the UB Credit Facility were used to fund the $6M ROHI Payment and the ROHI Other Payments said payments constitute fraudulent conveyances, pursuant to 11 U.S.C. § 544(b)(1) and common law, and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said conveyances and recover the property transferred and/or the value thereof, together with interest, as the Court shall determine.

## COUNT 6
### FRAUDULENT TRANSFER
### 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1),
### 28 U.S.C. § 3304(b)(1)(A) Haw. Rev. Stat. § 651C-4(a)(1), and 11 U.S.C. § 550
### (*2009 Payments to ROHI*)

451. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 450, and highlights the allegations set forth in Count 5 as relevant to this Count.

452. In addition, or in the alternative, to the extent the Debtor had dominion of the proceeds of the UB Credit Facility, and proceeds of the UB Credit Facility were used to fund the $6M ROHI Payment and the ROHI Other Payments, said payments were made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

453. The $6M ROHI Payment and Other ROHI Payments were intended to benefit, and were in fact made for the benefit of TrashMasters (and its equity holders), the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, Mr. Asay, Sr., and Mr. Asay, Jr.

454. To the extent the Debtor had full dominion of the proceeds of the UB Credit Facility, and proceeds of the UB Credit Facility were used to fund the $6M ROHI Payment and the ROHI Other Payments said payments constitute avoidable transfers, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(A), and/or Haw. Rev. Stat. § 651C-4(a)(1),

U.S. Bankruptcy Court - Hawaii  #18-90035  Dkt # 71  Filed  07/31/19  Page 83 of 173

and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfers and recover the property transferred and/or the value thereof, together with interest, as the Court shall determine.

**COUNT 7**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)**
**and 6502(a)(1), Haw. Rev. Stat. § 651C-4(a)(2),**
**28 U.S.C § 3304(b)(1)(B), and 11 U.S.C. § 550**
*(2009 ROHI Payments)*

455.   Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 454, and highlights the allegations set forth in Count 5 as relevant to this Count.

456.   In addition, or in the alternative, to the extent the Debtor had dominion of the proceeds of the UB Credit Facility, and proceeds of the UB Credit Facility were used to fund the $6M ROHI Payment and the ROHI Other Payments, the Debtor made the $6M ROHI Payment and ROHI Other Payments without receiving a reasonably equivalent value in exchange for said payments.

457.   The $6M Payment and the ROHI Other Payments was made on account of an obligation of TrashMasters to ROHI, and/or on account of ROHI's obligations to its lienholders and lender.

458.   The Debtor had no liability for these obligations.

459.   The Debtor was insolvent or became insolvent shortly after it made the $6M ROHI Payment and the ROHI Other Payments.

460.   After making the $6M ROHI Payment and the ROHI Other Payments, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

461.   The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

462.   The $6M ROHI Payment and Other ROHI Payments were intended to be made and were in fact made for the benefit of TrashMasters (and its equity holders), the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, Mr. Asay, Sr., and Mr. Asay, Jr.

463.   To the extent the Debtor had full dominion of the proceeds of the UB Credit Facility, and proceeds of the UB Credit Facility were used to fund the $6M ROHI Payment and the ROHI Other Payments said payments constitute avoidable transfers, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(B), and/or Haw. Rev. Stat. § 651C-4(a)(2), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfers and recover the property transferred and/or the value thereof, together with interest, as the Court shall determine.

## COUNT 8
## FRAUDULENT TRANSFER
## 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1),
## Haw. Rev. Stat. § 651C-5(a), and 11 U.S.C. § 550
## (*2009 ROHI Payments*)

464.   Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 463, and highlights the allegations set forth in Count 5 as relevant to this Count.

465.   In addition, or in the alternative, to the extent the Debtor had full dominion of the proceeds of the UB Credit Facility, and proceeds of the UB Credit Facility were used to fund the $6M ROHI Payment and the ROHI Other Payments, the Debtor made the $6M ROHI Payment and ROHI Other Payments without receiving a reasonably equivalent value in exchange for said payments.

466.   The $6M Payment and the ROHI Other Payments was made on account of an obligation of TrashMasters to ROHI, and/or on account of ROHI's obligations to its lienholders and lender.

467.   The Debtor had no liability for these obligations.

468.   The Debtor was insolvent or became insolvent shortly after it made the $6M ROHI Payment and the ROHI Other Payments.

469.   After making the $6M ROHI Payment and the ROHI Other Payments, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

470.   The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

471.   The $6M ROHI Payment and Other ROHI Payments were intended to be made, and were made for the benefit of TrashMasters (and its equity holders), the Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, Mr. Asay, Sr., and Mr. Asay, Jr.

472.   To the extent the Debtor had full dominion of the proceeds of the UB Credit Facility and proceeds of the UB Credit Facility were used to fund the $6M ROHI Payment and the ROHI Other Payments said payments constitute avoidable transfers, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), and/or Haw. Rev. Stat. § 651C-5(a), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfers and recover the property transferred and/or the value thereof, together with interest, as the Court shall determine.

**COUNT 9**
**FRAUDULENT CONVEYANCE**
**11 U.S.C. § 544(b)(1), Common Law and 11 U.S.C. § 550**
**(*Advisory Agreement*)**

473.   Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 472.

474.   The Advisory Agreement was not an arms-length transaction.

475.   The Advisory Agreement was a one-sided contract.

476.   The Corridor O/Ds controlled, managed, and represented the Corridor Entities, including Corridor Capital, a party to the Advisory Agreement.

477.   Certain Corridor Entities also controlled and/or managed Corridor Capital.

478.   The SPB O/Ds controlled, managed, and represented the SPB Entities, including SPB Management, a party to the Advisory Agreement.

479.   Certain SPB Entities also controlled and/or managed SPB Management.

480.   The Corridor Enterprise controlled TrashMasters, which was the Debtor's manager.

481.   The SPB Enterprise controlled TrashMasters, which was the Debtor's manager.

482.   The Advisory Agreement was a mechanism by which the Corridor Enterprise, Corridor O/Ds, SPB Enterprise, and SPB O/Ds could direct and control the Debtor's affairs for each of their own benefit and engage in self-dealing.

483.   The Advisory Agreement was entered into at, or near, the same time as the Union Bank Credit Facility (including the UB $4.5M Term Loan, UB

$500k LOC, and UB Security Agreement), the ROHI APA, the Maricopa APA, and 2009 Contribution Agreement.

484.    The Advisory Agreement contemplated the future sale of TrashMasters and its subsidiaries, including the Debtor.

485.    The Corridor O/Ds, Corridor Enterprise, SPB O/Ds, and SPB Enterprise in structuring the Advisory Agreement assured themselves a return out of the Debtor's operating revenue, ahead of the Debtor's creditors, and irrespective of the Debtor's financial condition.

486.    The Advisory Agreement was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

487.    The Advisory Agreement contemplated Corridor Capital and SPB Management furnishing the Debtor, TrashMasters, and TMAZ certain advisory services.

488.    The Debtor had its own officers and directors.

489.    TrashMasters had its own officers and directors.

490.    TMAZ had its own officers and directors.

491.    The former owners of ROHI, Maricopa and KNG, namely Mr. Asay, Sr., Mr. Asay, Jr., Ms. Henriques, and Mr. Gourlay, ran the day-to-day operations of their respective businesses.

492.   The former owners of ROHI, Maricopa, and KNG were hired at different times to run the Debtor's operations.

493.   Corridor Capital had no specialized knowledge, skill, or expertise in the refuse business.

494.   The Corridor Enterprise had no specialized knowledge, skill, or expertise in the refuse business.

495.   The Corridor O/Ds had no specialized knowledge, skill, or expertise in the refuse business.

496.   SPB Management had no specialized knowledge, skill, or expertise in the refuse business.

497.   The SPB Enterprise had no specialized knowledge, skill, or expertise in the refuse business.

498.   The SPB O/Ds had no specialized knowledge, skill, or expertise in the refuse business.

499.   All costs related to TrashMasters' acquisition of the ROHI and Maricopa assets were paid in May 2009.

500.   In or about May 1, 2009, Corridor Capital was paid $23,587.84 in "deal expenses".

501.   In or about May 1, 2009, SPB Waste was paid $23,684.43 in "deal expenses".

502. The amounts paid to Corridor Capital and SPB in May 1, 2009 were in addition to amounts paid to other professionals for "deal expenses" and "legacy costs", including without limitation, (i) $98,902.00 to Green Hasson & Janks, an accounting firm, (ii) $140,631.05 to Buchalter Nemer, a law firm, (iii) $69,490.00 to Mr. Asay, Sr., and (iv) $24,432.00 to Arnold Rothlisberger, attorney for Mr. Asay, Sr. and/or Mr. Asay, Jr.

503. The Advisory Agreement was intended by the Corridor O/Ds and SPB O/Ds to serve as a mechanism to extract additional money from the Debtor.

504. Advisory Fees accrued under the Advisory Agreement from the inception of the Debtor, TrashMasters and TMAZ.

505. The Advisory Fees had a minimum floor and accrued irrespective of how much capital or net income the Debtor, TrashMasters and TrashMasters generated.

506. TrashMasters generated no income and had no business operations.

507. TrashMasters had no ability, independent of the Debtor, to pay Advisory Fees.

508. Advisory Fees accrued even if the Debtor, TrashMasters, and/or TMAZ were insolvent.

509. Advisory Fees accrued even if Corridor Capital and/or SPB Management furnished no services to the Debtor, TrashMasters, and/or TMAZ.

510. The Advisory Fees were based on EBITDA and a minimum floor not based on the actual services performed under the Advisory Agreement.

511. The Advisory Fees had a minimum fee amount, or floor, which increased each year, irrespective of the Debtor's performance.

512. The Advisory Agreement required pre-payment of the Advisory Fees in the minimum "floor" amount.

513. The first annual pre-payment of Advisory Fees was due on October 1, 2009.

514. In subsequent years, the annual prepayment of Advisory Fees was due on May 1, 2009 of each year, or the beginning of the annual period.

515. The Advisory Agreement required a "true-up" payment in June of each year, after the end of the applicable annual period.

516. The terms of the Advisory Agreement further required payment of Corridor Capital's and SPB Management's out of pocket expenses and upon information and belief, the Debtor paid Corridor Capital's and SPB Management's out of pocket expenses.

517. The Debtor was not the only party obligated under the Advisory Agreement.

518. The Advisory Agreement did not distinguish between the services to be furnished to TrashMasters, the Debtor, or TMAZ.

519. The Advisory Agreement did not distinguish between the services Corridor Capital or SPB Management furnished the Debtor.

520. The Advisory Agreement did not require any kind of accounting or audit of services actually furnished under the Advisory Agreement.

521. The Advisory Agreement permitted Corridor Capital and SPB Management to receive Advisory Fees even if they furnished no services under the Advisory Agreement.

522. Any services Corridor Capital or SPB Management under the Advisory Agreement was of little or no value to the Debtor.

523. Any services furnished under the Advisory Agreement were duplicative of and overlapped the services of the officers, directors and managers of the Debtor, TrashMasters, and/or TMAZ.

524. Any services furnished under the Advisory Agreement resulted in the diversion of the Debtor's operating funds to pay debts for which it was not obligated to pay and to benefit others.

525. Any services furnished under the Advisory Agreement caused the Debtor to incur obligations, including without limitation loan and guaranty obligations for the purpose of paying the debts of others.

526. Any services furnished under the Advisory Agreement resulted in the Debtor understating its debt and overstating the value of its assets in its financial statements.

527. The Debtor made all, or substantially all, of the payments made on account of the Advisory Agreement.

528. The Advisory Agreement was intended as a vehicle to siphon money out of the Debtor to pay Corridor Capital and SPB Management Advisory Fees ahead of the Debtor's creditors.

529. The Advisory Fees paid to Corridor Capital and SPB Management were in turn paid to the other Corridor Entities and Corridor O/Ds (including Mr. Enenstein, Mr. Monnier, Mr. Greulich, and Ms. Davis), and other SPB Entities and SPB O/Ds (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg).

530. The other Corridor Entities, Corridor O/Ds, other SPB Entities, and SPB O/Ds, among others, each were intended to benefit and in fact benefitted from the Advisory Agreement.

531. The terms of the Advisory Agreement purported to relieve Corridor Capital and SPB Management of any responsibility for their advice or any losses.

532. The Advisory Agreement was not an arms-length or good faith transaction.

533. The Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds knew that the Advisory Agreement would operate to their benefit and to the detriment of the Debtor's creditors.

534. The Advisory Agreement was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

535. The Advisory Agreement constitutes an avoidable conveyance, pursuant to 11 U.S.C. § 544(b)(1) and common law, and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said conveyance and recover the property transferred or the value thereof, including all payments made on account of or in connection with the Advisory Agreement, together with interest as the Court shall determine.

## COUNT 10
### FRAUDULENT TRANSFER
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1),
28 U.S.C. § 3304(b)(1)(A), Haw. Rev. Stat. § 651C-4(a)(1), and 11 U.S.C. § 550
(*Advisory Agreement*)**

536. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 535, and highlights the allegations set forth in Count 9 as relevant to this Count.

537. In addition, or in the alternative, the Advisory Agreement was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

538. The other Corridor Entities, Corridor O/Ds, other SPB Entities, and SPB O/Ds, among others, each were intended to benefit and in fact benefitted from the Advisory Agreement.

539. The Advisory Agreement constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(A), and/or Haw. Rev. Stat. § 651C-4(a)(1) and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, including all payments made on account of or in connection with the Advisory Agreement, together with interest as the Court shall determine.

## COUNT 11
## FRAUDULENT TRANSFER
## 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1),
## 28 U.S.C. § 3304(b)(1)(B), Haw. Rev. Stat. § 651C-4(a)(2), and 11 U.S.C. § 550
## (*Advisory Agreement*)

540. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 539, and highlights the allegations set forth in the Count 9 as relevant to this Count.

541. In addition, or in the alternative, the Debtor incurred the Advisory Agreement obligation without receiving a reasonably equivalent value in exchange for said agreement.

542. The Debtor was insolvent or became insolvent shortly after it incurred the Advisory Agreement obligation.

543. At the time the obligation was incurred, the newly formed Debtor had little or no revenue to pay expenses outside of its operating costs.

544. In or about the same time that the Debtor pre-paid the October 2, 2009 Advisory Fees to Corridor Capital ($200,000.00) and SPB Management ($100,000.00), it drew down on its UB $500k LOC.

545. The Debtor could not, and was not able to pay the Advisory Agreement obligations on a going forward basis or on time.

546. After incurring the Advisory Agreement obligation, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

547. The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

548. The other Corridor Entities, Corridor O/Ds, other SPB Entities, and SPB O/Ds, among others, each were intended to benefit, and in fact benefitted, from the Advisory Agreement.

549. The Advisory Agreement constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28

U.S.C. § 3304(b)(1)(B), and/or Haw. Rev. Stat. § 651C-4(a)(2) and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, including all payments made on account of or in connection with the Advisory Agreement, together with interest, as the Court shall determine.

**COUNT 12**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1),**
**Haw. Rev. Stat. § 651C-5(a), and 11 U.S.C. § 550**
**(*Advisory Agreement*)**

550. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 549, and highlights the allegations set forth in Count 9 as relevant to this Count.

551. In addition, or in the alternative, the Debtor incurred the Advisory Agreement obligation without receiving a reasonably equivalent value in exchange for said obligation.

552. The Debtor was insolvent or became insolvent shortly after it incurred the Advisory Agreement obligation.

553. After incurring the Advisory Agreement obligation, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

554. The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

555. The Corridor Entities, including Corridor Capital and the SPB Entities, including SPB Management were insiders of the Debtor.

556. The other Corridor Entities, Corridor O/Ds, other SPB Entities, and SPB O/Ds, among others, each were intended to benefit and in fact benefitted from the Advisory Agreement.

557. The Advisory Agreement constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), and/or Haw. Rev. Stat. § 651C-5(a) and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, including all payments made on account of or in connection with the Advisory Agreement, together with interest, as the Court shall determine.

## COUNT 13
### FRAUDULENT CONVEYANCE
### 11 U.S.C. § 544(b)(1), Common Law and 11 U.S.C. § 550
### (*Corridor Capital Advisory Fees*)

558. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 557, and highlights the allegations set forth in Count 9 as also relevant to this Count.

559. On or about October 2, 2009, the Debtor paid Corridor Capital $200,000.00 in advisory fees.

560. On or about May 6, 2010, the Debtor paid Corridor Capital $210,000.00 in advisory fees.

561. On or about May 20, 2011, the Debtor paid Corridor Capital $50,000.00 in advisory fees.

562. Collectively, the above advisory fees in 2009-2011 are referred to herein as the "Corridor 2009-2011 Advisory Fees".

563. On or about June 27, 2012, Corridor Capital was paid $289,018.75 for accrued and unpaid fees pursuant to the Advisory Agreement (the "2012 Corridor Advisory Fee").

564. On or about May 20, 2013, the Debtor paid Corridor Capital $182,325.94 in advisory fees (the "2013 Corridor Advisory Fee").

565. On or about May 5, 2014, the Debtor paid Corridor Capital $95,721.12 in advisory fees (the "2014 Corridor Advisory Fee").

566. The Corridor 2009-2011 Advisory Fees, the 2012 Corridor Advisory Fee, the 2013 Advisory Fee and the 2014 Advisory Fee are collectively referred to herein as the "Corridor Advisory Fees".

567. The Debtor's payment of the Corridor Advisory Fees was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

568. The Debtor did not have available funds to pay the Corridor Advisory Fees outstanding in 2012, and was made to incur the 2012 $2.5M Convergent Loan (and financing costs), which loan the Debtor serviced.

569. The Debtor's payment of the Corridor Advisory Fees outstanding in 2012 ($289,018.75) was made from proceeds of the 2012 $2.5M Convergent Loan.

570. The 2012 $2.5M Convergent Loan obligation was incurred to pay, among other things, the outstanding Corridor Advisory Fees in 2012, even if it left the Debtor insolvent or unable to pay its debts as they became due.

571. The 2012 $2.5M Convergent Loan was made for the benefit of, among others, Corridor Capital and the other Corridor Entities.

572. The 2012 $2.5M Convergent Loan and 2012 Corridor Advisory Fees were made with the intent to hinder, delay and defraud creditors.

573. The Debtor's payment of the 2013 Corridor Advisory Fees and the 2014 Corridor Advisory Fees occurred shortly after the 2012 ASB Credit Agreement and 2012 $2.5M Convergent Loan and shortly before the 2015 ASB Refinance.

574. Certain Corridor O/Ds were at the same time principals, managers, and/or directors and officers of one or more Corridor Entities.

575. Certain Corridor O/Ds directly participated in the structuring, drafting, negotiation and approval of the Advisory Agreement.

576. The TrashMasters O/Ds and Debtor O/Ds approved of the Advisory Agreement.

577. The Advisory Agreement expressly permitted the accrual of advisory fees when the Debtor was insolvent.

578. Corridor Capital, the Corridor O/Ds, and the other Corridor Entities did not provide adequate or good consideration in exchange for the Corridor Advisory Fees.

579. Corridor Capital, the Corridor O/Ds, and the other Corridor Entities participated in, had knowledge of, and/or directed the payment of the Corridor Advisory Fees.

580. Corridor Capital, the Corridor O/Ds, and the other Corridor Entities are insiders of the Debtor.

581. Corridor Capital, the Corridor O/Ds. and the other Corridor Entities had direct knowledge of the Debtor's financial condition and financial affairs.

582. Corridor Capital, the Corridor O/Ds and the other Corridor Entities had direct knowledge that the Debtor was insolvent, or was made insolvent as a result of the Corridor Advisory Fees.

583. Corridor Capital, the Corridor O/Ds, and the other Corridor Entities purposefully paid Corridor Capital ahead of other creditors, including without limitation the C&C, the Internal Revenue Service, and the State of Hawaii Department of Taxation.

584. The Debtor was insolvent or became insolvent shortly after the payment of the Corridor Advisory Fees.

585. Corridor Capital and the other Corridor Entities were insiders of the Debtor.

586. The Corridor Entities and Corridor O/Ds, including, among others, Mr. Enenstein, Mr. Monnier, Mr. Greulich, and Ms. Davis were intended to benefit, and in fact benefitted, from the Corridor Advisory Fees.

587. The Debtor's payment of the Corridor Advisory Fees constitutes avoidable fraudulent conveyances, pursuant to 11 U.S.C. § 544(b)(1) and Common Law, and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said conveyances and recover the property transferred or the value thereof, together with interest as the Court shall determine.

## COUNT 14
### FRAUDULENT TRANSFER
### 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)
### and 6502(a)(1), Haw. Rev. Stat. § 651C-4(a)(1),
### 28 U.S.C § 3304(b)(1)(A), and 11 U.S.C. § 550
### (*Corridor Capital Advisory Fees*)

588.    In addition, or in the alternative, Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 587, and highlights the allegations set forth in Count 13 as relevant to this Count.

589.    The Debtor's payment of each of the Corridor Advisory Fees was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

590.    The Corridor Entities and Corridor O/Ds, including, among others, Mr. Enenstein, Mr. Monnier, Mr. Greulich, and Ms. Davis were intended to benefit, and in fact benefitted, from the Debtor's payment of the Corridor Advisory Fees.

591.    The Debtor's payment of each of the Corridor Advisory Fees constitutes avoidable transfers, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), Haw. Rev. Stat. § 651C-4(a)(1) and/or 28 U.S.C. § 3304(b)(1)(A), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfers and recover the property transferred or the value thereof, together with interest as the Court shall determine.

**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)**
**and 6502(a)(1), Haw. Rev. Stat. § 651C-4(a)(2),**
**28 U.S.C § 3304(b)(1)(B), and 11 U.S.C. § 550**
**(*Corridor Capital Advisory Fees*)**

592. In addition, or in the alternative, Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 591, and highlights the allegations set forth in Count 13 as relevant to this Count.

593. The Corridor Advisory Fees were paid without the Debtor receiving a reasonably equivalent value in exchange for its payment of said fees.

594. The Debtor was insolvent or became insolvent shortly after payment of each of the Corridor Advisory Fees.

595. After payment of each of the Corridor Advisory Fees, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

596. The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

597. Corridor Capital and the other Corridor Entities were insiders of the Debtor.

598. The Corridor Entities and Corridor O/Ds, including, among others, Mr. Enenstein, Mr. Greulich, Mr. Monnier, and Ms. Davis were intended to

benefit and in fact benefitted from the Debtor's payment of the Corridor Advisory Fees.

599. The Debtor's payment of each of the Corridor Advisory Fees constitutes avoidable transfers, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), Haw. Rev. Stat. § 651C-4(a)(2) and/or 28 U.S.C. § 3304(b)(1)(B), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfers and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

**COUNT 16**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)**
**and 6502(a)(1), Haw. Rev. Stat. § 651C-5(a),**
**28 U.S.C § 3304(a)(1), and 11 U.S.C. § 550**
**(*Corridor Capital Advisory Fees*)**

600. In addition, or in the alternative, Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 599, and highlights the allegations set forth in Count 13 as particularly relevant to this Count.

601. The Corridor Advisory Fees were paid without the Debtor receiving a reasonably equivalent value in exchange for its payment of said fees.

602. The Debtor was insolvent or became insolvent shortly after payment of the Corridor Advisory Fees.

603. After payment of the Corridor Advisory Fees, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

604. The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

605. Corridor Capital and the other Corridor Entities were insiders of the Debtor.

606. The Corridor Entities and Corridor O/Ds, including, among others, Mr. Enenstein, Mr. Greulich, Ms. Monnier, and Ms. Davis were intended to benefit, and in fact benefitted, from the Corridor Advisory Fees.

607. The Debtor's payment of the Corridor Advisory Fees constitutes avoidable transfers, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), Haw. Rev. Stat. § 651C-5(a) and/or 28 U.S.C. § 3304(a)(1), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfers and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 17
## FRAUDULENT CONVEYANCE
## 11 U.S.C. § 544(b)(1), Common Law, and 11 U.S.C. § 550
### (*SPB Advisory Fees*)

608. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 607, and highlights the allegations set forth in Count 9 as also relevant to this Count.

609. On or about October 2, 2009, the Debtor paid SPB Management $100,000.00 in advisory fees.

610. On or about May 6, 2010, the Debtor paid SPB Management $105,000.00 in advisory fees.

611. On or about May 20, 2011, the Debtor paid SPB Management $50,000.00 in advisory fees.

612. Collectively, the above advisory fees in 2009-2011 are referred to herein as the "SPB 2009-2011 Advisory Fees".

613. On or about June 27, 2012, SPB Management was paid $289,018.75 for accrued and unpaid fees pursuant to the Advisory Agreement (the "2012 SPB Advisory Fee").

614. On or about May 20, 2013, the Debtor paid SPB Management $182,325.94 in advisory fees (the "2013 SPB Advisory Fee").

615. On or about May 5, 2014, the Debtor paid SPB Management $95,721.12 in advisory fees (the "2014 SPB Advisory Fee").

616. The 2009-2011 SPB Advisory Fees, the 2012 SPB Advisory Fee, the 2013 SPB Advisory Fee, and 2014 SPB Advisory Fee are collectively referred to herein as the "SPB Advisory Fees".

617. The Debtor's payment of the SPB Advisory Fees was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

618. The Debtor was insolvent or became insolvent shortly after the payment of each of the SPB Advisory Fees.

619. The Debtor did not have available funds to pay the SPB Advisory Fees outstanding in 2012, and was made to incur the 2012 $2.5M Convergent Loan (and financing costs), which loan the Debtor serviced.

620. The Debtor's payment of the SPB Advisory Fees outstanding in 2012 ($289,018.75) was made from proceeds of the 2012 $2.5M Convergent Loan.

621. The 2012 $2.5M Convergent Loan was incurred to pay, among other things, the outstanding SPB Advisory Fees in 2012, even if it left the Debtor insolvent or unable to pay its debts as they became due.

622. The 2012 $2.5M Convergent Loan obligation was incurred and intended to benefit, and in fact benefitted, among others, SPB Management and the other SPB Entities.

623. The 2012 $2.5M Convergent Loan and SPB Advisory Fees were made with the intent to hinder, delay and defraud creditors.

624.   The Debtor's payment of the 2013 SPB Advisory Fees and the 2014 SPB Advisory Fees was made shortly after the Debtor incurred the 2012 $2.5M Convergent Loan obligations and shortly before the 2015 ASB Refinance.

625.   Certain Corridor O/Ds and SPB O/Ds were at the same time principals, managers, and/or directors and officers of one or more of the Corridor Entities and the SPB Entities.

626.   Certain Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities directly participated in the structuring, drafting, negotiation and approval of the Advisory Agreement.

627.   The Advisory Agreement expressly permitted the accrual of advisory fees when the Debtor was insolvent.

628.   SPB Management did not provide adequate or good consideration in exchange for the SPB Advisory Fees.

629.   SPB Management participated in, had knowledge of, and/or directed the payment of the SPB Advisory Fees.

630.   SPB Management and the other SPB Entities were insiders of the Debtor.

631.   The other SPB Entities and SPB O/Ds, including, Mr. Bass, Mr. Bulloch, and Mr. Pressberg were intended to benefit from, and in fact benefitted from, the SPB Advisory Fees.

632.   The Debtor's payment of the SPB Advisory Fees constitutes avoidable fraudulent conveyances, pursuant to 11 U.S.C. § 544(b)(1), and common law, and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said conveyances and recover the property transferred or the value thereof, together with interest as the Court shall determine.

**COUNT 18**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)**
**and 6502(a)(1), Haw. Rev. Stat. § 651C-4(a)(1),**
**28 U.S.C § 3304(b)(1)(A), and 11 U.S.C. § 550**
**(*SPB Advisory Fees*)**

633.   In addition, or in the alternative, Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 632, and highlights the allegations set forth in Count 17 as relevant to this Count.

634.   The Debtor's payment of each of the SPB Advisory Fees was made with the actual intent to hinder, delay, or defraud the Debtor's creditors.

635.   The other SPB Entities and SPB O/Ds, including, Mr. Bass, Mr. Bulloch, and Mr. Pressberg were intended to benefit, and in fact benefitted from the Debtor's payment of the SPB Advisory Fees.

636.   The Debtor's payment of each of the SPB Advisory Fees constitutes avoidable transfers, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), Haw. Rev. Stat. § 651C-4(a)(1) and/or 28 U.S.C. § 3304(b)(1)(A), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid

said transfers and recover the property transferred or the value thereof, together with interest as the Court shall determine.

**COUNT 19**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)**
**and 6502(a)(1), Haw. Rev. Stat. § 651C-4(a)(2),**
**28 U.S.C § 3304(b)(1)(B), and 11 U.S.C. § 550**
**(*SPB Advisory Fees*)**

637.   In addition, or in the alternative, Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 636, and highlights the allegations set forth in Count 17 as relevant to this Count.

638.   The SPB Advisory Fees were paid without the Debtor receiving a reasonably equivalent value in exchange for its payment of said fees.

639.   The Debtor was insolvent or became insolvent shortly after payment of each of the SPB Advisory Fees.

640.   After payment of each of the SPB Advisory Fees, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

641.   The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

642.   SPB Management and the SPB Entities were insiders of the Debtor.

643.  The other SPB Entities and SPB O/Ds, including, Mr. Bass, Mr. Bulloch, and Mr. Pressberg were intended to benefit, and in fact benefitted, from the Debtor's payment of the SPB Advisory Fees.

644.  The Debtor's payment of each of the SPB Advisory Fees constitutes avoidable transfers, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), Haw. Rev. Stat. § 651C-4(a)(2) and/or 28 U.S.C. § 3304(b)(1)(B), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfers and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 20
### FRAUDULENT TRANSFER
### 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A),
### and 6502(a)(1), Haw. Rev. Stat. § 651C-5(a),
### 28 U.S.C § 3304(a)(1), and 11 U.S.C. § 550
### (*SPB Advisory Fees*)

645.  In addition, or in the alternative, Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 644, and highlights the allegations set forth in Count 17 as relevant to this Count.

646.  The SPB Advisory Fees were paid without the Debtor receiving a reasonably equivalent value in exchange for its payment of said fees.

647.  The Debtor was insolvent or became insolvent shortly after payment of each of the SPB Advisory Fees.

648. After payment of each of the SPB Advisory Fees, the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

649. The Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond its ability to pay as they became due.

650. SPB Management and the SPB Entities were insiders of the Debtor.

651. The other SPB Entities and SPB O/Ds, including, Mr. Bass, Mr. Bulloch, and Mr. Pressberg were intended to benefit and in fact benefitted from the SPB Advisory Fees.

652. The Debtor's payment of the SPB Advisory Fees constitutes avoidable transfers, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), Haw. Rev. Stat. § 651C-5(a) and/or 28 U.S.C. § 3304(a)(1), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfers and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 21
## FRAUDULENT CONVEYANCE
## 11 U.S.C. § 544(b)(1), Common Law, and 11 U.S.C. § 550
### *(ROHI Payoff - $752,448.96)*

653. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 652.

654. On or about June 27, 2012, the Debtor paid ROHI $752,448.96.

655. The $752,448.96 payment was for the outstanding amount TrashMasters owed ROHI pursuant to the ROHI Note (the "ROHI Payoff") and ROHI APA.

656. The Debtor was not indebted to ROHI for the ROHI Note or the obligations of TrashMasters under the ROHI APA.

657. The Debtor's O/Ds, TrashMasters (its equity holders), the TrashMasters O/Ds, Corridor Entities, Corridor O/Ds, SPB Entities, SPB O/Ds, including without limitation, Mr. Bass, Mr. Enenstein, Mr. Monnier, Mr. Asay, Jr., and Mr. Leonard, intended that the Debtor pay the debts of TrashMasters, including, among others, the ROHI Payoff.

658. The Debtor did not have available funds to pay the ROHI Payoff, and was made to incur the 2012 $2.5M Convergent Loan, even if it left the Debtor insolvent or unable to pay its debts as they became due.

659. The Debtor's payment of the ROHI Payoff was made from proceeds of the 2012 $2.5M Convergent Loan.

660.   The 2012 $2.5M Convergent Loan was made for the benefit of, among others, TrashMasters (and its equity holders), the TrashMasters O/Ds, Corridor Entities, Corridor O/Ds, SPB Entities, and SPB O/Ds.

661.   The 2012 $2.5M Convergent Loan and the ROHI Payoff was made with the intent to hinder, delay, and defraud the Debtor's creditors.

662.   ROHI did not provide adequate or good consideration in exchange to the Debtor for the ROHI Payoff.

663.   The ROHI Payoff was of no benefit to the Debtor.  The Debtor was neither a party to the ROHI APA or the ROHI Note.

664.   ROHI was a member of TrashMasters, and TrashMasters the Debtor's sole manager.

665.   ROHI knew that TrashMasters was a shell company, with no operations and no independent ability to pay ROHI the ROHI Payoff.

666.   ROHI and/or its principal had direct knowledge of the Debtor's financial condition.

667.   ROHI had direct knowledge that the Debtor was insolvent or was made insolvent as a result of the ROHI Payoff.

668.   The ROHI Payoff was made and intended to be made for the benefit of TrashMasters (and its equity holders), and the Corridor Entities, SPB

Entities, Corridor O/Ds, SPB O/Ds, including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Gourlay, Ms. Davis, Mr. Bass, Mr. Bulloch, and Mr. Pressberg.

669. The Debtor's payment of the ROHI Payoff constitutes a fraudulent conveyance pursuant to 11.U.S.C. § 544(b)(1) and common law, and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said conveyance and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

**COUNT 22**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)**
**and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(A),**
**Haw Rev. Stat § 651C-4(a)(1), and 11 U.S.C. § 550**
***(ROHI Payoff - $752,448.96)***

670. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 669, and highlights the allegations made in Count 21 as relevant to this Count.

671. In addition, or in the alternative, the Debtor's incurring of the 2012 $2.5M Convergent Loan and payment to ROHI of the ROHI Payoff was made with actual intent to hinder, delay, or defraud the Debtor's creditors.

672. The ROHI Payoff was made and intended to be made for the benefit of TrashMasters (and its equity holders), and the Corridor Entities, SPB Entities, Corridor O/Ds, and SPB O/Ds, including without limitation, Mr.

Enenstein, Mr. Bass, Mr. Bulloch, and Mr. Pressberg, Mr. Enenstein, Mr. Monnier, Mr. Greulich, and Ms. Davis.

673. The Debtor's payment of the ROHI Payoff constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(A), and/or Haw. Rev. Stat. § 651C-4(a)(1), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 23
### FRAUDULENT TRANSFER
### 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)
### and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(B)
### Haw Rev. Stat § 651C-4(a)(2), and 11 U.S.C. § 550
### *(ROHI Payoff - $752,448.96)*

674. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 673, and highlights the allegations set forth in Count 21 as relevant to this Count.

675. In addition, or in the alternative, the Debtor paid the ROHI Payoff without receiving a reasonably equivalent value in exchange for the ROHI Payoff.

676. The ROHI Note was an obligation of TrashMasters.

677. The ROHI Note was not an obligation of the Debtor.

678. The Debtor received no benefit from the ROHI Payoff.

679. The remaining assets of the Debtor were unreasonably small in relation to the payment of the ROHI Payoff.

680. The Debtor's payment of the ROHI Payoff was made when the Debtor intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

681. The ROHI Payoff was intended to be made and was in fact made for the benefit of TrashMasters (and its equity holders), and the Corridor Entities, SPB Entities, Corridor O/Ds, SPB O/Ds, including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Greulich, Ms. Davis, Mr. Bass, Mr. Bulloch, and Mr. Pressberg.

682. Payment of the ROHI Payoff constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(B), and/or Haw. Rev. Stat. § 651C-4(a)(2), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 24
### FRAUDULENT TRANSFER
### 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)
### and 6502(a)(1), 28 U.S.C. § 3304(a)(1)
### Haw. Rev. Stat. § 651C-5(a), and 11 U.S.C. § 550
### *(ROHI Payoff - $752,448.96)*

683. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 682, and highlights the allegations set forth in Counts 21 and 23 as relevant to this Count.

684. In addition, or in the alternative, the Debtor's payment of the ROHI Payoff was made without receiving reasonably equivalent value in exchange for said payment.

685. The Debtor was insolvent at that time or became insolvent as a result of the Debtor's payment of the ROHI Payoff.

686. The ROHI Payoff was made for the benefit of TrashMasters (and its equity holders), and the Corridor Entities, SPB Entities, Corridor O/Ds, SPB O/Ds, including without limitation, Mr. Enenstein, Mr. Greulich, Mr. Monnier, Ms. Davis, Mr. Bass, Mr. Bulloch, and Mr. Pressberg.

687. Payment of the ROHI Payoff constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(a)(1) and/or Haw. Rev. Stat. § 651C-5(a), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 25
### FRAUDULENT CONVEYANCE
### 11 U.S.C. § 544(b)(1), Common Law, and 11 U.S.C. § 550
### (*KNG Guaranty*)

688.  Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 687.

689.  On or about August 13, 2010, the Debtor entered into that certain KNG Guaranty.

690.  The KNG Guaranty secured the KNG Note, which was an obligation of TrashMasters to KNG pursuant to the KNG APA.

691.  The Debtor was not indebted to KNG for the KNG Note or the obligations set forth in the KNG APA.

692.  The Debtor received no value on account of its furnishing KNG the KNG Guaranty.

693.  The KNG Guaranty made the Debtor liable to KNG for the debt of TrashMasters and unnecessarily encumbered the assets of the Debtor for no consideration and to the detriment of the Debtor's creditors.

694.  KNG and Mr. Gourlay were insiders of the Debtor.

695.  Mr. Gourlay was a director of TrashMasters.

696.  Mr. Gourlay was a principal of KNG.

697.  Mr. Gourlay and KNG had knowledge that the KNG Note was an obligation of TrashMasters and not an obligation of the Debtor.

698. The Debtor was insolvent at the time the Debtor incurred the KNG Guaranty obligation, or became insolvent shortly after the obligation was incurred.

699. The Debtor's O/Ds, TrashMasters (and its equity holders), TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Enterprise and SPB Enterprise, knew and intended TrashMasters to be a shell company.

700. TrashMasters, the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities, knew or should have known that TrashMasters was unable to pay the debts it incurred to others.

701. TrashMasters (and its equity holders), the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities, intended that the Debtor pay the debts of TrashMasters to others.

702. The KNG Guaranty furthered the Defendants' fraudulent scheme of having TrashMasters acquire assets of other companies, including KNG, for which the Debtor, and not TrashMasters, would pay, and to routinely cause the Debtor to pay for the debts of TrashMasters.

703. Defendants, including without limitation, TrashMasters, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Leonard, and Mr. Asay, Jr. intended the Debtor to pay the KNG Note, and in fact had the Debtor pay the KNG Note.

704. The KNG Guaranty was made with the intent to hinder, delay and defraud the Debtor's creditors.

705. TrashMasters (and its equity holders), the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Leonard, Mr. Asay, Jr., and Mr. Gourlay each were intended to benefit, and in fact benefitted, from the Debtor incurring the KNG Guaranty.

706. The KNG Guaranty constitutes an avoidable conveyance, pursuant to 11 U.S.C. § 544(b)(1) and common law, and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said conveyance and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

**COUNT 26**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)**
**and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(A),**
**Haw. Rev. Stat. § 651C-4(a)(1), and 11 U.S.C. § 550**
**(*KNG Guaranty*)**

707. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 706, and highlights the allegations set forth in Count 25 as relevant to this Count.

708. In addition, or in the alternative, the Debtor's incurring of the KNG Guaranty was made with actual intent to hinder, delay, or defraud the Debtor's creditors.

709. The pledge of the Debtor's assets to KNG pursuant to the KNG Guaranty was part of the Defendants' fraudulent scheme.

710. KNG and Mr. Gourlay were insiders of the Debtor.

711. KNG and Mr. Gourlay had knowledge that the KNG Note was an obligation of TrashMasters and not an obligation of the Debtor.

712. The Debtor was insolvent at the time the Debtor incurred the KNG Guaranty or became insolvent shortly after it incurred the obligation.

713. TrashMasters (and its equity holders), the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Leonard, Mr. Asay, Jr., and Mr. Gourlay each were intended to benefit, and in fact benefitted, from the Debtor incurring the KNG Guaranty.

714. The KNG Guaranty constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. §3304(b)(1)(A), and/or Haw. Rev. Stat. § 651C-4(a)(1), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 27
### FRAUDULENT TRANSFER
### 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)
### and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(B),
### Haw. Rev. Stat. § 651C-4(a)(2), and 11 U.S.C. § 550
### (*KNG Guaranty*)

715.   Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 714, and highlights the allegations set forth in Count 25 as relevant to this Count.

716.   In addition, or in the alternative, the Debtor incurred the KNG Guaranty obligation without receiving a reasonably equivalent value in exchange for the KNG Guaranty.

717.   The remaining assets of the Debtor were unreasonably small in relation to the KNG Guaranty.

718.   The Debtor incurred the KNG Guaranty when the Debtor intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

719.   TrashMasters (and its equity holders), the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities, TrashMasters, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Leonard, Mr. Asay, Jr., and Mr. Gourlay each were intended to benefit, and in fact benefitted, from the Debtor incurring the KNG Guaranty.

720.   The KNG Guaranty constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(B), and/or Haw. Rev. Stat. § 651C-4(a)(2), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

**COUNT 28**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A)**
**and 6502(a)(1), 28 U.S.C. § 3304(a)(1)**
**Haw. Rev. Stat. § 651C-5(a), and 11 U.S.C. § 550**
*(KNG Guaranty)*

721.   Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 720, and highlights the allegations set forth in Count 25 as relevant to this Count.

722.   In addition, or in the alternative, the Debtor incurred the KNG Guaranty without receiving reasonably equivalent value in exchange for said obligation.

723.   The Debtor was insolvent at that time or became insolvent as a result of the KNG Guaranty.

724.   TrashMasters, the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities, including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Leonard,

Mr. Asay, Jr., and Mr. Gourlay each were intended to benefit, and in fact benefitted, from the Debtor incurring the KNG Guaranty.

725. The KNG Guaranty constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(a)(1), and/or Haw. Rev. Stat. § 651C-5(a), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 29
**FRAUDULENT CONVEYANCE**
**11 U.S.C. § 544(b)(1), Common Law, and 11 U.S.C. § 550**
**(*KNG Payoff - $1,525,127.49*)**

726. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 725.

727. On or about June 27, 2012, the Debtor paid KNG $1,525,127.49.

728. The $1,525,127.49 payment was for the outstanding amount TrashMasters owed KNG pursuant to the KNG Note (the "KNG Payoff").

729. The Debtor was not indebted to KNG for the KNG Note or the KNG APA.

730. The Debtor received no value on account of its furnishing KNG the KNG Guaranty, and the KNG Guaranty is an avoidable transfer.

731.  TrashMasters was liable to KNG for the KNG Note and the obligations under the KNG APA.

732.  The Debtor's payment of the KNG Payoff was made from proceeds of the 2012 ASB Credit Agreement.

733.  The 2012 ASB Credit Agreement was made for the benefit of (among others) each of the Corridor Entities, SPB Entities, Mr. Enenstein, Mr. Monnier, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, and Mr. Gourlay.

734.  The 2012 ASB Credit Agreement and KNG Payoff was a part of the Defendants' fraudulent scheme and were made with the intent to hinder, delay and defraud creditors.

735.  The Defendants intended for the Debtor to pay the debts of TrashMasters, including without limitation, TrashMasters' obligations to KNG under the KNG Note and KNG APA even if it left the Debtor insolvent or unable to pay its debts as they became due.

736.  The Debtor did not have the available funds to pay KNG and was made to incur the 2012 ASB Credit Agreement to do so, which loan obligations (and financing costs) the Debtor paid.

737.  KNG and Mr. Gourlay were insiders of the Debtor.

738.  Mr. Gourlay was a director of TrashMasters.

739.  Mr. Gourlay was a principal of KNG.

740. Mr. Gourlay and KNG had knowledge that the proceeds of the 2012 ASB Credit Agreement would be used to pay the KNG Payoff.

741. Mr. Gourlay and KNG had knowledge that the KNG Note was an obligation of TrashMasters and not an obligation of the Debtor.

742. KNG did not provide adequate or good consideration to the Debtor in exchange for the KNG Payoff.

743. The Debtor was insolvent at the time the Debtor incurred the 2012 ASB Credit Agreement obligation and paid the KNG Payoff, or became insolvent shortly after the obligation was incurred and the payment was made.

744. The KNG Payoff was intended to benefit, and in fact benefitted, TrashMasters (and its equity holders), the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities, including without limitation, Mr. Enenstein, Mr. Monnier, Mr. Greulich, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Leonard, Mr. Asay, Jr. and Mr. Gourlay.

745. The Debtor's payment of the KNG Payoff constitutes an avoidable conveyance, pursuant to 11 U.S.C. § 544(b)(1) and common law, and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said conveyance and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

**COUNT 30**
**FRAUDULENT TRANSFER**
**11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1),**
**28 U.S.C. § 3304(b)(1)(A), Haw. Rev. Stat. § 651C-4(a)(1), and 11 U.S.C. § 550**
*(KNG Payoff - $1,525,127.49)*

746. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 745, and highlights the allegations set forth in Count 29 as relevant to this Count.

747. In addition, or in the alternative, the Debtor's incurring of the 2012 ASB Credit Agreement obligation and payment to KNG of the KNG Payoff was made with actual intent to hinder, delay, or defraud the Debtor's creditors.

748. KNG and Mr. Gourlay were insiders of the Debtor.

749. KNG and Mr. Gourlay had knowledge that the proceeds of the 2012 ASB Credit Agreement would be used to pay the KNG Payoff.

750. KNG and Mr. Gourlay had knowledge that the KNG Note was an obligation of TrashMasters and not an obligation of the Debtor.

751. The Debtor was insolvent at the time the Debtor incurred the 2012 ASB Credit Agreement obligation and paid the KNG Payoff, or became insolvent shortly after the obligation was incurred and the payment was made, and was unable to pay its debts as they became due.

752. The Debtor received no benefit from the KNG Payoff.

753. The KNG Payoff was intended to benefit, and in fact benefitted, TrashMasters (and its equity holders), the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities, including without limitation, Mr. Enenstein, Mr. Monnier, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Leonard, Mr. Asay, Jr., and Mr. Gourlay.

754. The Debtor's payment of the KNG Payoff constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(A), and/or Haw. Rev. Stat. § 651C-4(a)(1), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 31
### FRAUDULENT TRANSFER
### 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1),
### 28 U.S.C. § 3304(b)(1)(B), Haw. Rev. Stat. § 651C-4(a)(2), and 11 U.S.C. § 550
### (*KNG Payoff - $1,525,127.49*)

755. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 754, and highlights the allegations set forth in Count 29 as relevant to this Count.

756. In addition, or in the alternative, the Debtor paid the KNG Payoff without receiving a reasonably equivalent value in exchange for the payment of the KNG Payoff.

757. The remaining assets of the Debtor were unreasonably small in relation to the payment of the KNG Payoff.

758. The Debtor's payment of the KNG Payoff was made when the Debtor intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

759. The Debtor received no benefit from the KNG Payoff.

760. The KNG Payoff was intended to benefit and in fact benefitted TrashMasters (and its equity holders), the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities, including without limitation, Mr. Enenstein, Mr. Monnier, Ms. Davis, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Leonard, Mr. Asay, Jr., and Mr. Gourlay.

761. Payment of the KNG Payoff constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. § 3304(b)(1)(B), and Haw. Rev. Stat. § 651C-4(a)(2), and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

# COUNT 32
## FRAUDULENT TRANSFER
## 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1),
## 28 U.S.C. §3304(a)(1), Haw. Rev. Stat. § 651C-5(a), and 11 U.S.C. § 550
## *(KNG Payoff - $1,525,127.49)*

762. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 761, and highlights the allegations set forth in Count 29 as relevant to this Count.

763. In addition, or in the alternative, the Debtor's payment of the KNG Payoff was made without receiving reasonably equivalent value in exchange for said payment.

764. The Debtor was insolvent at that time or became insolvent as a result of the Debtor's payment of the KNG Payoff.

765. The KNG Payoff was intended to benefit, and in fact benefitted, TrashMasters (and its equity holders), the Debtor's O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities and SPB Entities, including without limitation, Mr. Enenstein, Ms. Davis, Mr. Monnier, Mr. Bass, Mr. Bulloch, Mr. Pressberg, Mr. Leonard, Mr. Asay, Jr., and Mr. Gourlay.

766. Payment of the KNG Payoff constitutes an avoidable transfer, pursuant to 11 U.S.C. § 544(b)(1), 26 U.S.C. §§ 6901(a)(1)(A) and 6502(a)(1), 28 U.S.C. §3304(a)(1), and/or Haw. Rev. Stat. § 651C-5(a), and the Plaintiff, pursuant

to 11 U.S.C. § 550, is entitled to avoid said transfer and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 33
### FRAUDULENT TRANSFER
### 11 U.S.C. § 544(b)(1), Haw. Rev. Stat. §§ 651C-4(a)(1) and (2) and 651C-5(a), 11 U.S.C. § 548 and 11 U.S.C. § 550
### *(Colbeck Payments)*

767. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 766, and highlights the allegations made in the III.P. Brian Colbeck Section.

768. TrashMasters engaged Mr. Colbeck, under the Consulting Agreement, in the capacity as interim Chief Operating Officer of TrashMasters for the benefit of TrashMasters.

769. In particular, Mr. Colbeck was primarily responsible for TrashMasters' financial performance and driving the proceeds of preparing TrashMasters for sale.

770. The Debtor was not obligated to Mr. Colbeck or Colbeck Consulting under the Consulting Agreement.

771. The Consulting Agreement was of no benefit to the Debtor.

772. The "Colbeck Payments", a non-exhaustive list of which is attached as Exhibit "42", were made for the benefit of Mr. Colbeck, Colbeck

Consulting, TrashMasters (and its equity holders), and the Corridor Enterprise and SPB Enterprise, including each of their respective principals.

773. Colbeck Consulting was an alter ego of Mr. Colbeck.

774. The Debtor's payment of the Colbeck Payments was made with actual intent to hinder, delay or defraud the Debtor's creditors.

775. The sale of TrashMasters was of no benefit to the Debtor.

776. Hiring Mr. Colbeck was part of the Defendants' fraudulent scheme and served the private equity interests of the Corridor Enterprise and SPB Enterprise of buying and selling TrashMasters and possibly the Debtor or the Debtor's assets.

777. Defendants intended for the Debtor to pay the debts of TrashMasters, including TrashMasters' obligations to Mr. Colbeck and Colbeck Consulting under the Consulting Agreement.

778. In addition, or in the alternative, the Debtor made the Colbeck Payments to Mr. Colbeck, and/or Colbeck Consulting without receiving a reasonably equivalent value in exchange for said consulting fee payments.

779. The remaining assets of the Debtor were unreasonably small in relation to the payment of the Colbeck Payments.

780. The Debtor's payment of the Colbeck Payments was made when the Debtor intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

781. The Debtor was insolvent at the time or became insolvent as a result of the Colbeck Payments.

782. The Colbeck Payments were intended and made for the benefit of TrashMasters (and its equity holders), the Corridor Enterprise and the SPB Enterprise.

783. The Debtor's payment of the Colbeck Payments constitutes avoidable transfers, pursuant to 11 U.S.C. §544(b)(1), Haw. Rev. Stat. §§ 651C-4(a)(1) and (2) and 651C-5(a) and/or 11 U.S.C. § 548, and the Plaintiff, pursuant to 11 U.S.C. § 550, is entitled to avoid said transfers and recover the property transferred or the value thereof, together with interest, as the Court shall determine.

## COUNT 34
## CIVIL CONSPIRACY TO COMMIT
## FRAUDULENT CONVEYANCES

784. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 783, as well as the allegations set forth in Section I. "PARTIES".

785. To the extent the Debtor and TrashMasters, as well as the Corridor Enterprise and SPB Enterprise, from time to time had different officers,

directors, and managers, this Count is intended to be made as against the officers, directors, or managers that were officers, directors, or managers (or *de facto* officers, directors, or managers), during the relevant time periods of each of the fraudulent conveyances alleged herein, including those additional officers, directors, or managers (or *de facto* officers, directors, or managers) that may be later identified.

786.   TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor Enterprise, and SPB Enterprise were familiar with, had knowledge of, controlled, participated in, were responsible for, and directed the Debtor's affairs, including the Debtor's financial affairs at all relevant times.

787.   TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor Enterprise, and SPB Enterprise had direct knowledge of and responsibility for the Debtor's financial condition and insolvency.

788.   The conduct of TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor Enterprise, and SPB Enterprise caused the Debtor's insolvency.

789.   TrashMasters, and certain of the Debtor O/Ds, TrashMasters O/Ds, Corridor Enterprise, and SPB Enterprise were integral participants in and/or had knowledge of TrashMasters' acquisition of the assets of ROHI, Maricopa, and KNG, and variously negotiated, directed, approved, and agreed to said acquisitions.

790.    This includes, among others, Mr. Asay, Sr., Mr. Asay, Jr., Mr. Leonard, Mr. Enenstein, Mr. Monnier (and the Corridor Enterprise), Mr. Bass, Mr. Bulloch and Mr. Pressberg (and the SPB Enterprise).

791.    TrashMasters (and its equity holders), Mr. Asay, Sr., Mr. Asay, Jr., the Corridor Enterprise (including, Mr. Enenstein and Mr. Monnier), and the SPB Enterprise (including, Mr. Bass, Mr. Bulloch, and Mr. Pressberg) were integral participants in and/or had knowledge of the Union Bank Credit Facility, variously initiating, negotiating, directing, approving, and agreeing to all or parts of said credit facility.

792.    TrashMasters (and its equity holders), Mr. Asay, Sr., Mr. Asay, Jr., the Corridor Enterprise (including Mr. Enenstein and Mr. Monnier), and the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) were integral participants in and/or had knowledge of the Advisory Agreement, variously initiating, negotiating, directing, approving and agreeing to said agreement.

793.    TrashMasters (and its equity holders), Mr. Asay, Sr., Mr. Asay, Jr., Mr. Gourlay, the Corridor Enterprise (including variously Mr. Enenstein, Mr. Monnier, Mr. Greulich, Ms. Davis), and the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) were integral participants in and/or had knowledge of and agreed to the Advisory Fees payments made to Corridor Capital and SPB Management pursuant to the Advisory Agreement.

794. TrashMasters (and its equity holders), Mr. Asay, Jr., Mr. Leonard, Mr. Gourlay, the Corridor Enterprise, (including Mr. Enenstein, Mr. Monnier, and Ms. Davis), and the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) were integral participants and/or had knowledge of the ASB 2012 Credit Agreement, variously initiating, negotiating, directing, approving, and agreeing to said credit agreement.

795. TrashMasters (and its equity holders), Mr. Asay, Jr., Mr. Leonard, Mr. Gourlay, the Corridor Enterprise, (including Mr. Enenstein, Mr. Monnier, and Ms. Davis), and the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) were integral participants and/or had knowledge of the 2012 $2.5M Convergent Loan Agreement, variously initiating, negotiating, directing, approving, and agreeing to said loan agreement.

796. TrashMasters (and its equity holders), Mr. Asay, Jr., Mr. Leonard, the Corridor Enterprise, (including Mr. Enenstein, Mr. Greulich, and Ms. Davis), and the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) were integral participants and/or had knowledge of and agreed to the engagement of Lincoln to market and sell TrashMasters, the Debtor and/or the Debtor's assets.

797. TrashMasters (and its equity holders), Mr. Asay, Jr., the Corridor Enterprise (including Mr. Enenstein, Mr. Greulich, and Ms. Davis), and

the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) were integral participants in and/or had knowledge of, and agreed to the Colbeck Consulting Agreement, variously initiating, negotiating, directing, approving, and agreeing to the Consulting Agreement.

798. TrashMasters (and its equity holders), Mr. Asay, Jr., Mr. Colbeck, the Corridor Enterprise (Mr. Enenstein, Mr. Greulich, and Ms. Davis), the SPB Enterprise (Mr. Bass, Mr. Bulloch, and Mr. Pressberg) were integral participants in and/or had knowledge of, and agreed to the 2015 ASB Refinance, variously initiating, negotiating, directing, approving, and agreeing said refinance.

799. Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, and Mr. Pressberg each served in management roles for their respective Corridor Enterprise and SPB Enterprise entities, certain of which entities (Corridor Capital and SPB Management) are parties to the Advisory Agreement.

800. The Corridor Enterprise management team and the SPB Enterprise management team also served in management roles for their respective Corridor Entities and SPB Entities, certain of which entities (Corridor TM and SPB Waste) had membership interests in TrashMasters, and thus an interest in the Debtor.

801. The applicable Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities were responsible for and

knew of, and therefore the Corridor Entities and SPB Entities were also responsible for, and knew of, participated in, directed, approved of, and/or agreed to the fraudulent conveyances set forth in Counts 1, 5, 9, 13, 17, 21, 25, and 29.

802. A conspiracy or agreement existed between and among TrashMasters, the applicable Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities, and they acted in concert to make the fraudulent conveyances set forth in Counts 1, 5, 9, 13, 17, 21, 25, and 29.

803. TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities each were intended to benefit, or in fact benefitted from said fraudulent conveyances.

804. The Debtor and/or the Debtor's creditors' suffered damages resulting from the fraudulent conveyances that are traceable to the conspiracy, which damages, together with applicable interest, shall be determined by the Court.

**COUNT 35**
**CIVIL CONSPIRACY TO COMMIT**
**FRAUDULENT TRANSFERS**

805. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 804.

806. To the extent the Debtor and TrashMasters, as well as the Corridor Enterprise and/or the SPB Enterprise, from time to time had different officers, directors, and managers, this Count is intended to be made as against

those officers, directors and managers that were officers, directors and managers during the relevant time periods of each of the fraudulent transfers alleged herein, including those additional officers, directors and managers (and *de facto* officers, directors and managers) that may be later identified.

807.   TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor Enterprise, and SPB Enterprise each were familiar with, had knowledge of, controlled, participated in, were responsible for, and directed the Debtor's affairs, including the Debtor's financial affairs at all relevant times.

808.   TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor Enterprise, and SPB Enterprise each had direct knowledge of and responsibility for the Debtor's financial condition and insolvency.

809.   The conduct of TrashMasters (and its equity holders), the TrashMasters O/Ds, Debtor O/Ds, Corridor Enterprise, and SPB Enterprise caused the Debtor's insolvency.

810.   TrashMasters, and certain of the Debtor O/Ds, TrashMasters O/Ds, Corridor Enterprise, and SPB Enterprise each were integral participants in and/or had knowledge of TrashMasters' acquisition of the assets of ROHI, Maricopa, and KNG, and variously negotiated, directed, approved, and agreed to said acquisitions.

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 71   Filed  07/31/19   Page 142 of 173

811. This includes, among others, Mr. Asay, Sr., Mr. Asay, Jr., Mr. Leonard, Mr. Enenstein, Mr. Monnier (and the Corridor Enterprise), Mr. Bass, Mr. Bulloch and Mr. Pressberg (and the SPB Enterprise).

812. TrashMasters (and its equity holders), Mr. Asay, Sr., Mr. Asay, Jr., the Corridor Enterprise (including, Mr. Enenstein and Mr. Monnier), and the SPB Enterprise (including, Mr. Bass, Mr. Bulloch, and Mr. Pressberg) each were integral participants in and/or had knowledge of the Union Bank Credit Facility, variously initiating, negotiating, directing, approving, and agreeing to all or parts of said credit facility.

813. TrashMasters (and its equity holders), Mr. Asay, Sr., Mr. Asay, Jr., the Corridor Enterprise (including Mr. Enenstein and Mr. Monnier), and the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) each were integral participants in and/or had knowledge of the Advisory Agreement, variously initiating, negotiating, directing, approving and agreeing to said agreement.

814. TrashMasters (and its equity holders), Mr. Asay, Sr., Mr. Asay, Jr., Mr. Gourlay, the Corridor Enterprise (including variously Mr. Enenstein, Mr. Monnier, Mr. Gruelich, Ms. Davis), and the SPB Enterprise (including variously Mr. Bass, Mr. Bulloch, and Mr. Pressberg) each were integral participants in and/or had knowledge of and agreed to the Advisory Fees payments the Debtor

made to Corridor Capital and SPB Management pursuant to the Advisory Agreement.

815. TrashMasters (and its equity holders), Mr. Asay, Jr., Mr. Leonard, Mr. Gourlay, the Corridor Enterprise, (including Mr. Enenstein, Mr. Monnier, and Ms. Davis), and the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) each were integral participants and/or had knowledge of the ASB 2012 Credit Agreement, variously initiating, negotiating, directing, approving, and agreeing to said credit agreement.

816. TrashMasters (and its equity holders), Mr. Asay, Jr., Mr. Leonard, Mr. Gourlay, the Corridor Enterprise, (including Mr. Enenstein, Mr. Monnier, and Ms. Davis), and the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) each were integral participants and/or had knowledge of the 2012 $2.5M Convergent Loan Agreement, variously initiating, negotiating, directing, approving, and agreeing to said loan agreement.

817. TrashMasters (and its equity holders), Mr. Asay, Jr., Mr. Leonard, the Corridor Enterprise, (including Mr. Enenstein, Mr. Gruelich, and Ms. Davis), and the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) were integral participants and/or had knowledge of and agreed to the engagement of Lincoln to market and sell TrashMasters, the Debtor and/or the Debtor's assets.

818.  TrashMasters (and its equity holders), Mr. Asay, Jr., the Corridor Enterprise (including Mr. Enenstein, Mr. Greulich, and Ms. Davis), and the SPB Enterprise, (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) each were integral participants in and/or had knowledge of, and agreed to the Colbeck Consulting Agreement, variously initiating, negotiating, directing, approving, and agreeing to the Consulting Agreement.

819.  TrashMasters (and its equity holders), Mr. Asay, Jr., Mr. Colbeck, the Corridor Enterprise (including Mr. Enenstein, Mr. Greulich, and Ms. Davis), the SPB Enterprise (including Mr. Bass, Mr. Bulloch, and Mr. Pressberg) each were integral participants in and/or had knowledge of, and agreed to the 2015 ASB Refinance, variously initiating, negotiating, directing, approving, and agreeing said refinance.

820.  Mr. Enenstein, Mr. Monnier, Mr. Bass, Mr. Bulloch, and Mr. Pressberg each served in management roles for their respective Corridor Enterprise and SPB Enterprise entities, certain of which entities (Corridor Capital and SPB Management) are parties to the Advisory Agreement.

821.  The Corridor Enterprise management team and the SPB Enterprise management team also served in management roles for their respective Corridor Entities and SPB Entities, certain of which entities (Corridor TM and SPB

Waste) had membership interests in TrashMasters, and thus an interest in the Debtor.

822. TrashMasters (and its equity holders), and the applicable Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities were responsible for and knew of, and therefore the Corridor Entities and SPB Entities were also responsible for, knew of, participated in, directed, and/or approved of the fraudulent transfers set forth in Counts 2-4, 6-8, 10-12, 14-16, 18-20, 22-24, 26-28, and 30-33.

823. Together, the applicable officers, directors, and managers (and *de facto* officers, directors and managers) acted in concert to further the Defendants' fraudulent scheme, and a conspiracy or agreement existed between and among TrashMasters (and its equity holders), the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities to cause the Debtor to make the fraudulent transfers set forth in Counts 2-4, 6-8, 10-12, 14-16, 18-20, 22-24, 26-28, and 30-33.

824. TrashMasters (and its equityholders), the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities were intended to benefit from, and in fact, benefitted from said fraudulent transfers.

825.   The Debtor and and/or the Debtor's creditors' suffered damages resulting from the fraudulent transfers that are traceable to the conspiracy, which damages, together with applicable interest, shall be determined by the Court.

**COUNT 36**
**BREACH OF FIDUCIARY DUTY -**
**FRAUDULENT CONVEYANCES AND TRANSFERS**

826.   Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 825.

827.   Paragraph 4 of the Amended and Restated Limited Liability Company Agreement of Rolloffs Hawaii, LLC, dated May 1, 2009 (the "Rolloffs Operating Agreement") provides as follows:

> The business and affairs of the Company will be managed by its Manager.  The name of the initial managers shall be TrashMasters, LLC.  The Manager will direct, manage and control the business of the Company to the best of its abilities.  Except for situation in which the approval of the Member is expressly required by this LLC Agreement or by non-waivable provision of applicable law, the Manager will have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The manager may appoint officers and agents to assist with its management of the Company, and such officers and agents shall have such duties and responsibilities are determined by the Manager from time to time.  No officer or agent will have authority (general or specific) to act for or bind the Company unless the Manager delegates such authority to

such officer or agent, and then only to the extent so delegated by the manager.  (Emphasis added.)

Exhibit "13".

828.   In addition to its fiduciary duties under the Rolloffs Operating Agreement, TrashMasters, as the manager of the Debtor, also owed a fiduciary duty of care and loyalty to the Debtor pursuant to Haw. Rev. Stat. §428-409.

829.   Pursuant to the terms of the TrashMasters Operating Agreement, TrashMasters O/Ds managed and controlled the Debtor.

830.   The controlling members of TrashMasters also managed and controlled the Debtor.

831.   Corridor TM and SPB Waste were the controlling members of TrashMasters.

832.   The Corridor Enterprise, including the Corridor O/Ds controlled Corridor TM.

833.   The SPB Enterprise, including the SPB O/Ds controlled SPB Waste.

834.   Further, as expressly set forth in their respective Employment Agreements, Mr. Asay, Sr., Mr. Asay, Jr., Mr. Gourlay, and Mr. Leonard were assigned certain managing duties and responsibilities of TrashMasters and the Debtor, and each owed duties to TrashMasters and the Debtor, including a duty as set forth in their respective employment agreements to "perform faithfully the

duties assigned" and a duty of loyalty, during the identified periods of their respective employment.

835. Further, the applicable Corridor O/Ds and SPB O/Ds not only exercised dominion and control of the Corridor Enterprice and SPB Enterprise, respectively, the Corridor Enterprice and SPB Enterprise in managing and controlling the Debtor and TrashMasters also owed the Debtor a fiduciary duty.

836. In participating in, directing, and authorizing and/or permitting each of the fraudulent conveyances and fraudulent transfers set forth in the Counts herein, TrashMasters (and its equity holders) and the applicable Debtor O/Ds, TrashMasters O/Ds, Corridor Enterprice (including the applicable Corridor O/Ds), and SPB Enterprise (including the applicable SPB O/Ds) breached their fiduciary duties to the Debtor and the Debtor's creditors and did not act in good faith toward the interests of the Debtor.

837. The applicable Corridor O/Ds, SPB O/Ds, Corridor TM and SPB Waste used their positions with the Debtor, TrashMasters, the Corridor Entities and SPB Entities to engage in self-dealing and improperly encumbered and distributed assets of the Debtor to themselves and their affiliated companies, Corridor Capital and SPB Management for their own benefit.

838. The applicable Debtor O/Ds, TrashMasters (and its equity holders), the TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and

SPB Entities preferred themselves, and their creditors over other creditors of the Debtor, including among others, the C&C, the Internal Revenue Service, and the State of Hawaii, Department of Taxation.

839. TrashMasters, the applicable Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities fraudulently expanded the Debtor's debt taking on larger loans to pay for the debt of others, leveraged the Debtor's assets for their own benefit and the benefit of others, misused and/or converted the Debtor's cash, deepened the Debtor's insolvency, and prolonged the corporate life of the Debtor.

840. TrashMasters and the applicable Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities, and the TrashMasters Audit Committee, in expanding the Debtor's company debt, overstated the value of the Debtor's assets and understated the Debtor's debt.

841. TrashMasters and the applicable Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities in expanding the Debtor's company debt, intentionally overstated the value of the Debtor's assets and understated the Debtor's debt to obtain loans from third-party lenders, namely Union Bank, ASB, and Convergent, to pay themselves and the debt of TrashMasters.

842. By prolonging the corporate life of the Debtor, TrashMasters and the applicable Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, and SPB O/Ds, Corridor Entities, and SPB Entities were able to pay the debts of TrashMasters and others, and make payments to insiders, including Corridor Capital and SPB Management.

843. In addition, and/or in the alternative, pursuant to the alter ego doctrine, the officers, directors, and managers (and *de facto* officers, directors, and managers) named in this Count bear liability and pursuant to the single enterprise doctrine, each of the Corridor Entities and SPB Entities bear liability for the fraudulent conveyances and fraudulent transfers that resulted in a breach of their fiduciary duties insofar as they had a duty as managers or *de facto* managers to ensure that TrashMasters fulfilled its fiduciary duties to the Debtor.

844. The Debtor and the Debtor's creditors' suffered damages resulting from TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities breach of their fiduciary duties to the Debtor arising from the fraudulent transfers and fraudulent conveyances, which liability and damages against TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities, together with applicable interest, shall be determined by the Court.

**BREACH OF DUTY OF LOYALTY**

845. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 844, and highlights the allegations set forth in Count 36.

846. TrashMasters, the Debtor O/Ds (including without limitation Mr. Asay, Sr., and Mr. Asay, Jr.), TrashMasters O/Ds (including without limitation Mr. Asay, Sr. and Mr. Asay, Jr.), Corridor O/Ds (including without limitation Mr. Enenstein, Mr. Monnier, Mr. Greulich, and Ms. Davis), SPB O/Ds (including without limitation Mr. Bass, Mr. Bulloch, and Mr. Pressberg), Corridor Enterprise (including Corridor Capital, Corridor Advisors, and Corridor TM), and SPB Enterprise (including SPB Management, SPB Waste, SPB Capital GP, SPB Capital Partners, and SPB Partners) had a duty of loyalty to the Debtor.

847. Certain of the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities (as identified in Count 1) structured the Debtor, TrashMasters, and the Corridor Entities and SPB Entities for their specific benefit and with the intent to insulate them from liability.

848. The Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities were on all sides of the Advisory Agreement transaction, as set forth in Count 9.

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 71   Filed  07/31/19   Page 152 of 173

849. The Corridor Enterprise and SPB Enterprise managed and controlled TrashMasters and therefore the Debtor and TMAZ, and controlled Corridor Capital and SPB Management, respectively.

850. The Advisory Agreement was unfair and over compensated Corridor Capital, SPB Management, and those principals, officers, directors, or managers of the Corridor Enterprise and SPB Enterprise in turn received proceeds of the Advisory Fees.

851. The Advisory Agreement further provided that Corridor Capital and SPB Management would not be responsible in any way for the advice provided to the Debtor.

852. By sitting on all sides of the Advisory Agreement transaction and also authorizing and directing the Debtor's payment of fees under the Advisory Agreement to Corridor Capital and SPB Management, TrashMasters, the Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities, engaged in self-dealing to the Debtor's detriment, and breached their duty of loyalty to the Debtor.

853. To pay certain of the Advisory Fees and the debt of TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities caused the Debtor to incur and pay loan obligations, interest and fees, and closing costs for their sole benefit, and to the detriment of the Debtor and the Debtor's creditors.

854. TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities directly benefitted (or were intended to benefit) from their breach of their duty of loyalty to the Debtor in the amount of the TrashMasters debt the Debtor paid, the advisory fees paid to the Corridor Entities and SPB Entities, and the interest, fees, and expenses associated with the loans the Debtor incurred to pay the TrashMasters' debt and the advisory fees.

855. In addition, and/or in the alternative, pursuant to the alter ego doctrine, the officers, directors and managers named in this Count bear liability and pursuant to the single enterprise doctrine, each of the Corridor Entities and SPB Entities bear liability for the breach of fiduciary duties insofar as they had a duty as managers or *de facto* managers to ensure that they and TrashMasters fulfilled its fiduciary duties to the Debtor.

856. The Debtor and the Debtor's creditors, suffered damages resulting from TrashMasters', the Debtor O/Ds', TrashMasters O/Ds', Corridor O/Ds', SPB O/Ds', Corridor Entities', and SPB Entities' breach of their duty of loyalty to the Debtor, which damages, together with applicable interest, shall be determined by the Court.

## COUNT 38
## BREACH OF DUTY OF CARE

857.    Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 856.

858.    This Count is intended to include those managers, officers and directors that managed the Debtor during the relevant time periods and participated in, approved, and/or had knowledge, or should have had knowledge, of the wrongful conduct set forth herein.

859.    TrashMasters, the Debtor O/Ds, the TrashMasters O/Ds, the Corridor O/Ds, SPB O/Ds, Corridor Enterprise, and SPB Enterprise as managers, officers, and directors (or *de facto* managers, officers and directors of the Debtor) of the Debtor each owed a duty of care to the Debtor.

860.    TrashMasters, the Debtor O/Ds, the TrashMasters O/Ds, the Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities breached their duty of care to the Debtor by, among other things, converting property of the Debtor, and having the Debtor secure, guaranty, and take on additional debt and expenses to pay for, among other things, the debt of TrashMasters and the subject Advisory Fees.

861.    In paying the debt of TrashMasters, the Debtor received nothing of value.

862. In incurring loan obligations to pay the debt of TrashMasters, and paying the loan payments, fees and interest to Union Bank, ASB, and Convergent, the Debtor received nothing of value.

863. In paying the various Advisory Fees and the Colbeck Payments, the Debtor received nothing of value beyond the services for which it had already paid others to do, including without limitation, the Debtor O/Ds and employees of the Debtor.

864. TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities further breached their duty of care by causing the Debtor to increase its debt to creditors, deepening the Debtor's insolvency, and prolonging the Debtor's corporate life after the Debtor was insolvent.

865. In doing so, TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities directly benefitted from the Advisory Fees the Debtor paid to Corridor Capital and SPB Management, as well as the Union Bank credit facility, the 2012 ASB Credit Agreement, the Convergent Loan Agreement, and the 2015 ASB Refinance, to the detriment of the Debtor and its creditors.

866. In addition, and/or in the alternative, pursuant to the alter ego doctrine, the officers, directors and managers named in this Count bear liability

and pursuant to the single enterprise doctrine, each of the Corridor Entities and SPB Entities bear liability for the wrongful conduct of TrashMasters that resulted in a breach of its fiduciary duty of care to the Debtor insofar as they had a duty as managers or *de facto* managers to ensure that TrashMasters fulfilled its fiduciary duties to the Debtor.

867. The Debtor suffered damages resulting from TrashMasters, the Debtor O/Ds', TrashMasters O/Ds', Corridor O/Ds', SPB O/Ds', Corridor Entities', and SPB Entities' breach of their duty of care to the Debtor, which damages, together with applicable interest, shall be determined by the Court.

**COUNT 39**
**CIVIL CONSPIRACY TO**
**BREACH FIDUCIARY DUTIES**

868. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 867, and highlights the allegations set forth in Counts 36, 37, and 38.

869. Together, TrashMasters, the Debtor O/Ds, TrashMasters O/Ds, Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities acted in concert to further the Defendants' fraudulent scheme, and were in agreement, and conspired among and between each other to breach their fiduciary duties to the Debtor, including their duties of care and loyalty as set forth in Counts 36, 37, and 38.

870. The Corridor Enterprise and SPB Enterprise conspired and acted in concert to, among other things, understate the debt of the Debtor, overstate the value of the Debtor's assets, and unnecessarily cause the Debtor to incur debt and liability (deepening its insolvency), leverage its assets, and pay the debt of TrashMasters and others.

871. The Debtor suffered damages resulting from TrashMasters, the Debtor O/Ds', TrashMasters O/Ds', Corridor O/Ds', SPB O/Ds', Corridor Entities', and SPB Entities' civil conspiracy to breach their fiduciary duties to the Debtor, which damages together with applicable interest, shall be determined by the Court.

**COUNT 40**
**AIDING AND ABETTING**
**BREACH OF FIDUCIARY DUTIES**

872. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 871.

873. At various times, Mr. Enenstein, Mr. Monnier, Mr. Greulich, and Ms. Davis served as officers, directors, and/or managers (or *de facto* officers, directors or managers) of the Debtor and also simultaneously served as principals, managers, officers, and/or directors of each of the affiliated Corridor Entities in the Corridor Enterprise.

874. At various times, Mr. Bass, Mr. Bulloch, and Mr. Pressberg served as officers, directors and/or managers (or *de facto* officers, directors or managers) of the Debtor, and also simultaneously served as principals, managers, officers and/or directors of each of the affiliated SPB Entities in the SPB Enterprise.

875. The Corridor Enterprise, via Corridor Capital, and the SPB Entities, via SPB Management, were also advisors to the Debtor and TrashMasters.

876. In the event the Court determines that any of the applicable Defendants in Counts 36, 37, and/or 38, or any of the aforementioned Corridor O/Ds, Corridor Entities, SPB O/Ds, SPB Entities, did not have or did not breach their fiduciary duties to the Debtor, then said Defendants in participating in the management of the Debtor and/or TrashMasters aided and abetted the other Defendants in breaching their fiduciaries duties to the Debtor as set forth in Counts 36, 37, and/or 38.

877. The Debtor suffered damages resulting from the aforementioned Defendants aiding and abetting the breach of fiduciary duties in Counts 36, 37, and 38, which damages, together with applicable interest, shall be determined by the Court.

# COUNT 41
## ALTER EGO

878. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 877.

879. Whether considered a separate Count, or a doctrine applicable to other Counts set forth herein, to extend liability for said Counts to those who controlled the various alter egos, Plaintiff alleges as follows.

880. Certain of the Debtor O/Ds and TrashMasters O/Ds were also Corridor O/Ds and SPB O/Ds, and principals, managers, and directors of the Corridor Entities and SPB Entities.

881. In particular, Mr. Enenstein, Mr. Greulich, Mr. Monnier, and Ms. Davis were at one time or another TrashMasters O/Ds, Debtor O/Ds and Corridor O/Ds.

882. Mr. Bass and Mr. Bulloch were TrashMasters O/Ds and SPB O/Ds, and Mr. Pressberg and SPB O/D.

883. The Corridor Entities and SPB Entities were also advisors to the Debtor and TrashMasters.

884. TrashMasters was controlled by the Corridor Entities and the SPB Entities and those in control of the Corridor Entities and SPB Entities, namely the Corridor O/Ds and SPB O/Ds.

885. Corridor TM was an alter ego of the other Corridor Entities and each of the Corridor O/Ds.

886. SPB Waste was an alter ego of the other SPB Entities and each of the SPB O/Ds.

887. TrashMasters was the alter ego of the Corridor O/Ds, SPB O/Ds, Corridor Entities, and SPB Entities.

888. As alter egos, TrashMasters, Corridor TM, and SPB Waste engaged in fraudulent conveyances and transfers and breaches of their fiduciary duties to the Debtor.

889. The Debtor and the Debtor's creditors suffered due to the wrongful conduct of TrashMasters, Corridor TM, and SPB Waste and those individuals that controlled those entities.

890. Recognition of the separate corporate fictions of TrashMasters, Corridor TM, SPB Waste, the other Corridor Entities, and the other SPB Entities will bring about an injustice and inequity to the Debtor and the Debtor's creditors.

891. Accordingly, Corridor TM, Corridor Capital, Corridor Advisors, Mr. Enenstein, Mr. Greulich, Mr. Monnier, Ms. Davis, SPB Waste, SPB Management, SPB Capital GP, SPB Capital Partners, SPB Partners, Mr. Bass, Mr. Bulloch, and Mr. Pressberg are each, jointly and severally, liable for the legal obligations of TrashMasters, Corridor TM, and SPB Waste.

## COUNT 42
## SINGLE ENTERPRISE
### *(Corridor Entities and SPB Entities)*

892.  Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 891.

893.  In the alternative, and whether considered as a separate Count or as a doctrine applicable to impose liability as against the Corridor Entities and the SPB Entities for the other Counts set forth herein, Plaintiff alleges as follows.

894.  Together the Corridor Entities makeup a private equity firm serving a single interest and serving as a single enterprise.

895.  The Corridor O/Ds had complete dominion and control of the Corridor Entities.

896.  The Corridor Entities were operated as divisions, and the affairs of the Corridor Entities so intermingled that no distinct corporate lines were maintained.

897.  An inequity will result if the acts of the Corridor Entities and the Corridor O/Ds are not treated as that of a single enterprise.

898.  Together, the SPB Entities makeup a private equity firm serving a single interests and serving as a single enterprise.

899.  The SPB O/Ds had complete dominion and control of the SPB Entities.

U.S. Bankruptcy Court - Hawaii  #18-90035  Dkt # 71  Filed  07/31/19  Page 162 of 173

900. The SPB Entities were operated as divisions, and the affairs of the SPB Entities so intermingled that no distinct corporate lines were maintained.

901. An inequity will result if the acts of the SPB Entities and the SPB O/Ds are not treated as that of a single enterprise.

902. Together the Corridor Entities and SPB Entities owned and controlled TrashMasters.

903. Accordingly, Corridor TM, Corridor Capital, and Corridor Advisors as a single enterprise are, jointly and severally, liable for the legal obligations of each other.

904. SPB Management, SPB Capital GP, SPB Capital Partners, SPB Partners, as a single enterprise are each, jointly and severally, liable for the legal obligations of each other.

## COUNT 43
## UNJUST ENRICHMENT
### (*All Defendants*)

905. Plaintiff incorporates by reference and hereby realleges the allegations contained in paragraphs 1 through 904.

906. Defendants have benefitted from value belonging to the Debtor and have been unjustly enriched to the detriment of the Debtor.

907. By reason of the foregoing, the Plaintiff is entitled to a judgment against each of the Defendants, in an amount equal to the value of the

transfer(s) and/or obligation(s) by which they benefitted, on account that they were unjustly enriched.

## VIII. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that the Court:

A.    With respect to Count 1, enter judgment avoiding the UB Credit Facility conveyance described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property conveyed, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

B.    With respect to Count 2, enter judgment avoiding the UB Credit Facility transfer described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

C.    With respect to Count 3, enter judgment avoiding the UB Credit Facility transfer described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

D.    With respect to Count 4, enter judgment avoiding the UB Credit Facility transfer described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

E.     With respect to Count 5, enter judgment avoiding the $6M ROHI Payment and the ROHI Other Payments, and awarding Plaintiff for the benefit of the Debtor's estate, the property conveyed, or the value thereof, as the Court may determine and prejudgment interest on the value transferred;

F.     With respect to Count 6, enter judgment avoiding the $6M ROHI Payment and the ROHI Other Payments, and awarding Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine and prejudgment interest on the value transferred;

G.     With respect to Count 7, enter judgment avoiding the $6M ROHI Payment and the ROHI Other Payments, and awarding Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine and prejudgment interest on the value transferred;

H.     With respect to Count 8, enter judgment avoiding the $6M ROHI Payment and the ROHI Other Payments, and awarding Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine and prejudgment interest on the value transferred;

I.     With respect to Count 9, enter judgment avoiding the Advisory Agreement and awarding Plaintiff for the benefit of the Debtor's estate, the property conveyed, or the value thereof, as the Court may determine and prejudgment interest on the value transferred;

J.     With respect to Count 10, enter judgment avoiding the Advisory Agreement and awarding Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine and prejudgment interest on the value transferred;

K.     With respect to Count 11, enter judgment avoiding the Advisory Agreement and awarding Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine and prejudgment interest on the value transferred;

L.     With respect to Count 12, enter judgment avoiding the Advisory Agreement and awarding Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine and prejudgment interest on the value transferred;

M.     With respect to Count 13, enter judgment against avoiding the Advisory Fees described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property conveyed, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

N.     With respect to Count 14, enter judgment avoiding the Advisory Fees described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

O.     With respect to Count 15, enter judgment avoiding the Advisory Fees described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

P.     With respect to Count 16, enter judgment avoiding the Advisory Fees described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

Q.     With respect to Count 17, enter judgment avoiding the Advisory Fees described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property conveyed, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

R.     With respect to Count 18, enter judgment avoiding the Advisory Fees described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

S.     With respect to Count 19, enter judgment avoiding the Advisory Fees described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

T.    With respect to Count 20, enter judgment avoiding the Advisory Fees described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

U.    With respect to Count 21, enter judgment, avoiding the ROHI Payoff described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property conveyed, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

V.    With respect to Count 22, enter judgment avoiding the ROHI Payoff described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

W.    With respect to Count 23, enter judgment avoiding the ROHI Payoff described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

X.    With respect to Count 24, enter judgment avoiding the ROHI Payoff described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

Y.     With respect to Count 25, enter judgment avoiding the KNG Guaranty described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property conveyed, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

Z.     With respect to Count 26, enter judgment avoiding the KNG Guaranty described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

AA.   With respect to Count 27, enter judgment avoiding the KNG Guaranty described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

BB.   With respect to Count 28, enter judgment avoiding the KNG Guaranty described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

CC.   With respect to Count 29, enter judgment avoiding the KNG Payoff described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property conveyed, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

DD. With respect to Count 30, enter judgment avoiding the KNG Payoff described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

EE. With respect to Count 31, enter judgment avoiding the KNG Payoff described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

FF. With respect to Count 32, enter judgment avoiding the KNG Payoff described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

GG. With respect to Count 33, enter judgment avoiding the Colbeck Payments described therein, and awarding the Plaintiff for the benefit of the Debtor's estate, the property transferred, or the value thereof, as the Court may determine, and prejudgment interest on the value transferred;

HH. With respect to Count 34, enter judgment against each of the relevant Defendants, jointly and severally, for civil conspiracy to commit fraudulent conveyances, in an amount to be proven at trial;

II.     With respect to Count 35, enter judgment against each of the relevant Defendants, jointly and severally, for civil conspiracy to commit fraudulent transfers, in an amount to be proven at trial;

JJ.     With respect to Count 36, enter judgment against each of the relevant Defendants, jointly and severally, for breach of fiduciary duty for committing fraudulent conveyances and transfers, in an amount to be proven at trial;

KK.     With respect to Count 37, enter judgment against each of the relevant Defendants, jointly and severally, for breach of fiduciary duty of loyalty, in an amount to be proven at trial;

LL.     With respect to Count 38, enter judgment against each of the relevant Defendants, jointly and severally, for breach of fiduciary duty of care, in an amount to be proven at trial;

MM.     With respect to Count 39, enter judgment against each of the relevant Defendants, jointly and severally, for civil conspiracy to commit breach of fiduciary duties, in an amount to be proven at trial;

NN.     With respect to Count 40, enter judgment against each of the relevant Defendants, jointly and severally, for aiding and abetting the breach of fiduciary duties, in an amount to be proven at trial;

OO.   With respect to Count 41, enter judgment against Corridor TM, Corridor Capital, Corridor Advisors, Mr. Enenstein, Mr. Greulich, Mr. Monnier, Ms. Davis, SPB Waste, SPB Management, SPB Capital GP, SPB Capital Partners, SPB Partners, Mr. Bass, Mr. Bulloch, and Mr. Pressberg, jointly and severally, for the legal obligations of each of their respective alter egos - TrashMasters, Corridor TM, and SPB Waste, in an amount to be proven at trial;

PP.   With respect to Count 42, enter judgment against each of the Corridor Entities, jointly and severally, for the legal obligations of each of the other Corridor Entities in an amount to be proven at trial, and enter judgment against each of the SPB Entities, jointly and severally, for the legal obligations of each of the other SPB Entities in an amount to be proven at trial;

QQ.   With respect to Count 43, enter judgment against each of the relevant Defendants, in an amount equal to the value of the transfer(s) and/or obligation(s) by which they benefitted, on account that they were unjustly enriched, in an amount to be proven at trial;

RR.   Award Plaintiff its attorneys' fees and costs, as applicable; and

SS.   Award Plaintiff all other and further relief to which it may be entitled or which may be appropriate in the circumstances.

DATED: Honolulu, Hawaii, July 31, 2019.

/s/ Carisa Lima Ka'ala Duffy
SIMON KLEVANSKY
ALIKA L. PIPER
CARISA LIMA KA'ALA DUFFY
Attorneys for Plaintiff
Trustee Dane S. Field

Dane S. Field, Chapter 7 Trustee for the Estate of Rolloffs Hawaii, LLC v. TrashMasters, LLC, et al., Adversary Proceeding No. 18-90035, United States Bankruptcy Court, District of Hawaii; FIRST AMENDED COMPLAINT