

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 16-01294 |
| | Chapter 7 |
| ROLLOFFS HAWAII, LLC, | |
| Debtor. | |
| | Adv. Pro. No. 18-90035 |
| DANE S. FIELD, Chapter 7 Trustee, | |
| | Dkt. 71 |
| Plaintiff, | |
| vs. | |
| TRASHMASTERS, LLC, et al. | |
| Defendants. | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON FRAUDULENT TRANSFER CLAIMS

The trial in this adversary proceeding was held on September 14-17,

2021. At trial, Enver Painter, Simon Klevansky, and Carisa Lima Ka'ala

Duffy represented plaintiff Dane S. Field, chapter 7 trustee of Rolloffs Hawaii, LLC, and Brett R. Tobin represented defendant Rolloffs Hawaii, Inc. Kristian Gourlay attempted to represent defendant The KNG Group, LLC, but the court did not permit him to do so, pursuant to Local Rule 81.1(b), because he is not a licensed attorney.

All claims against all other parties were dismissed before trial. The claims in the first amended complaint (ECF 71) that remain for decision are counts 5-8 and 21-24 against Rolloffs Hawaii, Inc., and counts 25-32 against The KNG Group, Inc.

## I.     APPLICABLE LAW

### A.     Section 544(b)

Section 544(b) of the Bankruptcy Code provides that, subject to an exception that is not applicable here, "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowable] unsecured claim . . ." Section 544(b) allows the trustee to step

2

into the shoes of an actual creditor of the debtor and assert avoidance claims that the creditor could bring.

Under section 544(b), the trustee must identify an actual creditor holding an allowable claim against the debtor that could have asserted avoidance claims.

## B.    HUFTA and FDCPA

In this case, the trustee employs section 544(b) to claim that certain transfers and obligations are avoidable under the Hawaii Uniform Fraudulent Transfers Act ("HUFTA," Haw. Rev. Stat. ch. 651C) and the Federal Debt Collections Procedure Act ("FDCPA," 28 U.S.C. §§ 3001-3308). HUFTA and FDCPA create claims that are identical in substance.

The trustee relies on three pairs of provisions of HUFTA and FDCPA.[1]

---

[1] The first amended complaint does not state claims under Haw. Rev. Stat. § 651C-5(b) or its FDCPA counterpart, 28 U.S.C. § 3304(a)(2).

3

### 1. *Intentional Fraudulent Transfers*

The first is Haw. Rev. Stat. § 651C-4(a)(1), which applies to

intentional fraudulent transfers:

> A transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor, whether the creditor's claim arose
> before or after the transfer was made or the obligation was
> incurred, if the debtor made the transfer or incurred the
> obligation . . . with actual intent to hinder, delay, or defraud
> any creditor of the debtor . . .

28 U.S.C. § 3304(b)(1)(A) is identical in substance.

These sections codify the common law of fraudulent conveyances,

which originated in the Statute of 13 Elizabeth I (1570) and remains good

law in Hawaii, *Achiles v. Cajigal*, 39 Haw. 493 (1952).

HUFTA and FDCPA provide substantively identical lists of

circumstantial factors that a court may employ to ascertain the debtor's

intent. Haw. Rev. Stat. § 651C-4(b); 28 U.S.C. § 3304(b)(2).

### 2. *Constructive Fraudulent Transfers*

The second pair of provisions on which the trustee relies is Haw. Rev.

Stat. § 651C-4(a)(2) and 28 U.S.C. § 3304(b)(1)(B). These provisions apply to

4

one type of so-called "constructive" fraudulent transfers, meaning transfers that are avoidable based largely on the objective circumstances and effects of the transfers, and without proof of actual intent to hinder, delay, or defraud creditors. Specifically, Haw. Rev. Stat. § 651C-4(a) provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> * * *
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The third provision on which the trustee relies is Haw. Rev. Stat. § 651C-5(a), which creates another constructive fraudulent transfer claim:

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 461   Filed  10/21/21   Page 5 of 35

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation.

This is identical in substance to 28 U.S.C. § 3304(a)(1).

### 3. *"Transfer" and "Obligation" Defined*

The statutes define "transfer" broadly. The word means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes a payment of money, a release, a lease, and the creation of a lien or encumbrance." Haw. Rev. Stat. § 651C-1; *see also* 28 U.S.C. § 3301(6).

Neither HUFTA nor FDCPA defines "obligation." Applying its ordinary meaning, the term includes a debt.

### 4. *"Value" and "Reasonably Equivalent Value" Defined*

HUFTA and FDCPA provide that "value is given for a transfer or an obligation if in exchange for the transfer or obligation property is

6

transferred or an antecedent debt is secured or satisfied . . ." Haw. Rev. Stat. § 651C-3; 28 U.S.C. § 3303(a).

HUFTA and FDCPA do not provide a general definition of "reasonably equivalent" value. Haw. Rev. Stat. §651C-3(b) and 28 U.S.C. §3303(b) provide an example, but it is not applicable to this case. A debtor who satisfies a debt, not of the debtor, but of someone else, does not receive "reasonably equivalent value." *Hansen v. Cramer*, 39 Cal.2d 321, 324, 245 P.2d 1059, 1060-61 (Cal. 1952).

### 5. *"Insolvent" Defined*

Under HUFTA, a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." Haw. Rev. Stat. § 651C-2(a). Again, 28 U.S.C. § 3302(a) is identical in substance.[2]

---

[2] If the debtor owes secured debts, the encumbered assets are excluded from the asset side of the computation (see the definition of "asset" in Haw. Rev. Stat. § 651C-1 and 28 U.S.C. § 3301(2)(A)) and the secured debt is excluded from the liabilities side (pursuant to Haw. Rev. Stat. § 651C-2(e) and 28 U.S.C. § 3302(d)).

7

Neither statute defines "fair valuation." Under the virtually identical language of the Bankruptcy Code, 11 U.S.C. § 101(32), the "fair valuation" of a transferor's assets depends on (among other things) whether, at the time of the transfer, the transferor was a "going concern or was on its deathbed." *Wolkowitz v. Am. Rsch. Corp. (In re DAK Indus., Inc.)*, 170 F.3d 1197 (9th Cir. 1999) (cleaned up), *aff'g* 195 B.R. 117 (Bankr. C.D. Cal. 1996). A transferor is "on its deathbed" "if its liquidation was clearly imminent when the transfers were made." *In re DAK Indus.*, 195 B.R. 117, 125. Conversely, a transferor is a "going concern" if it is "a concern that can cover its costs." *In re Taxman Clothing Co.*, 905 F.2d 166, 169 (7th Cir. 1990); *accord Off. Comm. of Unsecured Creditors of Toy King Distribs., Inc. v. Liberty Sav. Bank, FSB* (*In re Toy King Distribs., Inc.*), 256 B.R. 1, 92 (Bankr. M.D. Fla. 2000) ("Despite repeated borrowings, the debtor could not continue as a going concern without additional equity infusions because it was unable to generate sufficient sales to allow it to pay its operating costs in addition to its debt.").

8

To determine whether a company was a going concern, "there is no talismanic inquiry; [the court] must review the entire financial picture of the debtor." *Gillman v. Sci. Rsch. Prods. Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555 (10th Cir. 1995). Whether the transferor was a going concern on a given date is a question of fact. *Id.* The amount of time that passed between the date of the transfer and the date of the transferor's bankruptcy filing is relevant to the question of whether the debtor was a going concern at the date of the transfer, but the time lapse is not determinative. For example, the court may consider whether, at the time in question, a company's expected costs are greater than its expected revenues, as well as the source and type of contribution that allows it to continue operating. *See In re Taxman Clothing Co*, 905 F.2d at 169; *In re Mama D'Angelo, Inc.*, 55 F.3d at 555-557.

"A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." Haw. Rev. Stat. § 651C-2(b). 28 U.S.C. § 3302(b) is identical in substance. The presumption is rebuttable; in

9

effect, it shifts the burden of proof to the defendant. Unif. Fraudulent

Transfer Act § 2 cmt. 2.

> In determining whether a debtor is paying its debts generally as
> they become due, the court should look at more than the
> amount and due dates of the indebtedness. The court should
> also take into account such factors as the number of the debtor's
> debts, the proportion of those debts not being paid, the
> duration of the nonpayment, and the existence of bona fide
> disputes or other special circumstances alleged to constitute an
> explanation for the stoppage of payments. The court's
> determination may be affected by a consideration of the
> debtor's payment practices prior to the period of alleged
> nonpayment and the payment practices of the trade or industry
> in which the debtor is engaged. The case law that has
> developed under § 303(h)(1) of the Bankruptcy Code has not
> required a showing that a debtor has failed or refused to pay a
> majority in number and amount of his or her debts in order to
> prove general nonpayment of debts as they become due.

*Id.*

### C.    Burden and Standards of Proof

The trustee has the burden of proof on all issues (unless the

presumption of insolvency applies, in which case the burden of proof on

that issue shifts to the defendant). The "clear and convincing evidence"

standard applies to the intentional fraudulent transfer claims, and the

10

"preponderance of the evidence" standard applies to all other claims.

*Kekona v. Abastillas*, 113 Hawaii 174, 181 (2006); *In re Lester*, 616 B.R. 549, 561-61 (Bankr. D. Or. 2020).

## II.    FINDINGS OF FACT

### A.    The 2009 ROHI Payment

From about 1978 until May 1, 2009, Rolloffs Hawaii, Inc. ("ROHI") operated a successful and profitable refuse collection business. Robert and Linda Henriques owned and managed ROHI.

TrashMasters, LLC ("TM") is a Delaware limited liability company. Its members included Corridor Capital LLC and SPB Management LLC (or their affiliates).

ROHI, Mr. and Mrs. Henriques, and TM entered into an Asset Purchase Agreement dated February 26, 2009, pursuant to which TM agreed to acquire most of the assets of ROHI. The stated purchase price was $10 million. Of this amount, $6,750,000 was payable in cash at closing, $1 million was payable pursuant to a promissory note made by TM,

11

another $1 million was payable in the form of a minority membership interest in TM, and $1.25 million was payable in cash if and when certain new military contracts were made. The military contracts were not timely made, so the purchase price was reduced to $8.75 million.

The asset purchase closed on May 1, 2009. Several relevant transactions occurred at the closing.

First, TM acquired the ROHI assets and immediately contributed them to Rolloffs Hawaii, LLC ("RHL"), the debtor in this bankruptcy case, as a capital contribution. TM was the sole member and manager of RHL. RHL was not a party to the Asset Purchase Agreement and did not owe anything to ROHI for the assets. Because TM transferred the assets to RHL as a capital contribution, RHL also did not owe anything to TM in exchange for the assets.

Second, RHL and another subsidiary of TM entered into an agreement with Union Bank pursuant to which Union Bank made a term loan of $4.5 million and provided a revolving line of credit in the amount

12

of $500,000. The loan was secured by RHL's assets, which at that time consisted only of the assets that TM had purchased from ROHI and contributed to RHL.

Third, RHL used proceeds of the Union Bank loan to pay $3,180,722.87 to or for the benefit of ROHI as part of the purchase price under the Asset Purchase Agreement (the "2009 ROHI Payment"). The Corridor/SPB parties made capital contributions totaling about $4 million to pay the rest of the cash portion of the purchase price.

The 2009 ROHI Payment was a transfer of property of RHL. Union Bank lent and disbursed the money to its borrower, RHL, and not to TM or anyone else, so the loan proceeds with which RHL made the 2009 ROHI Payment were RHL's property.

### 1. *Actual Creditor at Time of Transfer*

The Internal Revenue Service, the State of Hawaii Department of Taxation, and the City and County of Honolulu are creditors of RHL. The Internal Revenue Service's and the State's tax claims arose as soon as RHL

13

commenced operations, earned taxable income, and paid taxable payroll. The City's claim for "tipping fees" (a charge for dumping waste in the City's landfill) arose when RHL first dumped a load of waste in the landfill; this probably happened on the first day of RHL's operations.

### 2. Intentional Fraud

The trustee did not prove, by clear and convincing evidence, that RHL made the 2009 ROHI Payment with the intent to hinder, delay, or defraud its creditors. When the asset purchase closed and RHL made the 2009 ROHI payment, RHL intended to pay its creditors as their claims became due, so RHL could generate a profit and provide a return on the Corridor/SPB parties' $4 million investment. RHL intended to take maximum advantage of credit terms offered by its vendors and intended to pay its debts only when they became due (in some cases well after its vendors provided services and supplies to RHL), but it did not intend at the outset to pay vendors and other creditors late.

14

### 3. *Constructive Fraud*

RHL did not receive reasonably equivalent value in exchange for the 2009 ROHI Payment. RHL did not owe any money to ROHI (or to TM), so the payment did not satisfy a debt owed by RHL. RHL did not receive the assets in return for the 2009 ROHI Payment; rather, it received them as a capital contribution from TM.

The trustee did not prove, by a preponderance of the evidence, that, at the time of the 2009 ROHI Payment, RHL was engaged or was about to engage in a business or a transaction for which its remaining assets after the 2009 ROHI Payment were unreasonably small in relation to the business or transaction, or that RHL intended to incur, or believed or reasonably should have believed that RHL would incur, debts beyond RHL's ability to pay as they became due. At the outset of its business, RHL intended to be, and reasonably believed that it would be, a successful company that generated a profit and a return on the investment of its members, including the multimillion dollar investment of the Corridor/SPB

15

parties. Although RHL's expectations soon proved too optimistic, RHL's belief was reasonable at its inception because ROHI had profitably operated the same business for decades.

At the date of the 2009 ROHI Payment, the assets of RHL, valued either on a going concern or orderly liquidation basis, were greater than its debts. The price fixed in the arms-length Asset Purchase Agreement between ROHI and TM ($8.75 million) is strong evidence of the value of those assets.

The trustee suggests that the Corridor/SPB parties were motivated to pay too much for the assets, but the trustee did not offer sufficient evidence to sustain that theory.

Douglas D. Asay and his son, Douglas L. Asay, both testified that TM overpaid for the assets. I give this testimony little weight. Their opinion is based primarily on their view that the trucks and equipment were not well maintained and not in good condition. The Asays' assessment of the equipment is reliable based on their extensive experience with the

16

operational aspects of the waste hauling business. But they have no

experience or expertise in financial matters, so their valuation of the other

assets, such as customer contracts and relationships, is less reliable.

I find that, when RHL made the 2009 ROHI payment, its assets (at a

going concern or liquidation value) were worth more than its debts.[3]

## B.    The KNG Asset Purchase

The KNG Group, LLC ("KNG"), is a Hawaii limited liability

company that was engaged in the waste collection and disposal business.

Pursuant to an Asset Purchase Agreement, to which RHL was not a

party, dated August 13, 2010, TM acquired the assets of KNG for a total

purchase price of $6.3 million. TM contributed the purchased assets to RHL

as a capital contribution.

---

[3] Technically, the assets covered by Union Bank's lien should not be counted as assets, and the secured debt owed to Union Bank should be excluded. See n. 2 supra. But this doesn't change the result. Either way, RHL had net equity of about $1.5 million.

Part of the purchase price was paid in the form of a promissory note in the amount of $1.5 million made by TM in favor of KNG. RHL guaranteed the note (the "KNG Guaranty") and pledged its equipment as collateral for the note. To pay part of the remaining purchase price, the Corridor/SPB parties contributed about $2.3 million in cash.

### 1. *Intentional Fraud*

The trustee did not prove, by clear and convincing evidence, that RHL incurred its obligations under the KNG Guaranty with the intent to hinder, delay, or defraud its creditors. RHL executed the KNG Guaranty as part of an integrated set of transactions in which it acquired the assets of KNG and in which TM's and RHL's sponsors, the Corridor/SPB entities, invested about $2.3 million in cash. At that time, RHL intended to generate a profit, which requires paying its creditors as their claims became due, so RHL's ultimate owners could receive a return on their investment.

18

### 2. *Constructive Fraud*

RHL received value -- the KNG assets -- in return for the KNG Guaranty. It is true that TM was the buyer under the KNG asset purchase agreement and that it contributed the assets to RHL as a capital contribution. But the only reasonable inference from the circumstances of the transaction is that each step of the transaction was dependent on the others, and that, but for the KNG Guaranty, KNG would not have agreed to sell the assets at all and RHL never would have received them. KNG had a good reason to insist that RHL guaranty the obligation to pay for the assets, because RHL ended up with the assets and was the only company in the TM family with operating income.

At the time of the KNG acquisition, the fair value of the KNG assets that RHL received was at least $1.5 million (the principal amount of the note to which the KNG Guaranty applied). Therefore, RHL received reasonably equivalent value in exchange for the KNG Guaranty.

19

### C.    RHL's Financial Struggles

From shortly after its commencement of operations in 2009 until it filed a bankruptcy petition in December 2016, RHL was in financial trouble. RHL never met any of its financial projections and never generated a profit from its operations.

In 2010, at the time of the KNG acquisition, RHL and TM had trouble obtaining financing. The principals of the Corridor/SPB entities had hoped to obtain an additional $2 million loan from Union Bank to finance the KNG acquisition. But Union Bank refused to do so because of RHL's defaults, missed projections, and losses. Therefore, the Corridor/SPB parties were forced to invest $2.3 million to complete the KNG acquisition. By December 2011, Union Bank declared covenant defaults under its loan and demanded that RHL find a new source of financing.

By 2011 and 2012, RHL was generally not paying its debts as they became due. RHL consistently struggled to pay its debts on time, often "stretching" accounts payable beyond their due dates. RHL's debt to the

City for tipping fees, which was its largest single trade debt, steadily grew (except for a short period in 2012). In mid-2011, RHL made late rent payments to ROHI on RHL's primary operating facility and some of its vendors put it on COD status. RHL suffered regular cash shortages and paid only those vendors that had to be paid to prevent the vendors from cutting RHL off. RHL did not pay the company's accountants on time. RHL also had difficulty keeping up its payments to Union Bank.

### D.    The 2012 ASB/Convergent Refinancing

In 2012, after one prospective replacement lender turned TM down, TM obtained refinancing loans from American Savings Bank ("ASB") and Convergent Capital Partners II, L.P. ("Convergent").

ASM lent $4.3 million and Convergent lent $2.5 million. TM and RHL were the borrowers under both loans. The loan proceeds were deposited in RHL's account.

21

### E.    The 2012 KNG Payment and the 2012 ROHI Payment

On June 26, 2012, RHL used part of the loan proceeds to pay

$1,525,127 to KNG in satisfaction of the KNG Guaranty (the "2012 KNG

Payment").

On June 27, 2012, RHL used part of the loan proceeds to pay

$752,448.96 to ROHI in satisfaction of the ROHI Note (the "2012 ROHI

Payment").

The 2012 KNG Payment and the 2012 ROHI Payment were transfers

of RHL's property. The loan proceeds belonged to RHL.

### 1.    *Intentional Fraud*

The trustee did not prove, by clear and convincing evidence, that

RHL made the 2012 KNG Payment or the 2012 ROHI Payment with the

intent to hinder, delay, or defraud its creditors. TM and RHL hoped that

the ASB/Convergent refinancing would eliminate the threat posed by

Union Bank's declarations of default and would provide time to stabilize

RHL's finances or sell it. (ASB and Convergent were only willing to

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 461   Filed 10/21/21   Page 22 of 35

provide the refinancing loan if the ROHI and KNG notes were paid off.)
TM's and RHL's hopes were unrealistic, but the trustee must prove that
RHL subjectively harbored an improper intent, and the evidence on that
point is not clear and convincing.

### 2. *Constructive Fraud*

In return for the 2012 KNG Payment, RHL received reasonably
equivalent value in the form of satisfaction of its debt under the KNG
Guaranty. RHL did not receive any value in return for the 2012 ROHI
Payment because RHL was not liable to ROHI and therefore did not satisfy
a debt that it owed to anyone.

By June 2012, when RHL made the 2012 KNG Payment and the 2012
ROHI Payment, RHL reasonably should have believed that RHL would
incur debts beyond its ability to pay as they became due. RHL had
consistently suffered operating losses since its inception and had often
failed to pay its vendors when its debts became due. Although RHL must
have hoped to become profitable, there is no evidence that RHL did

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 461   Filed  10/21/21   Page 23 of 35

anything, or had any plan, to eliminate its losses and achieve profitability. The ASB/Convergent refinancing staved off an imminent risk of default and foreclosure from Union Bank, but no reasonable person would have believed that the refinancing solved RHL's problems.

### E.    RHL's Insolvency in 2012

When RHL made the 2012 KNG Payment and the 2012 ROHI Payment, RHL was insolvent.

At that time, RHL was generally not paying its debts when due. Thus, ROHI and KNG bear the burden of proof on this issue, and they have not carried that burden.

Regardless of who bears the burden of proof, I find that RHL was insolvent at the relevant time. The analysis of Ross Murakami and the experts on whose opinions he relies (Gary Kuba, John Robert Webb, and Chris Ponsar) are convincing and accurate.

My finding of insolvency is based on a going concern valuation of RHL's assets in June 2012. RHL had been able to continue operating for

24

several years before June 2012. It continued to operate for over three years after June 2012 and was able to refinance its bank debt during that time. RHL was not financially healthy and it was able to cover its costs only by "stretching" its vendors and paying the vendors who needed to be paid, but it was not quite on its death bed.

I reject ROHI's criticisms of Mr. Murakami's opinions. The most important of those criticisms concern the value of the debt that TM owed to RHL and the value of RHL's customer contracts.

One asset category on RHL's balance sheet is labeled "due from related parties." That category consists of amounts that TM owed to RHL. I agree with Mr. Murakami that that asset category was worthless in 2012. TM had no assets other than RHL. Therefore, it had no ability to repay the amounts it owed to RHL, other than by (1) extracting funds from RHL and recycling them to RHL, (2) borrowing money from a third party, or (3) obtaining a capital contribution from its members or others. None of these options was available. (1) RHL had no spare cash and could not

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 461   Filed  10/21/21   Page 25 of 35

"upstream" any money to TM. Even if RHL could have afforded such a transfer, recycling RHL's money in this fashion would not have produced a net benefit to RHL. (2) By June 2012 (if not earlier), TM could not borrow money on its own; to obtain the ASB and Corridor loans and to acquire the KNG assets, it had to use RHL's credit and assets as security. (3) There is no reason to believe that TM could have obtained a capital contribution to repay its debt to RHL. The Corridor and SPB parties did invest money funds to pay for the ROHI and the KNG assets, but they never invested anything to reduce TM's debt to RHL or to support RHL's operations. Indeed, in 2016, when an infusion of about $1 million would have forestalled RHL's bankruptcy (*see* section II.F below), neither TM nor the Corridor/SPB parties nor anyone else stepped up to provide the funds.

ROHI's expert opined that TM's debt to RHL should be valued at its face amount in 2012 because RHL's bankruptcy trustee sued TM and the Corridor/SPB parties in 2019 and achieved a settlement of $1.7 million in 2021. I find this testimony unpersuasive because it ignores at least three

key facts. First, it ignores the significant attorneys' fees that the trustee incurred to achieve the settlement. Second, it ignores that the settlement occurred in 2021, while this analysis concerns RHL's financial condition nine years earlier, in 2012. It is absurd to say that a debt that was not repaid for nine years, and was only repaid (if at all) after years of hard-fought litigation, was worth its face amount in 2012. Third, it falsely assumes that the recovery was attributable to TM's account payable to RHL. In fact, the trustee did not sue TM on the account payable, but rather for transfer avoidance, breach of fiduciary duty, and other wrongs, and he also sued the Corridor/SPB parties who were not liable on the TM account payable.

Therefore, the fair value of TM's debt to RHL in June 2012 was zero.

ROHI also argues that, contrary to the opinion of Mr. Kuba, RHL's "goodwill" and "intangible assets" had substantial value in June 2012. Mr. Kuba valued these assets at zero. Specifically, ROHI argues that the customer contracts included in the goodwill category had value in June 2012 because, a few years earlier, RHL bought those contracts from ROHI

27

and KNG for substantial sums and, a few years later, the bankruptcy trustee sold RHL's assets, including its customer contracts, for a significant price. I do not find these comparisons persuasive.

It is not reasonable to say that the contracts had value in 2012 simply because TM agreed to pay good money for them in 2009 and 2010. The value of an asset depends on whether it can be put to profitable use. RHL was never able to make a profit. This track record shows that, by 2012, the value of the contracts bore little relation to what TM paid for them in 2009 and 2010.

The sale of the assets in 2016 is an apt comparison, but it cuts against ROHI. The base purchase price fixed in December 2016 was $5 million. This was an arms-length transaction so the price reflects the fair value of the assets at that time. In June 2012, RHL's total liabilities were $10.115 million. Therefore, RHL was solvent in June 2012 only if its assets were worth more than $10.115 million—in other words, if they were worth more than twice as much in June 2012 as they were in December 2016. It is not remotely

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 461   Filed  10/21/21   Page 28 of 35

plausible that RHL's assets lost half of their value during that period, especially considering that RHL's financial condition was already bad in 2012.

I find that, in June 2012, RHL's liabilities were about $10 million. Based on the evidence, I have no doubt that RHL's assets, tangible and intangible, had a going concern value significantly less than $10 million in June 2012 and that RHL was insolvent on that date.

### F.    2017 Asset Sale

By 2014, RHL's sponsors decided to divest themselves of RHL.

In April 2014, TM retained a financial advisor to assist with a possible sale of TM. In June 2014, TM retained a consultant to serve as TM's interim chief operating officer to prepare TM for sale within eighteen months.

RHL's situation became even more desperate in the spring of 2016. Until then, the City and County of Honolulu allowed refuse haulers to pay tipping fees sixty days after the date of an invoice. In the spring of 2016, the sixty-day period was shortened to thirty days. This meant that RHL needed

29

to pay one month's tipping fees, or about $1 million, immediately or else RHL would be locked out of the landfill. RHL did not have sufficient cash and the Corridor/SPB parties did not contribute any more money.

Therefore, RHL worked with ASB and agreed to sell its assets to West Oahu Aggregates for a base purchase price of $5 million. On December 6, 2016, RHL filed a chapter 11 bankruptcy petition and a motion to approve the sale. The court entered an order approving the sale on January 19, 2017.

On December 9, 2016, RHL owed money to the Internal Revenue Service, the State of Hawaii Department of Taxation, and the City & County of Honolulu.

## III.   CONCLUSIONS OF LAW

The Internal Revenue Service, the State of Hawaii Department of Taxation, and the City & County of Honolulu each holds an allowed claim against the estate. The Internal Revenue Service, the State of Hawaii Department of Taxation, and the City & County of Honolulu could assert the claims under HUFTA that the trustee has asserted in this adversary

30

proceeding. The Internal Revenue Service could also assert the claims under FDCPA that the trustee has asserted in this adversary proceeding. Under section 544(b), the trustee may assert those claims.

## A. Intentional Fraud

The trustee failed to prove, by clear and convincing evidence, that RHL made any of the challenged transfers with the intent to hinder, delay, or defraud its creditors. Therefore, the defendants are entitled to judgment on all claims resting on the common law of fraudulent conveyances (Counts 5, 21, 25, and 29), and Haw. Rev. Stat. § 651C-4(a)(1) and FDCPA section 3304(b)(1)(A) (Counts 6, 22, 26, and 30).

## B. Constructive Fraud

The trustee proved that RHL did not receive a reasonably equivalent value in exchange for the 2009 ROHI payments. But the trustee did not prove that, at that time, RHL was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction, or RHL intended to incur,

31

or believed or reasonably should have believed that RHL would incur, debts beyond RHL's ability to pay as they became due. Therefore, ROHI is entitled to judgment on the claims to avoid and recover the 2009 ROHI Payment under Haw. Rev. Stat. § 651C-4(a)(2) and FDCPA section 3304(b)(1)(B) (Count 7).

Similarly, the trustee did not prove that RHL was insolvent when it made the 2009 ROHI Payment. Therefore, ROHI is entitled to judgment on claims to avoid and recover the 2009 ROHI Payment under Haw. Rev. Stat. § 651C-5(a) (Count 8).

The trustee proved that RHL did not receive reasonably equivalent value in return for the 2012 ROHI Payment and that RHL reasonably should have believed that RHL would incur debts beyond its ability to pay as they became due. The trustee also proved that RHL was insolvent at that time. The trustee is entitled to judgment against ROHI avoiding the 2012 ROHI Payment under Haw. Rev. Stat. § 651C-4(a)(2) and FDCPA section

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 461   Filed  10/21/21   Page 32 of 35

3304(b)(1)(B) (Count 23), and under Haw. Rev. Stat. § 651C-5(a) and FDCPA section 3304(a)(1) (Count 24).

RHL received reasonably equivalent value, in the form of the assets that RHL acquired from KNG (via TM), in exchange for the KNG Guaranty. KNG is therefore entitled to judgment on the claims seeking avoidance of the KNG Guaranty (Counts 27 and 28).

RHL received reasonably equivalent value, in the form of satisfaction of its obligations under the KNG Guaranty, in exchange for the 2012 KNG Payment. Therefore, KNG is entitled to judgment on the trustee's claims to avoid the 2012 KNG Payment (Counts 31 and 32).

## C.    Prejudgment Interest

The court has discretion to grant prejudgment interest under state law on the fraudulent transfers from the date each transfer was made. *Johnson v. Neilson (In re Slatkin),* 525 F.3d 805, 820 (9th Cir.2008); *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.),* 916 F.2d 528, 541–42 (9th Cir.1990).

33

Hawaii law authorizes prejudgment interest, Haw. Rev. Stat. § 636-16, "to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *Kalawaia v. AIG Haw. Ins. Co.*, 90 Haw. 167, 172, (1999); *see also Molinar v. Schweizer*, 95 Haw. 331, 335 (2001) (stating that "prejudgment interest compensates for the inevitable litigation delay in being reimbursed for damages incurred").

Hawaii state law also sets the interest rate. *See Hayes*, 916 F.2d at 541 ("State law regarding prejudgment interest is applicable via 11 U.S.C. § 544(b)."); *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 818 n. 4 (9th Cir. 1994). The statutory rate is ten percent per annum. Haw. Rev. Stat. § 478-3.

The trustee should recover pre-judgment interest at the Hawaii rate of 10 percent per annum, from the date on which 2012 ROHI Payment was made.

## IV.  JUDGMENT

Judgment shall enter (a) in favor of the trustee and against ROHI in the amount of $752,448.96 plus interest at ten percent per annum from June 27, 2012, to the date of judgment, and postjudgment interest at the applicable federal rate and (b) in favor of the defendants on all other claims. Counsel for the trustee shall prepare and circulate a proposed form of final judgment.

**END OF FINDINGS OF FACT AND CONCLUSION OF LAW**

U.S. Bankruptcy Court - Hawaii   #18-90035   Dkt # 461   Filed  10/21/21   Page 35 of 35